# EXHIBIT "A"

# SUMMONS
## (CITACION JUDICIAL)

**SUM-100**

FOR COURT USE ONLY
(SOLO PARA USO DE LA CORTE)

ENDORSED
FILED
ALAMEDA COUNTY

MAR 0 1 2011

CLERK OF THE SUPERIOR COURT
By       H. Lowell
                          Deputy

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
E*Trade Securities LLC; Pacific Investment Management Company LLC;

and Does 1-10, inclusive

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
William Bridge, Jr. and Michele Profant

NOTICE! You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association. NOTE: The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.

Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.

Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.

CASE NUMBER *(Número del Caso):*
RG11563509

The name and address of the court is:
*(El nombre y dirección de la corte es):*
Renee C. Davidson Alameda County Court
1225 Fallon Street
Oakland, CA  94612

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Daniel T. Bernhard                    Freeland Cooper & Foreman LLP
150 Spear Street, Suite 1800          415-541-0200
San Francisco, CA  94105

| DATE: FEB 10 2011 | Clerk, by | | Deputy |
|---|---|---|---|
| *(Fecha)* Pat S. Sweeten | *(Secretario)* H. Lowell | | *(Adjunto)* |

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citación use el formulario Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*
3. ☑ on behalf of *(specify):* E*Trade Securities LLC
   under: ☐ CCP 416.10 (corporation)          ☐ CCP 416.60 (minor)
          ☐ CCP 416.20 (defunct corporation)  ☐ CCP 416.70 (conservatee)
          ☐ CCP 416.40 (association or partnership)  ☐ CCP 416.90 (authorized person)
          ☑ other *(specify):* Limited Liability Company
4. ☐ by personal delivery on *(date):*

**SUMMONS**

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]

Code of Civil Procedure §§ 412.20, 465
www.courtinfo.ca.gov

William Bridge, Jr. and Michele Pr

<table>
<tr><td>1</td><td>

Daniel T. Bernhard  (CSB #104229)
FREELAND COOPER & FOREMAN LLP
150 Spear Street, Suite 1800
San Francisco, California 94105
Telephone: (415) 541-0200
Facsimile: (415) 495-4332
Email: bernhard@freelandlaw.com

Attorneys for Plaintiffs
William Bridge, Jr. and Michele Profant

</td><td>

**ENDORSED**
**FILED**
**ALAMEDA COUNTY**

MAR 0 1 2011

CLERK OF THE SUPERIOR COURT
By: H. Lovett
                              Deputy

</td></tr>
</table>

SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF ALAMEDA

| WILLIAM BRIDGE, JR. and MICHELE PROFANT,<br><br>Plaintiffs,<br><br>v.<br><br>E*TRADE SECURITIES LLC; PACIFIC INVESTMENT MANAGEMENT COMPANY LLC; and DOES 1-10, inclusive,<br><br>Defendants. | CASE NO.: RG11563509<br><br>**COMPLAINT FOR DAMAGES AND RESCISSION:**<br><br>1. Negligent Misrepresentation<br>2. Fraudulent Misrepresentation<br>3. Fraud<br>4. Breach of Contract<br>5. Rescission — Civ. Code Sec. 1689<br><br>**JURY TRIAL DEMANDED** |
|---|---|

For their Complaint herein, Plaintiffs William Bridge, Jr. and Michele Profant ("Plaintiffs"), allege as follows:

## PARTIES

1.      Plaintiffs are individuals who have resided at all relevant times in the City of Alameda, County of Alameda, California. They are now and have been at all relevant times the owners, as joint tenants, of an E*Trade brokerage account that was opened on their behalf by an employ, and has been at all times maintained by Plaintiffs at their residence in Alameda County. Plaintiffs are not employed in the financial industry and never have been, and they are not sophisticated investors.

2.      Defendant E*Trade Securities, LLC ("E*Trade") is a retail securities broker and investment firm, and currently operates as a nationwide online securities retail broker, among other

*Vertical left margin:* FREELAND COOPER & FOREMAN LLP  150 Spear Street, Suite 1800  San Francisco, California 94105

1

{00147692-1}

things. It transacts business in California and in Alameda County online through its retail brokerage activities and otherwise. It is and has been a member of FINRA and the NASD, and is governed by their rules, regulations and procedures, as well as by all applicable state and federal laws, and other regulations governing the securities industry.

3. Pacific Investment Management Company, LLC ("PIMCO") is commonly known as PIMCO. It is a securities brokerage and global financial and investment firm with offices worldwide. PIMCO is wholly owned by Allianz Global Investors, AG. PIMCO's principal place of business is in Newport Beach, California. PIMCO solicits and transacts business in the County of Alameda, California, and elsewhere.

4. Defendant Does 1-10, inclusive, are sued herein under fictitious names because their true names and capacities are unknown to Plaintiffs. When their true names and capacities are ascertained, Plaintiffs will amend this Complaint to allege them by inserting that information herein. Plaintiffs are informed and believe, and thereon allege, that each of the fictitiously named Defendants is responsible in some manner for the occurrences alleged herein, and that each is responsible in some manner for Plaintiffs damages, and proximately caused such.

5. Unless otherwise alleged, Plaintiffs are informed and believe and thereon allege that each Defendant was, at all times relevant, the agent, employee or representative of each of the other Defendants, and acted within the course and scope of that relationship.

## JURISDICTION AND VENUE

6. This Court has jurisdiction over these claims and these parties. The acts and conduct complained of herein, including the solicitation of Plaintiffs investment and the actual investment itself, all occurred in Alameda County. Defendants E*Trade and PIMCO both actively solicit and transact business in Alameda County, and throughout the State of California, through use of the U.S. Mail, the internet and telephone.

7. Venue is proper in this Court pursuant to section 395.5 of the Code of Civil Procedure. The investment made by Plaintiffs, and other obligations and duties owed by Defendants to Plaintiffs, were to be performed, and were performed, in Alameda County.

FREELAND COOPER & FOREMAN LLP
150 Spear Street, Suite 1800
San Francisco, California 94105

2

{00147692-1}

FREELAND COOPER & FOREMAN LLP
150 Spear Street, Suite 1800
San Francisco, California 94105

# FACTUAL ALLEGATIONS

8. "Auction Rate Securities" ("ARS") are long term debt or equity instruments that include municipal auction rate bonds and auction rate preferred shares ("ARPS") of closed-end municipal funds. ARS feature a variable interest rate that resets through a periodic bidding process generally known as a "Dutch auction."

9. ARS allowed issuers to obtain long-term financing at lower, short-term rates. The purchasers of ARS were willing to accept the lower rates because the frequent auctions increased the liquidity of the ARS. Financial firms and other issuers of ARS widely marketed ARS to investors as a cash management tool, especially useful to corporate entities. They were viewed and treated as equivalent to money market funds but typically offered a higher rate of return with equivalent liquidity. ARS were first introduced to the market in the mid-1980s, and originally they were available only to institutional and corporate investors, usually with a minimum purchase of $250,000 or more.

10. In a typical Dutch auction with ARS a bidder stated the amount of ARS the bidder was willing to purchase, and the minimum interest rate the bidder was willing to accept. All bids were then ranked, and the lowest interest rate required to sell all of a particular ARS product was known as the "clearing rate." Setting a clearing rate accomplished two things: (a) it set the interest rate that will be paid by the ARS issuer to the new owners until the next auction; and (b) it identified the successful bidders in the auction. Prior to an auction owners of ARS had three choices: they could offer their ARS for sale in the auction; they could choose to hold their existing position in the ARS; or they could decide to "hold at rate", i.e., they would retain their ARS if the new clearing rate was at least as high as the prior rate. Any interested buyer or investor, including but not limited to existing ARS owners, could submit bids to purchase. In a successful auction, the winning bidders became the new owners of the ARS sold.

11. When there were insufficient bids to purchase all of the ARS offered for sale at the auction, the auction failed. When an auction failed investors generally had no choice but to hold their illiquid investments until (a) the next successful auction; (b) the issuer redeemed the ARS; or (c) the investor elected to sell its ARS in a secondary market (typically at a much reduced price below par).

3

{00147692-1}

12. Issuers of ARS typically retained a financial firm to act a broker-dealer at the auction for that issuer's ARS, and investors placed bids with that broker-dealer for that issuer's ARS. The auction process for ARS deviated from a traditional Dutch auction to the extent that ARS broker-dealers and even issuers participated actively in the auction process by placing "support" bids during an auction. Intervention and support by broker dealers was essential to maintaining the success and coherence of ARS auctions. The support bids guaranteed that a market was maintained for the sale and purchase of ARS, and ARS with a low maximum rate were entirely dependent on such support bids to maintain their liquidity. Broker-dealers and issuers had no ongoing obligation to place support bids, or otherwise to intervene in auctions to insure their success, however.

13. Institutional and corporate investors in the ARS auction process, by virtue of their volume and duration of activity, were commonly aware of the broker-dealer practice of intervening in the auctions through support bids to insure liquidity. As ARS auctions became better known and more popular, broker-dealers and issuers began to market ARS to individuals. By the early 2000's, the minimum investment required for ARS had dropped to $25,000. Individuals were not typically knowledgeable about the ARS auction process, and were not informed of the practice of intervention and support bids that was standard in the auctions, and that rendered them an artificial market.

14. On May 31, 2006 the Securities and Exchange Commission issued an Order Instituting Administrative and Cease and Desist Proceedings, Making Findings, and Imposing Remedial Sanctions and a Cease and Desist Order Pursuant to Section 8A of the Securities Act of 1933, and Section 15(b) of the Securities Exchange Act of 1934. See, *In the Matter of Bear Stearns, et al.*, Securities Act of 1933 Release no. 8684, Securities Exchange Act of 1934 Release No. 53888, Administrative Proceeding File No. 3-12310 (the "Broker-Dealer Order"). In brief, the SEC found that the failure of broker-dealers and issuers to disclose the details of intervention and support bids in the ARS auctions violated applicable securities laws and regulations and was unlawful. The SEC also found that this unlawful conduct directly affected the clearing rates of the ARS. The SEC directed broker-dealers to disclose fully their bidding practices to investors and the market at large to mitigate and ameliorate the manipulative effect of such practices on the market.

FREELAND COOPER & FOREMAN LLP
150 Spear Street, Suite 1800
San Francisco, California 94105

4

{00147692-1}

15.     The SEC's action put on notice the entire ARS industry, composed of investment banks and other broker-dealer and issuers, that the industry's common practice of placing support bids artificially affected the clearing rates and thus was manipulative and deceptive. Such undisclosed intervention in the ARS auctions masked the real volatility and uncertainty of the ARS market. The failure to disclose the standard practice of support bids deprived investors of essential material information required by them to make informed and objective calculations of risk and other investment decisions.

16.     Plaintiff William Bridge, Jr. ("Bridge") has been an employee of Oracle Corporation for most of the past 20 years. In connection with Bridge's Oracle employment, and as part of his compensation, Bridge was awarded Oracle options over the time of his employment. In order to facilitate the handling and exercise of these options, Oracle established a brokerage account for Plaintiffs at E*Trade, account no. 6048-0792. Beginning when the E*Trade account was established, and continuously thereafter at all times relevant hereto, Plaintiffs received monthly account statements addressed to their home address in Alameda, California.

17.     Bridge left employment with Oracle Corporation in 2007, and thus had to exercise all of his vested options at that time, which resulted in a significant tax liability to Plaintiffs. In anticipation of paying this tax liability, Plaintiffs wanted and needed to have funds available to them from their E*Trade account.

18.     At all times relevant hereto Carl Hartmann was Plaintiffs' E*Trade account representative. Over a period of years Bridge had several discussions with Hartmann about investments. When Bridge exercised his Oracle options he discussed his tax liability with Hartmann, who arranged a telephone conference with Plaintiffs and another E*Trade employee named, upon information and belief, Robert Trent. Hartmann and Trent conducted a telephone conference call with Plaintiffs at their home in Alameda, California. During the course of this telephone conference call, Trent advised Plaintiffs to invest in ARS, which Plaintiffs had never heard of before. This telephone discussion was followed with additional communications between Plaintiffs and Hartmann, during the course of which Bridge again explained his need to have cash available to pay an anticipated tax obligation.

FREELAND COOPER & FORMAN LLP
150 Spear Street, Suite 1800
San Francisco, California 94105

5

(00147692-1)

19. In response to Plaintiffs' stated goals for absolute liquidity, Hartmann also recommended to Plaintiffs that they invest in ARS. He assured Plaintiffs that ARS had the essential qualities that Plaintiffs required and needed in any investment: (1) a higher rate of interest that was tax free in California; (2) safety in that such securities were backed by established and stable companies; and (3) immediate liquidity because ARS auctions occurred every week.

20. Based on the representations made to Plaintiffs by E*Trade, including but not limited to Hartmann, Plaintiffs agreed to purchase ARS. Neither Hartmann nor anyone else at E*Trade ever provided Plaintiffs at any time with a prospectus for any ARS investment, or with any disclosure documents or other written information about ARS. Plaintiffs relied exclusively and fully at all times on the representations and information provided to them by Hartmann and other E*Trade personnel in making their investment in ARS. Plaintiffs were unaware of the precise type of ARS investment product that E*Trade was recommending until after it was actually purchased.

21. Plaintiffs discovered the actual ARS investment product that E*Trade acquired for them for the first time when they received their regular E*Trade monthly account statement for March, 2007: the PIMCO California Municipal Income Fund Auction Preferred Shares, Series A, bearing CUSIP no. 72200N205.

22. In early 2008 the ARS auctions began to suffer a series of auction failures. Broker dealers and issuers ceased to participate in and manipulate the auctions by placing strategic support bids, and consequently many ARS auctions failed, and the ARS market quickly became "frozen" as the market for ARS disappeared. ARS held by investors, as well as by issuers and others, became completely illiquid as the primary market failed and any secondary markets vanished. At no time in 2008 did any Defendant communicate any information to Plaintiffs about the problems in the ARS market, the affect on Plaintiffs' PIMCO investment, or otherwise alert Plaintiffs or try to explain to them the impact on their investment resulting from the collapse of the ARS market.

23. Because Plaintiffs' anticipated tax obligation did not in fact arise in 2008 as they had expected, Plaintiffs had no immediate need for the funds in their PIMCO investment. Plaintiffs continued to receive monthly statements for their E*Trade account, and those gave no notice or indication of the collapse of the ARS market. Because no one ever informed Plaintiffs of the market

FREELAND COOPER & FOREMAN LLP
150 Spear Street, Suite 1800
San Francisco, California 94105

6

{00147692-1}

collapse and the ensuing illiquidity of their ARS investment, Plaintiffs were completely unaware that their investment had failed. Plaintiffs discovered that there was a problem with their PIMCO investment for the first time in July, 2009 when Plaintiffs went online to investigate selling the investment to raise funds for a planned home remodel.

24.    When Plantiffs could not make sense of the information on the PIMCO website concerning their investment, they contacted Hartmann at E*Trade in July, 2009. Hartmann then arranged a conference call with Plaintiffs and an E*Trade "expert" on the ARS market. In the conference call the E*Trade expert discussed the ARS market and its collapse. He counseled that Plaintiffs invested monies might be available in the future, but at that time the funds were "frozen" and completely illiquid.

25.    Hartmann and the expert further explained that E*Trade and PIMCO had redeemed the ARS investments of many clients. Together they promised Plaintiffs that their PIMCO investment could also be redeemed, such that Plaintiffs would receive a return of the full amount of their investment. They explained that the PIMCO investment would simply "disappear" from Plaintiffs' regular E*Trade account statement, and that Plaintiffs' full $400,000 investment would be credited to their account.

26.    Plaintiffs agreed to E*Trade's proposal, and believed that they had reached an agreement with E*Trade and had a resolution for their PIMCO investment failure with E*Trade. In fact, however, E*Trade never performed this redemption and instead E*Trade has steadfastly refused and failed to honor its promise to Plaintiffs.

27.    Defendant E*Trade is a broker and is required to observe various standards of conduct in its dealings with its customers. These standards are found in the Securities Exchange Act of 1934, and in rules imposed by the Securities and Exchange Commission (the "SEC") itself and through the authority of the SEC as granted to the National Association of Securities Dealers (the "NASD") and its successor organization, the Financial Industry Regulatory Authority ("FINRA").

28.    Among other obligations and requirements, E*Trade is required to supervise its agents, investment adviser representatives, and other individuals conducting securities business on its behalf pursuant to FINRA Rule 2010, in addition to 15 USC 78o(b)(4)(E) and NASD Rule 3010.

7

{00147692-1}

FREELAND COOPER & FOREMAN LLP
150 Spear Street, Suite 1800
San Francisco, California 94105

29.     Defendant E\*Trade is obligated, under FINRA Rule 2090 and prior NASD rules, including NASD Rule 2310, to "know thy customer" and to determine the suitability of any investment it recommends to customers based on a reasonable inquiry and other relevant information.

30.     Moreover, in accordance with applicable FINRA Rules 2010 and 2020 and other rules, it is unlawful for a person, in connection with the offer, sale, or purchase of a security, directly or indirectly: (1) to employ a device, scheme, or artifice to defraud; (2) to make an untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (3) to engage in an act, practice, or course of business that operates or would operate as a fraud or deceit upon another person. See also, 15 USC 78o(c)(2)(A) and NASD Rule 2210.

31.     At all times relevant hereto, Defendant PIMCO was a marketer, promoter, seller and administrator of closed-end municipal funds and similar investment products composed of or containing ARS, including ARPS. Defendant PIMCO has managed and offered various ARS products to the broad market since at least 2000. PIMCO was on notice of the SEC's 2006 Broker-Dealer Order, and further knew and understood, or should have reasonably known and understood, that the SEC had determined that full and complete timely disclosure of ARS auction practices to investors and purchasers of ARS products, including the common practice of placing support bids to insure successful auctions and to maintain liquidity, was absolutely required.

32.     PIMCO failed to conform or guide its conduct and business in a manner consistent with the SEC's findings and requirements for complete disclosure of the ARS auction process. As a substantial participant in the creation, marketing and sales of mutual funds, including numerous funds which are based on or contain ARS products, PIMCO had notice of, and was and is governed by the SEC's directions and regulations, including the directive in the Broker-Dealer Order requiring participants in the ARS industry to make full and complete disclosure concerning the ARS auction process. PIMCO failed to make such adequate and required disclosures, and failed also to take any actions to insure that its agents and brokers, including E\*Trade here, followed and complied with the disclosure requirements for such investments. PIMCO's failure to ensure the full disclosure of critical

8

COMPLAINT FOR DAMAGES AND RESCISSION

{00147692-1}

FREELAND COOPER & FOREMAN LLP
150 Spear Street, Suite 1800
San Francisco, California 94105

Exhibit A, Page 12

1 | and material information, as required by the SEC and other regulations and applicable law, exposed

2 | Plaintiffs here to the complete loss of their investment that Plaintiffs have suffered.

3 |     33.    Beginning in late 2009 and continuing thereafter, the SEC entered into numerous

4 | settlements with many of the ARS issuer or broker-dealer financial institutions that comprised the

5 | ARS investment industry. The focus of those settlements was redemption of ARS investments made

6 | by individuals and non-institutional investors. Upon information and belief, it was in light of these

7 | widespread settlements within the ARS industry that E*Trade promised Plaintiffs in July, 2009 that

8 | their PIMCO ARS investment would be redeemed, and that Plaintiffs would be made whole.

9 |     34.    E*Trade and PIMCO have been and are now, the target of ongoing investigations or

10 | legal proceedings involving their marketing and sale of ARS investment products. As recently as

11 | August, 2010 the Securities Division of the Office of the Attorney General of the State of South

12 | Carolina initiated an action against E*Trade for, *inter alia*, selling ARS investments to unsuitable

13 | investors. See, *In the Matter of: E*Trade Securities, LLC, Respondent*, File Nos. 09085, 10009,

14 | Administrative Proceeding Before The Securities Commissioner of South Carolina.

**FIRST CAUSE OF ACTION**
**(NEGLIGENT MISREPRESENTATION)**
(E*Trade and Does 1-5)

17 |     35.    Plaintiffs reallege, as though set forth in full, the allegations contained in paragraphs 1-

18 | 34 herein.

19 |     36.    Plaintiffs were not informed by E*Trade in advance about what ARS product E*Trade

20 | would purchase for Plaintiffs. Plaintiffs were never provided any information, including any

21 | prospectus or other disclosure information about their ARS investment prior to the time that the

22 | investment was made. No Defendant, nor anyone else, ever explained to Plaintiffs that ARS depended

23 | for their liquidity on a manipulated and artificial market, and that broker-dealers and other issuers had

24 | no obligation to make support bids in any auction, and could cease to do so at any time.

25 |     37.    Plaintiffs reasonably relied on E*Trade in making their investment, and as Plaintiffs'

26 | broker Defendants, and each of them, owed Plaintiffs a duty of care when it acted for Plaintiffs and

27 | provided investment advice to them. Defendants knew and expected that Plaintiffs would and did

28 | look to them for investment information, advice and guidance. The nature of the ARS auctions, the

9

{00147692-1}

FREELAND COOPER & FOREMAN LLP
150 Spear Street, Suite 1800
San Francisco, California 94105

1  vulnerability of such auctions to unforeseen and unpredictable events that would render the ARS

2  illiquid, was never explained to or understood by Plaintiffs.

3       38.    Defendants, and each of them, knew or should have known that Plaintiffs reasonably

4  would need and want information about the ARS auctions and investment, but Defendants omitted

5  and failed to disclose such material information to Plaintiffs. Instead, Defendants provided Plaintiffs

6  with misleading and inaccurate information about the stability of ARS, which misinformation

7  Defendants knew, or should have known, was false and incorrect.

8       39.    Plaintiffs relied on the misrepresentations and omissions made to them by Defendants,

9  and Defendants knew and intended that Plaintiffs would so rely. Plaintiffs' reliance was reasonable

10  and expected, as they looked to Defendants as their financial advisors, and Defendants at all times

11  held themselves out and offered themselves to Plaintiffs as such. As a direct result of Defendants'

12  acts and conduct, Plaintiffs have suffered injury and losses, as described herein.

### SECOND CAUSE OF ACTION
### (FRAUDULENT MISREPRESENTATION)
### (E*Trade and Does 1-5)

     40.    Plaintiffs reallege, as though set forth in full, the allegations contained in paragraphs 1-39 herein.

     41.    The misrepresentations and omissions made by Defendants, and each of them, were reckless, were made by Defendants knowing them to be untrue at the time, or with no reasonable basis to believe them to be true at the time they were made. Defendants' misrepresentations and omissions were, moreover, made with Defendants' intent and expectation that Plaintiffs would rely on them, and Plaintiffs did in fact reasonably rely on them.

     42.   As a direct consequence of relying and acting upon Defendants' misrepresentations and omissions, Plaintiffs suffered the injury and losses alleged herein.

### THIRD CAUSE OF ACTION
### (FRAUD)
### (E*Trade and Does 1-5)

     43.    Plaintiffs reallege, as though set forth in full, the allegations contained in paragraphs 1-42 herein.

10

{00147692-1}

FREELAND COOPER & FREEMAN LLP
150 Spear Street, Suite 1800
San Francisco, California 94105

44. Defendants, and each of them, knew that ARS were not a suitable investment for Plaintiffs based on Plaintiffs' stated goals and purposes. Among other things, Defendants, and each of them, knew that ARS were not a secure investment and risk free; knew that the market liquidity was completely a function of support bids and other market manipulation; knew that Plaintiffs did not understand or appreciate the market risks associated with the auctions; and knew, or had no reason to believe otherwise, that Plaintiffs were unaware of the manipulation in the ARS market that rendered that investment completely unsuitable for Plaintiffs' stated needs. Defendants failed and omitted to provide to Plaintiffs any disclosure materials or other information to apprise Plaintiffs of these and other actual risks of investing in ARS.

45. The misrepresentations and omissions by Defendants, and each of them, were intentional and made for the purpose of inducing Plaintiffs to rely on them, and to invest in ARS. Defendants, and each of them, knew that the representations were false at the time they were made, or that the material omissions rendered the information Plaintiffs had been given false and misleading. Defendants did nothing to correct these misrepresentations and omissions of material fact. Indeed, Defendants intended and sought to have Plaintiffs rely on them so that Plaintiffs would invest in ARS.

46. Plaintiffs did in fact rely on Defendants' misrepresentations and omissions, and invested in the PIMCO ARS based on such misrepresentations and omissions. Such reliance by Plaintiffs was both reasonable and easily foreseen by Defendants.

47. As a direct consequence of Defendants' intentional misrepresentations and omissions, Plaintiffs invested in the PIMCO ARS investment, lost the value of that investment, and have suffered damages in the amount of the investment, and for other losses Plaintiffs have sustained. In addition, Plaintiffs have been deprived the use of the funds that they were fraudulently induced to invest. Defendants' acts and conduct were malicious, oppressive and recklessly intended to damage Plaintiffs, and did in fact did damage Plaintiffs. Accordingly, Defendants are liable to Plaintiffs for punitive and exemplary damages, in an amount to punish and deter Defendants' conduct, as proved at trial.

///

///

///

FREELAND COOPER & FOREMAN LLP
150 Spear Street, Suite 1800
San Francisco, California 94105

11

COMPLAINT FOR DAMAGES AND RESCISSION

{00147692-1}

## FOURTH CAUSE OF ACTION
### (BREACH OF ORAL CONTRACT)
#### (E*Trade and Does 4-8)

48.     Plaintiffs reallege, as though set forth in full, the allegations contained in paragraphs 1-34 herein.

49.     When Plaintiffs first discovered the failure of their PIMCO ARS investment, in July, 2009, they contacted Hartmann and had specific discussions about the status of their investment.  At that time Hartman and other E*Trade personnel proposed to Plaintiffs and promised them that their investment could and would be redeemed by PIMCO, and that Plaintiffs would receive a full refund. Hartmann and other E*Trade personnel promised that the PIMCO ARS investment shares would be redeemed in full, that the investment would be deleted from Plaintiffs' account, and that Plaintiffs' account would be credited the full $400,000 value of the PIMCO ARS investment.

50.     Plaintiffs considered this offer and accepted it, as it was consistent with their overall investment goals and expectations, as well as with their immediate needs.  Plaintiffs took no other steps to recover their losses, based on these assurances from E*Trade.

51.     Despite Plaintiffs' acceptance of E*Trade's offer, and reliance thereon, no redemption or reimbursement for Plaintiffs was ever effected by E*Trade or any other entity.  Defendants have consistently refused and rejected Plaintiffs repeated demands that E*Trade honor its oral agreement with Plaintiffs.

52.     Plaintiffs, for their part, have performed all of the acts required by them as part of the consideration for their agreement with E*Trade.

## FIFTH CAUSE OF ACTION
### (RESCISSION)
#### (E*Trade, PIMCO, and Does 4-10)

53.     Plaintiffs reallege, as though set forth in full, the allegations contained in paragraphs 1-47 herein.

54.     The PIMCO ARS investment was misrepresented and falsified by Defendants to Plaintiffs.  In fact, the investment was not suitable for Plaintiffs regardless of what disclosures were made by Defendants, who in fact made no disclosures whatsoever to Plaintiffs about the PIMCO ARS

12

(00147692-1)

FREELAND COOPER & FOREMAN LLP
150 Spear Street, Suite 1800
San Francisco, California 94105

1   prior to the actual investment. Plaintiffs needed a highly liquid and secure investment, which need

2   they described to E*Trade repeatedly. Had Plaintiffs known the true facts about ARS and ARS

3   auctions and investment products, Plaintiffs would never have agreed to allow their funds to be

4   invested with PIMCO.

5       55.     Accordingly, Plaintiffs' PIMCO ARS investment should be rescinded, in accordance

6   with California Civil Code section 1689 (b) (1) and (2), and other applicable law. Defendants coerced

7   and misled Plaintiffs into the investment through fraud and misrepresentation. Moreover, there was a

8   complete failure of consideration for Plaintiffs' investment because Plaintiffs did not receive the

9   benefits of the investment that they were promised or reasonably expected, contrary to Defendants'

10  representations.

11

12      WHEREFORE, Plaintiffs pray for relief from Defendants as follows:

13      1.      That Plaintiffs recover money damages for the losses suffered as a consequence of

14  Defendants' tortious acts and conduct, according to proof at trial;

15      2.      For damages for Defendants' breach of contract with Plaintiffs, according to proof at

16  trial;

17      3.      For rescission of Plaintiffs' investment contract with Defendants, in the amount of

18  $400,000, plus recovery of costs and fees associated with Plaintiffs' investment, according to proof at

19  trial;

20      4.      For all consequential Plaintiffs have suffered, including but not limited to the costs and

21  fees they incurred and paid incident to their investment activities and their loss of use of the invested

22  monies;

23      5.      For punitive and exemplary damages in an amount according to proof at trial and

24  sufficient to deter Defendants' conduct;

25      6.      For prejudgment and post judgment interest in an amount according to proof at trial;

26      7.      For costs of suit herein; and

27

28  ///

FREELAND COOPER & FOREMAN LLP
150 Spear Street, Suite 1800
San Francisco, California 94105

13

{00147692-1}

8.    For such other and additional relief as the Court deems proper.

Dated: _____, 2011          FREELAND COOPER & FOREMAN LLP

                                    By: _____
                                        DANIEL T. BERNHARD
                                        Attorneys for Plaintiffs
                                        William Bridge, Jr. and Michele Profant

## JURY TRIAL DEMAND

Plaintiffs hereby demand a trial by jury on all causes of action subject to determination by a jury.

Dated: _____, 2011          FREELAND COOPER & FOREMAN LLP

                                    By: _____
                                        DANIEL T. BERNHARD
                                        Attorneys for Plaintiffs
                                        William Bridge, Jr. and Michele Profant

FREELAND COOPER & FOREMAN LLP
150 Spear Street, Suite 1800
San Francisco, California 94105

14

COMPLAINT FOR DAMAGES AND RESCISSION

{00147692-1}

CM-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State bar number, and address): | FOR COURT USE ONLY |
|---|---|
| Daniel T. Bernhard                                104229 | |
| Freeland Cooper & Foreman LLP | |
| 150 Spear Street, Suite 1800 | |
| San Francisco, CA 94105 | |
| TELEPHONE NO.: 415-541-0200    FAX NO.: 415-495-4332 | |

ATTORNEY FOR (Name): Plaintiffs

SUPERIOR COURT OF CALIFORNIA, COUNTY OF Alameda
STREET ADDRESS: 1225 Fallon Street
MAILING ADDRESS:
CITY AND ZIP CODE: Oakland, CA 94612
BRANCH NAME:

**ENDORSED**
**FILED**
**ALAMEDA COUNTY**

MAR 0 1 2011

CLERK OF THE SUPERIOR COURT
By H. Lovett
                    Deputy

CASE NAME: William Bridge & Michele Profant v. E*Trade Securities
LLC; Pacific Investment Management Co. LLC; & Does 1-10

| CIVIL CASE COVER SHEET | | Complex Case Designation | | CASE NUMBER: |
|---|---|---|---|---|
| [X] Unlimited (Amount demanded exceeds $25,000) | [ ] Limited (Amount demanded is $25,000 or less) | [ ] Counter | [ ] Joinder | RG 11 563509 |
| | | Filed with first appearance by defendant (Cal. Rules of Court, rule 3.402) | | JUDGE: |
| | | | | DEPT: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check one box below for the case type that best describes this case:

**Auto Tort**
- [ ] Auto (22)
- [ ] Uninsured motorist (46)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
- [ ] Asbestos (04)
- [ ] Product liability (24)
- [ ] Medical malpractice (45)
- [ ] Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
- [ ] Business tort/unfair business practice (07)
- [ ] Civil rights (08)
- [ ] Defamation (13)
- [ ] Fraud (16)
- [ ] Intellectual property (19)
- [ ] Professional negligence (25)
- [ ] Other non-PI/PD/WD tort (35)

**Employment**
- [ ] Wrongful termination (36)
- [ ] Other employment (15)

**Contract**
- [X] Breach of contract/warranty (06)
- [ ] Rule 3.740 collections (09)
- [ ] Other collections (09)
- [ ] Insurance coverage (18)
- [ ] Other contract (37)

**Real Property**
- [ ] Eminent domain/inverse condemnation (14)
- [ ] Wrongful eviction (33)
- [ ] Other real property (26)

**Unlawful Detainer**
- [ ] Commercial (31)
- [ ] Residential (32)
- [ ] Drugs (38)

**Judicial Review**
- [ ] Asset forfeiture (05)
- [ ] Petition re: arbitration award (11)
- [ ] Writ of mandate (02)
- [ ] Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400-3.403)**
- [ ] Antitrust/Trade regulation (03)
- [ ] Construction defect (10)
- [ ] Mass tort (40)
- [ ] Securities litigation (28)
- [ ] Environmental/Toxic tort (30)
- [ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
- [ ] Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
- [ ] RICO (27)
- [ ] Other complaint (not specified above) (42)

**Miscellaneous Civil Petition**
- [ ] Partnership and corporate governance (21)
- [ ] Other petition (not specified above) (43)

2. This case [ ] is [X] is not complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [ ] Large number of separately represented parties
   b. [ ] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. [ ] Substantial amount of documentary evidence
   d. [ ] Large number of witnesses
   e. [ ] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. [ ] Substantial postjudgment judicial supervision

3. Remedies sought (check all that apply): a. [X] monetary b. [X] nonmonetary; declaratory or injunctive relief c. [ ] punitive
4. Number of causes of action (specify): 5
5. This case [ ] is [X] is not a class action suit.
6. If there are any known related cases, file and serve a notice of related case. (You may use form CM-015.)

Date: March 1, 2011

Daniel T. Bernhard
(TYPE OR PRINT NAME)                    (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

| Form Adopted for Mandatory Use Judicial Council of California CM-010 [Rev. July 1, 2007] | **CIVIL CASE COVER SHEET** | Cal. Rules of Court, rules 2.30, 3.220, 3.400-3.403, 3.740; Cal. Standards of Judicial Administration, std. 3.10 www.courtinfo.ca.gov |
|---|---|---|

William Bridge, Jr. and Michele

CM-010

## INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET

To Plaintiffs and Others Filing First Papers. If you are filing a first paper (for example, a complaint) in a civil case, you must complete and file, along with your first paper, the *Civil Case Cover Sheet* contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check one box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the primary cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

To Parties in Rule 3.740 Collections Cases. A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

To Parties in Complex Cases. In complex cases only, parties must also use the *Civil Case Cover Sheet* to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

### CASE TYPES AND EXAMPLES

**Auto Tort**
Auto (22)–Personal Injury/Property Damage/Wrongful Death
Uninsured Motorist (46) *(if the case involves an uninsured motorist claim subject to arbitration, check this item instead of Auto)*

**Other PI/PD/WD (Personal Injury/ Property Damage/Wrongful Death) Tort**
Asbestos (04)
  Asbestos Property Damage
  Asbestos Personal Injury/
    Wrongful Death
Product Liability *(not asbestos or toxic/environmental)* (24)
Medical Malpractice (45)
  Medical Malpractice–
    Physicians & Surgeons
  Other Professional Health Care
    Malpractice
Other PI/PD/WD (23)
  Premises Liability (e.g., slip and fall)
  Intentional Bodily Injury/PD/WD (e.g., assault, vandalism)
  Intentional Infliction of
    Emotional Distress
  Negligent Infliction of
    Emotional Distress
  Other PI/PD/WD

**Non-PI/PD/WD (Other) Tort**
Business Tort/Unfair Business
  Practice (07)
Civil Rights (e.g., discrimination, false arrest) *(not civil harassment)* (08)
Defamation (e.g., slander, libel) (13)
Fraud (16)
Intellectual Property (19)
Professional Negligence (25)
  Legal Malpractice
  Other Professional Malpractice
    *(not medical or legal)*
Other Non-PI/PD/WD Tort (35)

**Employment**
Wrongful Termination (36)
Other Employment (15)

**Contract**
Breach of Contract/Warranty (06)
  Breach of Rental/Lease
    Contract *(not unlawful detainer or wrongful eviction)*
  Contract/Warranty Breach-Seller
    Plaintiff *(not fraud or negligence)*
  Negligent Breach of Contract/
    Warranty
  Other Breach of Contract/Warranty
Collections (e.g., money owed, open
  book accounts) (09)
  Collection Case–Seller Plaintiff
  Other Promissory Note/Collections
    Case
Insurance Coverage *(not provisionally complex)* (18)
  Auto Subrogation
  Other Coverage
Other Contract (37)
  Contractual Fraud
  Other Contract Dispute

**Real Property**
Eminent Domain/Inverse
  Condemnation (14)
Wrongful Eviction (33)
Other Real Property (e.g., quiet title) (26)
  Writ of Possession of Real Property
  Mortgage Foreclosure
  Quiet Title
  Other Real Property *(not eminent domain, landlord/tenant, or foreclosure)*

**Unlawful Detainer**
Commercial (31)
Residential (32)
Drugs (38) *(if the case involves illegal drugs, check this item; otherwise, report as Commercial or Residential)*

**Judicial Review**
Asset Forfeiture (05)
Petition Re: Arbitration Award (11)
Writ of Mandate (02)
  Writ–Administrative Mandamus
  Writ–Mandamus on Limited Court
    Case Matter
  Writ–Other Limited Court Case
    Review
Other Judicial Review (39)
  Review of Health Officer Order
  Notice of Appeal–Labor
    Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal. Rules of Court Rules 3.400–3.403)**
Antitrust/Trade Regulation (03)
Construction Defect (10)
Claims Involving Mass Tort (40)
Securities Litigation (28)
Environmental/Toxic Tort (30)
Insurance Coverage Claims *(arising from provisionally complex case type listed above)* (41)

**Enforcement of Judgment**
Enforcement of Judgment (20)
  Abstract of Judgment (Out of County)
  Confession of Judgment *(non-domestic relations)*
  Sister State Judgment
  Administrative Agency Award
    *(not unpaid taxes)*
  Petition/Certification of Entry of
    Judgment on Unpaid Taxes
  Other Enforcement of Judgment
    Case

**Miscellaneous Civil Complaint**
RICO (27)
Other Complaint *(not specified above)* (42)
  Declaratory Relief Only
  Injunctive Relief Only *(non-harassment)*
  Mechanics Lien
  Other Commercial Complaint
    Case *(non-tort/non-complex)*
  Other Civil Complaint
    *(non-tort/non-complex)*

**Miscellaneous Civil Petition**
Partnership and Corporate
  Governance (21)
Other Petition *(not specified above)* (43)
  Civil Harassment
  Workplace Violence
  Elder/Dependent Adult
    Abuse
  Election Contest
  Petition for Name Change
  Petition for Relief from Late
    Claim
  Other Civil Petition

William Bridge, Jr. and Michele

FREELAND COOPER & FOREMAN, LLP
Attn: BERNHARD, DANIEL T.
150 SPEAR STREET
SUITE 1800
SAN FRANCISCO, CA  94105

## Superior Court of California, County of Alameda

| | |
|---|---|
| Bridge<br><br>**Plaintiff/Petitioner(s)**<br><br>VS.<br><br>E* Trade Securities LLC<br><br>**Defendant/Respondent(s)**<br>(Abbreviated Title) | No. RG11563509<br><br>**NOTICE OF CASE MANAGEMENT CONFERENCE AND ORDER**<br>Unlimited Jurisdiction |

TO ALL PARTIES AND TO THEIR ATTORNEYS OF RECORD.

Notice is given that a Case Management Conference has been scheduled as follows:

| | | |
|---|---|---|
| Date: 07/14/2011<br>Time: 09:00 AM | Department: 520<br>Location: **Hayward Hall of Justice**<br>**3rd Floor**<br>**24405 Amador Street, Hayward CA 94544**<br><br>Internet: **http://www.alameda.courts.ca.gov** | Judge: **David Hunter**<br>Clerk: **Lindnell Williams**<br>Clerk telephone: **(510) 690-2729**<br>E-mail:<br>Dept.520@alameda.courts.ca.gov<br>Fax:  (510) 267-1531 |

### ORDERS

1. You must:
   a. **Serve all named defendants and file proofs of service on those defendants with the court within 60 days** of the filing of the complaint (CRC 3.110(b));
   b. **Give notice** of this conference to any party not included in this notice and file proof of service;
   c. **Meet and confer**, in person or by telephone, to consider each of the issues identified in CRC 3.724 no later than **30 calendar days** before the date set for the Case Management Conference;
   d. **File and serve** a completed Case Management Statement (use of Judicial Council Form CM-110 is mandatory) at least **15 days** before the Case Management Conference (CRC 3.725)*

2. If you do not follow the orders above, you are hereby ordered to show cause why you should not be sanctioned under CRC 2.30. The hearing on the Order to Show Cause re: Sanctions will be at the same time as the Case Management Conference. Sanctions may include monetary sanctions and any other sanction permitted by law, including striking pleadings or dismissing the action.

3. You are further ordered to appear in person† (or through your attorney of record) at the Case Management Conference noticed above. You must be thoroughly familiar with the case and fully authorized to proceed.

4. The Direct Calendar Judge will issue orders at the conclusion of the conference that should include:
   a. Referring to ADR and setting an ADR completion date
   b. Dismissing or severing claims or parties
   c. Setting a trial date.

   * Case Management Statements may be filed by E-delivery, by emailing them to the following address: **EDelivery@alameda.courts.ca.gov**. No fee is charged for this service. For further information, go to **Direct Calendar Departments at http://apps.alameda.courts.ca.gov/domainweb.**

   †Telephonic appearances at Case Management Conferences may be available by contacting CourtCall, an independent vendor, at least 3 business days prior to the scheduled conference. Parties may make arrangements by calling 1-888-882-6878, or faxing a service request to 1-888-882-2946. This service is subject to charges by the vendor.

### CLERK'S CERTIFICATE OF MAILING

I certify that the following is true and correct: I am the clerk of the above-named court and not a party to this cause. I served this Notice of Hearing by placing copies in envelopes addressed as shown hereon and then by sealing and placing them for collection, stamping or metering with prepaid postage, and mailing on the date stated below, in the United States mail at Alameda County, California, following standard court practices.

Executed on 03/04/2011.

By _____

Deputy Clerk

## Superior Court of California, County of Alameda



## Notice of Assignment of Judge for All Purposes

Case Number: RG11563509
Case Title:   Bridge VS E* Trade Securities LLC
Date of Filing: 03/01/2011

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

**Pursuant to Rule 3.734 of the California Rules of Court and Title 3 Chapter 2 of the Local Rules of the Superior Court of California, County of Alameda, this action is hereby assigned by the Presiding Judge for all purposes to:**

| | |
|---|---|
| **Judge:** | **David Hunter** |
| **Department:** | **520** |
| **Address:** | **Hayward Hall of Justice** |
| | **24405 Amador Street** |
| | **Hayward  CA  94544** |
| **Phone Number:** | **(510) 690-2729** |
| **Fax Number:** | **(510) 267-1531** |
| **Email Address:** | **Dept.520@alameda.courts.ca.gov** |

Under direct calendaring, this case is assigned to a single judge for all purposes including trial.

**Please note: In this case, any challenge pursuant to Code of Civil Procedure section 170.6 must be exercised within the time period provided by law.  (See Code Civ. Proc. §§ 170.6, subd. (a)(2) and 1013.)**

IT IS THE DUTY OF EACH PLAINTIFF AND CROSS COMPLAINANT TO SERVE A COPY OF THIS NOTICE IN ACCORDANCE WITH LOCAL RULES.

### General Procedures

All pleadings and other documents must be filed in the clerk's office at any court location except when the Court permits the lodging of material directly in the assigned department. All documents, with the exception of the original summons and the original civil complaint, shall have clearly typed on the face page of each document, under the case number, the following:

ASSIGNED FOR ALL PURPOSES TO
JUDGE David Hunter
DEPARTMENT 520

Page 1 of 3

All parties are expected to know and comply with the Local Rules of this Court, which are available on the Court's website at: http://www.alameda.courts.ca.gov/courts/rules/index.shtml and with the California Rules of Court, which are available at www.courtinfo.ca.gov.

Parties must meet and confer to discuss the effective use of mediation or other alternative dispute processes (ADR) prior to the Initial Case Management Conference. The court encourages parties to file a "Stipulation to Attend ADR and Delay Initial Case Management Conference for 90 Days". Plaintiff received that form in the ADR information package at the time the complaint was filed. The court's Web site also contains this form and other ADR information. If the parties do not stipulate to attend ADR, the parties must be prepared to discuss referral to ADR at the Initial Case Management Conference.

If all parties agree to change a scheduled court date, the parties must first send a fax letter to Department 520 outlining the requested schedule change and then contact the Courtroom Clerk to schedule a telephone conference with the Court.

Please submit a courtesy copy of all filed documents directly to Department 520.

## Schedule for Department 520

The following scheduling information is subject to change at any time, without notice. Please contact the department at the phone number or email address noted above if you have questions.

- Trials generally are held: Mondays, Tuesdays and Thursdays from 10:00 a.m. to 4:30 p.m. and Wednesdays from 10:00 a.m. to 4:00 p.m.
- Case Management Conferences are held: Mondays through Thursdays at 9:00 a.m.
- Law and Motion matters are heard: Fridays at 9:30 a.m.
- Settlement Conferences are heard: Fridays at 1:30 p.m.
- Ex Parte matters are heard: Mondays and Wednesdays at 9:30 a.m.

## Law and Motion Procedures

To obtain a hearing date for a Law and Motion or ex parte matter, parties must contact the department as follows:

- Motion Reservations
  Phone:          (510) 690-2729

- Ex Parte Matters
  Phone:          (510) 690-2729

## Tentative Rulings

The court may issue tentative rulings in accordance with the Local Rules. Tentative rulings will become the Court's order unless contested in accordance with the Local Rules. Tentative rulings will be available at:

- Website: www.alameda.courts.ca.gov/domainweb, Calendar Information for Dept. 520
- Phone: 1-866-223-2244

Dated: 03/03/2011 _____

_____
Presiding Judge,
Superior Court of California, County of Alameda

---

### CLERK'S CERTIFICATE OF MAILING

I certify that the following is true and correct: I am the clerk of the above-named court and not a party to this cause. I served this Notice by placing copies in envelopes addressed as shown on the attached Notice of Initial Case Management Conference and then by sealing and placing them for collection, stamping or metering with prepaid postage, and mailing on the date stated below, in the United States mail at Alameda County, California, following standard court practices.

Executed on 03/04/2011

By _____

_____
Deputy Clerk

**Exhibit A, Page 24**

Attorney or Party without Attorney:
DANIEL T. BERNHARD (SBN 104225)
FREELAND COOPER & FOREMAN LLP
150 SPEAR STREET, #1800
SAN FRANCISCO, CA 94105
Telephone No: 415-541-0200

Ref. No. or File No.:

Attorney for: Plaintiff

**FILED**
ALAMEDA COUNTY

APR 13 2011

CLERK OF THE SUPERIOR COURT
By:_____
Deputy

Insert name of Court, and Judicial District and Branch Court:
ALAMEDA COUNTY SUPERIOR COURT

Plaintiff: WILLIAM BRIDGE, JR. et al
Defendant: E*TRADE SECURITIES LLC. et al

| **PROOF OF SERVICE SUMMONS & COMPLAINT** | Hearing Date: | Time: | Dept/Div: | Case Number: RG11563509 |
|---|---|---|---|---|

*1. At the time of service I was at least 18 years of age and not a party to this action.*

2. I served copies of the SUMMONS;; COMPLAINT; CIVIL CASE COVER SHEET; NOTICE OF CASE MANAGEMENT CONFERENCE AND ORDER; NOTICE OF ASSIGNMENT OF JUDGE FOR ALL PURPOSES.

*3. a. Party served:*               E* TRADE SECURITIES LLC.
    *b. Person served:*         BECKY DEGEORGE, PROCESS SPECIALIST, CSC, REGISTERED AGENT

*4. Address where the party was served:*    2730 GATEWAY OAKS DRIVE
                                 SUITE 100
                                 SACRAMENTO, CA 95833

*5. I served the party:*
    a. **by personal service.** I personally delivered the documents listed in item 2 to the party or person authorized to receive service of process for the party (1) on: Wed., Mar. 30, 2011 (2) at: 2:55PM

6. The "Notice to the Person Served" (on the Summons) was completed as follows:
    *on behalf of:* E* TRADE SECURITIES LLC.
    *Other:* LIMITED LIABILITY COMPANY

*7. Person Who Served Papers:*                 Recoverable Cost Per CCP 1033.5(a)(4)(B)
    a. Sherry Shada                   *d. The Fee for Service was:*



    1814 "I" Street                    *e. I am: (3) registered California process server*
    Sacramento, CA 95814                   (i)   Independent Contractor
    Telephone   (916) 444-5111          (ii)  *Registration No.:*   2010-88
    Fax         (916) 443-3111        (iii) *County:*         Sacramento
    www.firstlegalnetwork.com

*8. I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.*

*Date: Thu, Mar. 31, 2011*

Judicial Council Form POS-010
Rule 2.150.(a)&(b) Rev January 1, 2007

PROOF OF SERVICE
SUMMONS & COMPLAINT

(Sherry Shada)   6661941.freco.356672

**Exhibit A, Page 25**

*9384327*

*Attorney or Party without Attorney:*
DANIEL T. BERNHARD (SBN 104229)
FREELAND COOPER & FOREMAN LLP
150 SPEAR STREET, #1800
SAN FRANCISCO, CA 94105
*Telephone No:* 415-541-0200

*Attorney for:* Plaintiff

*Ref. No. or File No.:*

**F I L E D**
ALAMEDA COUNTY

APR 1 3 2011

CLERK OF THE SUPERIOR COURT

*Insert name of Court, and Judicial District and Branch Court:*
ALAMEDA COUNTY SUPERIOR COURT

*Plaintiff:* WILLIAM BRIDGE, JR. et al

*Defendant:* E*TRADE SECURITIES LLC. et al

| PROOF OF SERVICE SUMMONS & COMPLAINT | Hearing Date: | Time: | Dept/Div: | Case Number: |
|---|---|---|---|---|
| | | | By | RG11563509 Deputy |

*1. At the time of service I was at least 18 years of age and not a party to this action.*

2. I served copies of the SUMMONS; COMPLAINT; CIVIL CASE COVER SHEET; NOTICE OF CASE MANAGEMENT
   CONFERENCE AND ORDER; NOTICE OF ASSIGNMENT OF JUDGE FOR ALL PURPOSES.

| 3. a. Party served: | PACIFIC INVESTMENT MANAGEMENT COMPANY LLC. |
|---|---|
| b. Person served: | BRANDON SJELIN, NATIONAL REGISTERED AGENTS, REGISTERED AGENT. |

| 4. Address where the party was served: | 2875 MICHELLE DRIVE SUITE 100 IRVINE, CA 92606 |
|---|---|

5. I served the party:
   a. **by personal service.** I personally delivered the documents listed in item 2 to the party or person authorized to receive service of
   process for the party (1) on: Thu., Mar. 31, 2011 (2) at: 11:07AM

6. The "Notice to the Person Served" (on the Summons) was completed as follows:
   on behalf of: PACIFIC INVESTMENT MANAGEMENT COMPANY LLC.
   Other: LIMITED LIABILITY COMPANY

7. **Person Who Served Papers:**                        Recoverable Cost Per CCP 1033.5(a)(4)(B)
   a. Timothy Bercovitz                        d. **The Fee for Service was:**
   b. **FIRST LEGAL SUPPORT SERVICES**          e. I am: (3) registered California process server
      301 CIVIC CENTER DRIVE                       (i)   Independent Contractor
      SANTA ANA, CA 92702                          (ii)  *Registration No.:*       1803
   c. 714-541-1110                                 (iii) *County:*                 Orange

8. *I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.*

   *Date:* Thu, Mar. 31, 2011

   (Timothy Bercovitz)                                                                U

Judicial Council Form POS-010          PROOF OF SERVICE
Rule 2.150.(a)&(b) Rev January 1, 2007   SUMMONS & COMPLAINT                       6661942.freco.356674

**Exhibit A, Page 26**



1  Thad A. Davis (CSB # 220503)
   Thad.Davis@ropesgray.com
2  Sarah Zenewicz (CSB# 258068)
   Sarah.Zenewicz@ropesgray.com
3  ROPES & GRAY LLP
   Three Embarcadero Center
4  San Francisco, California 94111-4006
   Telephone: (415) 315-6300
5  Facsimile: (415) 315-6350

6  Attorneys for Defendant
7  PACIFIC INVESTMENT MANAGEMENT COMPANY LLC

**FILED**
**ALAMEDA COUNTY**
APR 27 2011
CLERK OF THE SUPERIOR COURT
By _____
DEPUTY

8              SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                        COUNTY OF ALAMEDA

10

11 WILLIAM BRIDGE JR. and MICHELE          Case No. RG11563509
   PROFANT,
12                                          STIPULATION GRANTING
              Plaintiffs,                   EXTENSION OF TIME TO RESPOND
13                                          TO COMPLAINT
         v.
14                                          Cal. Rule Court 3.110
   E*TRADE SECURITIES LLC, PACIFIC
15 INVESTMENT MANAGEMENT,                   Complaint Filed: March 1, 2011
   COMPANY LLC, and DOES 1-10 inclusive,
16
              Defendants,
17

18

19

20

21                                                    BY FAX

22

23

24

25

26

27

28

**STIPULATION**

WHEREAS Defendant Pacific Investment Management Company LLC ("PIMCO") currently must file a response to Plaintiffs William Bridge Jr. and Michele Profant's Complaint for Damages and Rescission ("Complaint") by May 2, 2011; and

WHEREAS the parties, by counsel, have agreed, for good cause, that PIMCO shall have an additional fifteen days to file their response to the Complaint;

THE PARTIES, BY COUNSEL, HEREBY STIPULATE:

PIMCO may have an extension of fifteen days from May 2, 2011 to file its response to the Complaint. PIMCO must file its response by May 17, 2011.

In entering into this stipulation, PIMCO does not hereby waive any defense to the Complaint.

April 25, 2011

_____
Thad A. Davis
Sarah Zenewicz
ROPES & GRAY LLP

Attorneys for Defendant
PACIFIC INVESTMENT MANAGEMENT
COMPANY LLC

April 25, 2011

_____
Daniel T. Bernhard
FREELAND COOPER & FOREMAN LLP

Attorneys for Plaintiffs
WILLIAM BRIDGE JR. and
MICHELE PROFANT

1

## PROOF OF SERVICE

I am employed in the City and County of San Francisco, California. I am over the age of 18 and not a party to the within action. My business address is Ropes & Gray LLP, Three Embarcadero Center, San Francisco, California, 94111-4006.

On April 27, 2011, I served a copy of the below-listed document(s) described as:

**STIPULATION GRANTING EXTENSION OF TIME TO RESPOND TO COMPLAINT**

☐      **BY U.S. MAIL:** I enclosed the document(s) listed above in a sealed envelope or package, addressed to the person(s) at the address(es) set forth above and placed the envelope or package for collection and mailing, following this firm's ordinary business practices. I am readily familiar with this firm's practice for collecting and processing of documents for mailing. Under that practice, on the same day that document(s) is/are placed for collection and mailing, it/they is/are deposited in the ordinary course of business with the U.S. Postal Service, in a sealed envelope or package with postage fully prepaid.

☐      **BY FAX TRANSMISSION:** I faxed the document(s) to the persons at the fax numbers listed above. No error was reported by the fax machine that I used. A copy of the record of the fax transmission containing the time, date, and sending fax machine telephone number, which I printed out, is available upon request.

☐      **BY HAND-DELIVERY:** I served the document(s) by placing it/them in an envelope or package addressed to the persons at the addresses listed above and providing them to a professional messenger service for service. A copy of the professional messenger's proof of delivery is available upon request.

☐      **BY E-MAIL:** I caused the document(s) to be served electronically on the persons at the electronic notification addresses listed below.

☒      **BY OVERNIGHT DELIVERY:** I enclosed the documents in an envelope or package provided by an overnight delivery carrier and addressed to the person(s) at the address(es) listed above. I placed the envelope or package for collection and overnight delivery at an office or a regularly utilized drop box of the overnight delivery carrier.

Daniel T. Bernhard
FREELAND COOPER & FOREMAN LLP
150 Spear Street, Suite 1800
San Francisco, CA 94105

-1-

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on April 27, 2011, at San Francisco, California.

Carmen Baez

-2-

26596363_1

**Exhibit A, Page 30**

FREELAND COOPER & FOREMAN,
LLP
Attn:  BERNHARD, DANIEL T.
150 SPEAR STREET
SUITE 1800
SAN FRANCISCO, CA   94105

E* Trade Securities LLC

## Superior Court of California, County of Alameda
## Hayward Hall of Justice

| | |
|---|---|
| Bridge<br><br>                Plaintiff/Petitioner(s)<br><br>        VS.<br><br>E* Trade Securities LLC<br>              Defendant/Respondent(s)<br>       (Abbreviated Title) | No. <u>RG11563509</u><br><br>Stipulation Re: Extension of Time<br>Granted |

IT IS ORDERED that the Defendant's Stipulation Re: Extension of Time is granted.

Defendant Pacific Investment Management Company, LLC. may have through May 17, 2011, to file its response to the complaint.

Dated:  04/28/2011

_____
Judge David Hunter

10

ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address):

Daniel T. Bernhard                    104229
Freeland Cooper & Foreman LLP
150 Spear Street, Suite 1800
San Francisco, CA  94105

TELEPHONE NO.: 415-541-0200    FAX NO. (Optional): 415-495-4332
E-MAIL ADDRESS (Optional): bernhard@freelandlaw.com
ATTORNEY FOR (Name): Plaintiffs

SUPERIOR COURT OF CALIFORNIA, COUNTY OF Alameda
STREET ADDRESS: 1225 Fallon Street
MAILING ADDRESS:
CITY AND ZIP CODE: Oakland, CA  94612
BRANCH NAME:

**F I L E D**
ALAMEDA COUNTY

MAY 1 2 2011

CLERK OF THE SUPERIOR COURT
By _____
                              Deputy

PLAINTIFF/PETITIONER: William Bridge, Jr. and Michele Profant

DEFENDANT/RESPONDENT: E*TRADE SECURITIES LLC, ET. AL.

| REQUEST FOR DISMISSAL | CASE NUMBER: |
|---|---|
| | RG11563509 |

- [ ] Personal Injury, Property Damage, or Wrongful Death
  - [ ] Motor Vehicle  [ ] Other
- [ ] Family Law   [ ] Eminent Domain
- [X] Other (specify):    Breach of Contract

- A conformed copy will not be returned by the clerk unless a method of return is provided with the document. -

1. TO THE CLERK: Please dismiss this action as follows:
   a. (1) [ ] With prejudice   (2) [X] Without prejudice
   b. (1) [ ] Complaint        (2) [ ] Petition
      (3) [ ] Cross-complaint filed by (name):                    on (date):
      (4) [ ] Cross-complaint filed by (name):                    on (date):
      (5) [ ] Entire action of all parties and all causes of action
      (6) [X] Other (specify):*  As to Pacific Investment Management Company, LLC only

2. (Complete in all cases except family law cases.)
   [ ] Court fees and costs were waived for a party in this case. (This information may be obtained from the clerk. If this box is checked, the declaration on the back of this form must be completed.)

Date: May 12, 2011

Daniel T. Bernhard
(TYPE OR PRINT NAME OF [X] ATTORNEY [ ] PARTY WITHOUT ATTORNEY)

* If dismissal requested is of specified parties only, of specified causes of
action only, or of specified cross-complaints only, so state and identify
the parties, causes of action, or cross-complaints to be dismissed.

▶ _____
        (SIGNATURE)

Attorney or party without attorney for:
[X] Plaintiff/Petitioner    [ ] Defendant/Respondent
[ ] Cross-Complainant

3. TO THE CLERK: Consent to the above dismissal is hereby given.**
Date:

_____
(TYPE OR PRINT NAME OF [ ] ATTORNEY [ ] PARTY WITHOUT ATTORNEY)

** If a cross-complaint - or Response (Family Law) seeking affirmative
relief - is on file, the attorney for the cross-complainant (respondent) must
sign this consent if required by Code of Civil Procedure section 581(i)
or (j).

▶ _____
        (SIGNATURE)

Attorney or party without attorney for:
[ ] Plaintiff/Petitioner    [ ] Defendant/Respondent
[ ] Cross-Complainant

(To be completed by clerk)
4. [ ] Dismissal entered as requested on (date):
5. [ ] Dismissal entered on (date):                    as to only (name):
6. [ ] Dismissal not entered as requested for the following reasons (specify):

**DISMISSAL ENTERED**

MAY 1 2 2011

7. a. [ ] Attorney or party without attorney notified on (date):
   b. [ ] Attorney or party without attorney not notified.  Filing party failed to provide
          [ ] a copy to be conformed  [ ] means to return conformed copy
Date: _____    Clerk, by _____

Clerk of the Superior Court
By _____
                         Deputy
Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
CIV-110 [Rev. July 1, 2009]

**REQUEST FOR DISMISSAL**

Code of Civil Procedure, § 581 et seq.;
Gov. Code, § 68637(c); Cal. Rules of Court, rule 3.1390
www.courtinfo.ca.gov

William Bridge, Jr. and Michele Profant

FAXED

CIV-110

| PLAINTIFF/PETITIONER: | William Bridge, Jr. and Michele Profant | CASE NUMBER: |
|---|---|---|
| DEFENDANT/RESPONDENT: | E*TRADE SECURITIES LLC, ET. AL. | RG11563509 |

## Declaration Concerning Waived Court Fees

The court has a statutory lien for waived fees and costs on any recovery of $10,000 or more in value by settlement, compromise, arbitration award, mediation settlement, or other recovery. The court's lien must be paid before the court will dismiss the case.

1. The court waived fees and costs in this action for *(name)*: _N/A_

2. The person in item 1 *(check one)*:
   a. ☐ is not recovering anything of value by this action.
   b. ☐ is recovering less than $10,000 in value by this action.
   c. ☐ is recovering $10,000 or more in value by this action. *(If item 2c is checked, item 3 must be completed.)*

3. ☐ All court fees and costs that were waived in this action have been paid to the court *(check one)*:   ☐ Yes  ☐ No

I declare under penalty of perjury under the laws of the State of California that the information above is true and correct.

Date: _May 12, 2011_

_Daniel T. Bernhard_

(TYPE OR PRINT NAME OF  ☒ ATTORNEY  ☐ PARTY MAKING DECLARATION)                    (SIGNATURE)

---

CIV-110 [Rev. July 1, 2009]


Martin Dean's
ESSENTIAL FORMS™

**REQUEST FOR DISMISSAL**

Page 2 of 2

William Bridge, Jr. and Michele Profant

# CERTIFICATE OF SERVICE

I am employed in the City and County of San Francisco, State of California. I am over the age of eighteen and not a party to the within action; my business address is 150 Spear Street, Suite 1800, San Francisco, California 94105.

On May 12, 2011, I served the foregoing document described as follows:

## REQUEST FOR DISMISSAL

by placing a true and correct copy thereof enclosed in a sealed envelope addressed to the party(ies) of record whose name(s) and address(es) appear below:

| | |
|---|---|
| Edward D. Totino | Thad A. Davis |
| DLA PIPER LLP | ROPES & GRAY LLP |
| 1999 Avenue of the Stars, Suite 400 | 3 Embarcadero Center |
| Los Angeles, CA 90067 | San Francisco, CA 94111-4006 |

__X__ [BY MAIL - CCP § 1013a] I caused such sealed envelope with postage thereon fully prepaid to be placed in the United States mail at San Francisco, California, for collection and mailing to the office of addressee(s) on the date shown herein following ordinary business practice.

____ [HAND-DELIVERY/Personal/Messenger - CCP § 1011] I caused such envelope to be hand-delivered by a courier, who personally delivered such envelope to the office of the addressee(s) on the date herein.

____ [BY FACSIMILE - CCP § 1013(e)] - I caused such document(s) to be transmitted via facsimile electronic equipment transmission on the party(ies), whose name(s), address(es) and fax number(s) are listed above, on the date stated herein and at the time set forth on the attached transmission reported indicating that the facsimile transmission was complete and without error.

____ [BY FEDEX (Overnight Delivery) - CCP § 1013(c)] I caused such envelope to be delivered to the Federal Express Office in San Francisco, California, with whom we have a direct billing account, to be delivered on the next business day.

____ [BY E-MAIL or ELECTRONIC TRANSMISSION ]. Based on a court order or agreement of the parties to accept service by e-mail or electronic transmission, I caused the documents to be sent to the persons at the email addresses listed above. I did not receive within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

__X__ [STATE] I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

____ [FEDERAL] Service was made under the direction of a member of the bar of this Court who is admitted to practice and is not a party to this cause.

Executed on May 12, 2011, at San Francisco, California.

Joyce E. Johnson

---

CERTIFICATE OF SERVICE, CASE NO.  RG11563509
{00150470-1}

**Exhibit A, Page 34**

1  **DLA PIPER LLP (US)**
EDWARD D. TOTINO (SBN 169237)

2  MONICA DOURNAEE (SBN 268109)
1999 Avenue of the Stars, Suite 400

3  Los Angeles, California  90067-6023
Tel:  310.595.3000

4  Fax:  310.595.3300

5  Attorneys for Defendant
E*TRADE SECURITIES LLC

6

ENDORSED
FILED
ALAMEDA COUNTY

MAY 1 7 2011

CLERK OF THE SUPERIOR COURT
By _____A. MENDOLA_____
                              Deputy

7

8              **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

9                     **FOR THE COUNTY OF ALAMEDA**

10  WILLIAM BRIDGE, JR. and MICHELLE
PROFANT,

11

12              Plaintiffs,

13  v.

14  E*TRADE SECURITIES LLC; PACIFIC
INVESTMENT MANAGEMENT

15  COMPANY LLC; and DOES 1-10,
INCLUSIVE,

16

17              Defendants.

18

CASE NO. RG11563509

*ASSIGNED FOR ALL PURPOSES TO:*
*Judge David Hunter*
*Dept. 520*

**DEFENDANT E*TRADE SECURITIES
LLC'S NOTICE OF DEMURRER AND
DEMURRER TO PLAINTIFFS'
COMPLAINT; MEMORANDUM OF
POINTS AND AUTHORITIES IN
SUPPORT**

*[Filed concurrently with Request for Judicial
Notice, Compendium of Non-California
Authority and [Proposed] Order]*

19  Date:          July 15, 2011
Time:          9:30 a.m.

20  Place:         Dept. 520

21  Reservation #R-1181007

22  Complaint Filed:     March 1, 2011
Trial Date:          Not Set

23

24

25

26

27

28

DLA PIPER LLP (US)
LOS ANGELES

WEST\21974019.1

DEFENDANT E*TRADE SECURITIES LLC'S DEMURRER TO PLAINTIFFS' COMPLAINT

1    **TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

2         Notice is hereby given that on July 15, 2011, at 9:30 a.m., or as soon thereafter as this

3   matter may be heard in Department 520 of the Hayward Hall of Justice located at 24405 Amador

4   Street, Hayward, California, 94544, Defendant E*TRADE Securities LLC ("E*TRADE" or

5   "Defendant"), will bring on for hearing its Demurrers to the Complaint for Damages and

6   Rescission filed by Plaintiffs William Bridge, Jr. and Michelle Profant (collectively "Plaintiffs").

7   July 15, 2011 was the first day available for hearing on the Court's calendar.

8         Defendant demurs to Plaintiffs' Complaint as follows: the First, Second, Third, Fourth

9   and Fifth Causes of Action fail to state facts sufficient to constitute each cause of action alleged.

10   In addition, the First, Second, and Third causes of action, sounding in fraud, fail to state facts

11   with the requisite level of specificity so that they are uncertain, ambiguous, and unintelligible.

12        This Demurrer is based on this Notice, the attached Demurrer, the attached Memorandum

13   of Points and Authorities, Request for Judicial Notice, and Compendium of Non-California

14   Authority, as well as on all pleadings and records on file herein, those matters of which the Court

15   may properly take judicial notice, and upon such argument as the Court may consider at the

16   hearing on the Demurrer.

17   Dated: May 17, 2011              **DLA PIPER LLP (US)**

18

19                  By

20                     EDWARD D. TOTINO
                       MONICA DOURNAEE

21                        Attorneys for Defendant
                       E*TRADE Securities LLC

22

23

24

25

26

27

28

1

## DEMURRER TO PLAINTIFFS' COMPLAINT

2          Defendant hereby demurs to Plaintiffs' Complaint on each of the following

3 grounds:

4

## DEMURRER TO FIRST CAUSE OF ACTION

5          1.      The First Cause of Action for Negligent Misrepresentation fails to state

6 facts sufficient to constitute a cause of action against Defendant. CCP § 430.10(e).

7          2.      The First Cause of Action for Negligent Misrepresentation is also

8 uncertain, ambiguous, and unintelligible. CCP § 430.10(f).

9

## DEMURRER TO SECOND CAUSE OF ACTION

10          3.      The Second Cause of Action for Fraudulent Misrepresentation fails to state

11 facts sufficient to constitute a cause of action against Defendant. CCP § 430.10(e).

12          4.      The Second Cause of Action for Fraudulent Misrepresentation is also

13 uncertain, ambiguous, and unintelligible. CCP § 430.10(f).

14

## DEMURRER TO THIRD CAUSE OF ACTION

15          5.      The Third Cause of Action for Fraud fails to state facts sufficient to

16 constitute a cause of action against Defendant. CCP § 430.10(e).

17          6.      The Third Cause of Action for Fraud is also uncertain, ambiguous, and

18 unintelligible. CCP § 430.10(f).

19

## DEMURRER TO FOURTH CAUSE OF ACTION

20          7.      The Fourth Cause of Action for Breach of Contract fails to state facts

21 sufficient to constitute a cause of action against Defendant. CCP § 430.10(e).

22 ///

23 ///

24 ///

25 ///

26 ///

27 ///

28

WEST\21974019.1             1

1

## DEMURRER TO FIFTH CAUSE OF ACTION

2         8.    The Fifth Cause of Action for Rescission under Civil Code Section 1689

3 fails to state facts sufficient to constitute a cause of action against Defendant.  CCP § 430.10(e).

4

5 Dated: May 17, 2011                     **DLA PIPER LLP (US)**

6

7                             By

8                               EDWARD D. TOTINO
                              MONICA DOURNAEE

9                               Attorneys for Defendant
                              E*TRADE SECURITIES LLC

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

2

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.

## INTRODUCTION

Auction Rate Securities ("ARS") are equity or debt instruments that had variable interest rates set a periodic auctions. (Complaint, ¶ 8). The periodic auctions made ARS beneficial to issuers because they obtained lower rates than would otherwise be the case, and created liquidity for investors because the ARS could be sold at the auctions. (Complaint, ¶ 9).

Plaintiffs purchased $400,000 in ARS in early 2007. No later than March 2007, Plaintiffs knew the exact ARS they had purchased – the PIMCO California Municipal Income Fund Preferred Shares, Series A, bearing CUSIP No. 72200N205. (Complaint, ¶ 21). At all times the prospectus for this ARS, like those for all ARS, was available on the website of the United States Securities and Exchange Commission ('SEC").[1] The prospectus clearly disclosed the possibility that auctions may fail. *See id.* at p. 3. Despite this disclosure of risk, Plaintiffs did not sell their ARS although they had every opportunity for about a year to do so.

In early 2008, about a year after Plaintiffs purchased their ARS, the ARS market froze in when ARS auctions began failing as part of the unprecedented financial crisis that hit the nation. (Complaint, ¶ 22) This made it difficult for investors, like Plaintiffs, to sell their ARS. But that does not mean that any fraud or other wrongdoing was committed. All investments involve risk, and the failures of the ARS auctions were merely the materializations of a risk that was clearly disclosed in the ARS prospectuses.

Rather than recognizing that some investments do not turn out as planned, Plaintiffs seek, by hindsight, to turn their ARS purchase and the subsequent failure of the ARS market into a fraud claim against E*TRADE. However, they fail to plead the specific who, what, where, when and how necessary to plead fraud. Nor can they have relied on anything said by E*TRADE given the disclosures in the prospectus for their ARS. Therefore, Plaintiffs' first three causes of action

---

[1]    *See* http://www.sec.gov/Archives/edgar/data/1140411/000092701601502627/d497.txt, a true and correct copy of which is attached to the Request for Judicial Notice filed concurrently herewith.

1  fail.

2  Plaintiffs' remaining causes of action for breach of oral contract and rescission also fail.

3  As to the breach of oral contract, according to Plaintiffs' own allegations, E*TRADE did not

4  promise to do anything, nor did Plaintiffs provide E*TRADE with any consideration.  Instead,

5  E*TRADE supposedly told Plaintiff that defendant Pacific Investment Management Company

6  ("PIMCO") would be redeeming their ARS.  Since E*TRADE was not obligated to do anything

7  by this alleged agreement, it cannot have breached the agreement and E*TRADE's demurrer to

8  Plaintiffs' Fourth Cause of Action should be sustained.  As to Plaintiffs' final cause of action for

9  rescission, E*TRADE is not a proper party because it did not sell Plaintiffs the ARS.  According

10  the Plaintiffs' allegations, the ARS are purchased at auctions.  (Complaint, ¶¶ 9-10).  Since

11  E*TRADE was not the seller of the ARS to Plaintiff, it was not a party to the contract and cannot

12  be subject to rescission.  The Court should sustain E*TRADE's demurrer to all of Plaintiffs'

13  Causes of Action.

14  **II.**

15  **FACTUAL ALLEGATIONS**

16  Plaintiffs' allege that they purchased $400,000 in ARS in early 2007 in their E*TRADE

17  account.  (Complaint, ¶¶ 20, 25)  Plaintiff allege that they learned the particular ARS (also known

18  as APS or ARPS) that they purchased in March 2007 – the PIMCO California Municipal Income

19  Fund Preferred Shares, Series A, bearing CUSIP No. 72200N205.  (Complaint, ¶ 21)   At all

20  times the prospectus for this ARS, like those for all ARS, was available on the SEC's website.[2]

21  The prospectus clearly disclosed the possibility that auctions may fail and the other risks involved

22  in the investment: .

23  SPECIAL RISK CONSIDERATIONS

24  Risks of investing in APS include:

25  Auction Risk

26

27  [2]   *See* http://www.sec.gov/Archives/edgar/data/1140411/000092701601502627/d497.txt, a

28  true and correct copy of which is attached to the Request for Judicial Notice filed concurrently
herewith.

WEST\21974019.1                                    2

1    You may not be able to sell your APS at an Auction if the Auction
     fails; that is, if there are more APS offered for sale than there are
2    buyers for those shares. As a result, your investment in APS may be
     illiquid. Neither the Broker-Dealers nor the Fund are obligated to
3    purchase APS in an Auction or otherwise, nor is the Fund required
     to redeem APS in the event of a failed Auction.

4            *        *        *

5    Secondary Market Risk

6    You could receive less than the price you paid for your APS if you
7    sell them outside of an Auction, especially when market interest
     rates are rising. Although the Broker-Dealers may maintain a
8    secondary trading market in the APS outside of Auctions, they are
     not obligated to do so and no secondary market may develop or
9    exist at any time for the APS.

10   *See id.* at p. 3. Despite this disclosure of risk, Plaintiffs did not sell or otherwise dispose of their

11   ARS although they had every opportunity to do so from March 2007 until February 2008.

12        The materialization of these disclosed risks is exactly why Plaintiffs bring this case. In

13   early 2008, about a year after Plaintiffs purchased their ARS, the ARS market froze when ARS

14   auctions began failing as part of the unprecedented financial crisis that hit the nation. (Complaint,

15   ¶ 22) This made it difficult for investors, like Plaintiffs, to sell their ARS.

16        Plaintiffs claim that they did not learn about the failure of the ARS auctions until July

17   2009. (Complaint, ¶ 23) Plaintiffs allege that they contacted E*TRADE and E*TRADE told

18   them that their ARS would be "redeemed" – *i.e.*, bought back by the issuer. (Complaint, ¶ 25).

19   Plaintiffs claim that this created a contract with E*TRADE, but make no mention whatsoever of

20   any consideration that they offered to E*TRADE to support this contract. (Complaint, ¶¶25-26,

21   49-52).

22        When PIMCO did not redeem Plaintiffs' ARS, Plaintiffs sued E*TRADE and PIMCO.

23   As to E*TRADE, Plaintiffs allege five causes of action:  (1) Negligent Misrepresentation; (2)

24   Fraudulent Misrepresentation; (3) Fraud; (4) Breach of Contract; and (5) Rescission.  As

25   demonstrated below, each of Plaintiffs' causes of action fail and the Court should sustain

26   E*TRADE's demurrers.

27

28

WEST\21974019.1

3

# III.

## THE COURT SHOULD SUSTAIN THE DEMURRERS

**A.   Standard on Demurrer.**

A complaint or cause of action is subject to demurrer when it fails to state facts sufficient to constitute a cause of action, or is uncertain, ambiguous, or unintelligible.  Cal. Code Civ. Proc. § 430.10(e) and (f).  Code of Civil Procedure section 430.10 states, in pertinent part:

> The party against whom a complaint or cross-complaint has been filed may object, by demurrer or answer as provided in Section 430.30, to the pleading on any one or more of the following grounds:
>
> . . . .
>
> (e)     The pleading does not state facts sufficient to constitute a cause of action.
>
> (f)     The pleading is uncertain.  As used in this subdivision, "uncertain" includes ambiguous and unintelligible.

Cal. Code Civ. Proc. § 430.10; *see also*, *Aubry v. Tri-City Hosp. Dist.*, 2 Cal. 4th 962, 966-67 (1992).  As demonstrated below, Plaintiffs' Complaint both fails to state facts sufficient to constitute a cause of action and is uncertain.

**B.   Plaintiffs Fail to Plead Fraud with the Requisite Specificity in their First, Second and Third Causes of Action.**

Plaintiffs have failed to adequately plead their negligent misrepresentation, fraudulent misrepresentation, and fraud causes of action, as these claims are subject to the heightened pleading requirements of fraud.  "[F]raud must be pled specifically; general and conclusory allegations do not suffice."  *Lazar v. Superior Court*, 12 Cal.4th 631, 645 (1996).  Negligent misrepresentation is a form of fraud and likewise must be plead specifically.  *See* Cal. Civ. Code § 1710(2); *Cadlo v. Owens-Illinois, Inc.*, 125 Cal.App.4th 513, 519 (2004) ("Each element in a cause of action for fraud or negligent misrepresentation must be factually and specifically alleged.").  The particularity requirement forces Plaintiffs to allege facts that "show how, when, where, to whom, and by what means the representations were tendered."  *Id.*  Each and every element of a cause of action for fraud must be alleged in full, factually and specifically.  *Wilhelm*

1     *v. Pray, Price, Williams & Russell*, 186 Cal.App.3d 1334, 1331 (1986).

2         Plaintiffs' First, Second and Third Causes of Action clearly fail to meet this pleading

3     requirement. Plaintiffs fail to allege when the statements they complain about were made or

4     what specifically was said. (Complaint, ¶ 19) Instead, Plaintiffs merely allege a few conclusory

5     statements that do not amount to fraud. (Complaint, ¶ 19). The Court should sustain the

6     demurrer to the First, Second and Third Causes of Action.

7   **C.**     **Plaintiffs Cannot State a Claim for Fraud or Negligent Misrepresentation Because**
        **They Cannot Establish the Elements of Fraud of Negligent Misrepresentation.**

8

9         The elements of fraud are (1) misrepresentation (false representation, concealment or

10     nondisclosure), (2) knowledge of falsity, (3) intent to defraud, *i.e.* to induce reliance, (4)

11     justifiable reliance, and (5) resulting damages. *See Small v. Fritz Co.*, 30 Cal.4th 167, 173

12     (2003). Negligent misrepresentation has the same elements, except that instead of intent to

13     defraud (scienter), the Plaintiffs must establish that the defendant had no reasonable ground for

14     believing that the statements made were true. *Id.* at 174-75; *National Union Fire Ins. Co. v.*

15     *Cambridge*, 171 Cal.App.4th 35 (2009); Cal. Civ. Code § 1710. Plaintiffs fail to plead these

16     elements.

17         First, Plaintiffs fail to plead any false statements by E*TRADE. They state that

18     E*TRADE told them that (1) ARS had a higher rate of interest and were tax free; (2) ARS were

19     safe because they were backed by established and stable companies; and (3) ARS had immediate

20     liquidity because ARS auctions occurred ever week. None of these statements is alleged to be

21     false. In fact, Plaintiffs do not claim that the ARS they purchased failed to have a higher rate of

22     interest or be tax free. Plaintiffs do not claim that the ARS they purchased was not backed by an

23     established and stable company. Plaintiffs do not allege that ARS they purchased did not have

24     weekly auction where they could be sold. Instead, Plaintiffs allege that things changed a year

25     after they made their purchase when the ARS auctions began failing in 2008 (as a result of the

26     financial crisis). (Complaint, ¶ 22). Thus, Plaintiffs fail to establish the first element of fraud or

27     negligent misrepresentation.

28         Second, Plaintiffs fail to allege that E*TRADE knew these statements were false, or, as to

1   negligent misrepresentation, that E*TRADE had no reasonable ground for believing that the

2   statements made were true.  In fact, as alleged in Plaintiffs' Complaint, the ARS auctions did not

3   begin to fail until about a year after Plaintiffs' ARS purchase.  (Complaint, ¶ 22).

4        Third, Plaintiffs cannot demonstrate that E*TRADE made the statements with the intent to

5   defraud.  In fact, Plaintiffs do not allege any facts whatsoever showing that E*TRADE had

6   anything to gain by causing Plaintiffs to purchase ARS rather than some other investment.[3]

7        Fourth, Plaintiffs cannot demonstrate justifiable reliance, a key element for both fraud and

8   negligent misrepresentation.   The prospectus for the ARS Plaintiffs' purchased clearly disclosed

9   the risk of auction failure or that ARS may be sold at a discount on the secondary market:

10       SPECIAL RISK CONSIDERATIONS

11           Risks of investing in APS include:

12           Auction Risk

13           You may not be able to sell your APS at an Auction if the Auction
             fails; that is, if there are more APS offered for sale than there are
14           buyers for those shares. As a result, your investment in APS may be
             illiquid. Neither the Broker-Dealers nor the Fund are obligated to
15           purchase APS in an Auction or otherwise, nor is the Fund required
             to redeem APS in the event of a failed Auction.
16

17                *      *      *

18           Secondary Market Risk

19           You could receive less than the price you paid for your APS if you
             sell them outside of an Auction, especially when market interest
20           rates are rising. Although the Broker-Dealers may maintain a
             secondary trading market in the APS outside of Auctions, they are
21           not obligated to do so and no secondary market may develop or
             exist at any time for the APS.

22   Exhibit 1 to Request for Judicial Notice at p. 3.  As a matter of law, investors are on notice of

23   matters disclosed in a prospectus:

24           The prospectuses . . . discussed the possibility that the auctions
             could fail in the absence of sufficient demand.  The Plaintiffs could
25           have, with minimal diligence, read the prospectuses for the ARS

26   ───────────────────────
     [3]      The United States District Court for the Southern District of New York recently dismissed
27   with prejudice a class action against E*TRADE regarding its sales of ARS because, among other
     reasons, the plaintiffs could not establish scienter. *See Oughtred v. E*TRADE Financial Corp.*,
28   2011 WL 1210198 (S.D.N.Y. Mar. 31, 2011), attached as Exhibit 1 to the concurrently filed
     Compendium of Non-California Authority.

WEST\21974019.1                                    6

1   they purchased.  As the Second Circuit has noted, the prospectus is
    "the single most important document and perhaps the primary
2   resource an investor should consult in seeking [] information."
    *Brown*, 991 F.2d at 1032.  Furthermore, the prospectuses are easily
3   accessible to investors.  As another recent district court opinion,
    also involving ARS stated, "'[I]n today's world it is unrealistic to
4   argue that documents available on the SEC website are not readily
    accessible to the investing public.'" *In re Merrill Lynch*, 2010 WL
5   1257597, at *15 (quoting *In re Keyspan Corp. Sec. Litig.*, 383
    F.Supp.2d 358, 373 (E.D.N.Y.2003)); *see also Berwecky v. Bear,
6   Stearns & Co., Inc.*, 197 F.R.D. 65, 70 (S.D.N.Y.2000) ("[S]ince
    the ... prospectus is a public filing, all members of the public are
7   chargeable with knowledge of its contents.").  [¶] In addition, the
    SEC documents and press publications further detailed that it was
8   common practice for broker-dealers to place support bids in order
    to prevent ARS auction failures and influence the clearing rate, and
9   highlighted the risk of auction failure in the event broker-dealers
    withdrew their support for ARS auctions.

10

11   *In re UBS Auction Rate Sec. Litig.*, 2010 WL 2541166 at *23 (S.D.N.Y. June 10, 2010).[4]  Since

12   Plaintiffs purchased their ARS in the secondary market, there was no obligation that they be

13   provided with a prospectus by E*TRADE or anyone else.  *See, e.g.,* 17 C.F.R. 240.15c2-8.[5]

14   Instead, the prospectus was available to Plaintiffs for viewing on the SEC's website.

15          Finally, Plaintiffs fail to demonstrate that they suffered any damages.  They have not sold

16   their ARS at a loss, and still hold the security.  They have not alleged that the ARS is not paying

17   interest or its otherwise in default.

18          The Court should sustain E*TRADE's demurrer to Plaintiffs' First, Second and Third

19   Causes of Action.

20   **D.**     **Plaintiffs Fail to State a Claim for Breach of Contract Against E*TRADE.**

21          In their Fourth Cause of Action, Plaintiffs claim that E*TRADE breached an alleged oral

22   contact that Plaintiffs' ARS would be redeemed by PIMCO.  (Complaint, ¶ 49).  The essential

23   elements of breach of contract are "(1) the contract, (2) plaintiff's performance or excuse for

24   nonperformance, (3) defendant's breach, and (4) the resulting damages to plaintiff." *Reichert v.*

25   *General Ins. Co.*, 68 Cal.2d 822, 830 (1968).  For there to be a contract, there must be

26   _____

27   [4]     A true and correct copy of this decision is attached as Exhibit 2 to the concurrently filed
    Compendium of Non-California Authority.

28   [5]     A true and correct copy of this regulation is attached as Exhibit 3 to the concurrently filed
    Compendium of Non-California Authority.

1    consideration. *See* Cal. Civ. Code § 1550; *Diaz v. Bukey*, __ Cal.App.4th __, 11 Cal. Daily Op.

2    Serv. 5554, 2011 WL 1759798 at *2 (Cal. App. May 10, 2011).

3           Plaintiffs' breach of contract claim fails because they do not allege any consideration that

4    they provided to E*TRADE to support the alleged contract. (Complaint, ¶¶ 49-52).   In addition,

5    the supposed contract was that PIMCO would redeem the ARS, not that E*TRADE would.

6    (Complaint, ¶ 49)  Indeed, E*TRADE could not have redeemed the ARS Plaintiffs purchased

7    because it was not the issuer of the ARS. *See* Black's Law Dictionary (6th Ed. 1990) 1278

8    ("Redeem. To buy back. . . . To repurchase in a literal sense[.]").   Therefore, Plaintiff has not

9    pleaded that E*TRADE breached the alleged contract. The Court should sustain E*TRADE's

10   demurrer to the Fourth Cause of Action.

11       **E.**    **Plaintiffs Fail to State a Claim for Rescission Against E*TRADE.**

12          Plaintiffs' Fifth Cause of Action is for rescission under Civil Code § 1689(b)(1) and (2)

13   against E*TRADE and PIMCO.  Because, as explained above, Plaintiffs have failed to state a

14   claim for fraud, they cannot rescind based upon fraud.  Likewise, Plaintiffs cannot rescind based

15   upon failure of consideration because they make no allegation that they did not receive the ARS

16   that they purchased.  Instead, they complain about a subsequent event (auction failures) arising

17   from the financial crisis that is hindering their ability to sell their ARS. (Complaint, ¶ 22).

18          In addition, as against E*TRADE, Plaintiffs fail to state a claim because they did not

19   purchase their ARS from E*TRADE.  Instead, they bought them at an ARS auction.  (Complaint,

20   ¶¶ 8, 10).  Brokers are not proper parties to a rescission cause of action. *See, e.g., Podalsky v.*

21   *Price*, 87 Cal.App.2d 151, 164 (1948), disapproved on other grounds by *Gagne v. Bertran*, 43

22   Cal.2d 481 (1954); *Clancy v. Becker-Arbuckle-Wright Corp.*, 137 Cal.App. 43, 47 (1934) ("We

23   are of the opinion that appellant was not entitled to judgment for rescission against one who was

24   not a party to the agreement and that the nonsuit was properly granted herein as to the selling

25   agent."), overruling on other grounds recognized by *Tullis v. Title Guar. & Trust Co.*, 11

26   Cal.App.2d 391 (1936).  Instead, brokers' potential liability is on a separate, ancillary tort claim

27   for consequential damages. *See Super 7 Motel Assoc. v. Wang*, 16 Cal.App.4th 541, 550 (1993).

28   As demonstrated above, Plaintiffs fail to allege such a tort claim against E*TRADE.  Therefore,

1    the Court should sustain E*TRADE's demurer to Plaintiffs' Fifth Cause of Action.

2                                          **IV.**

3                                    **CONCLUSION**

4          This Court should sustain E*TRADE's Demurrer without leave to amend.  Plaintiffs fail

5    to plead their first three causes of action with the requisite specificity.  In addition, all five of

6    Plaintiffs' causes of action fail to state a claim against E*TRADE.

7

8    Dated: May 17, 2011                      DLA PIPER LLP (US)

9

10                                  By  _____
                                        EDWARD D. TOTINO
11                                      MONICA N. DOURNAEE
                                        Attorneys for Defendant
12                                      E*TRADE SECURITIES LLC

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

WEST\21974019.1                              9

DEFENDANT E*TRADE SECURITIES LLC'S DEMURRER TO PLAINTIFFS' COMPLAINT

1    **PROOF OF SERVICE**

2

3    STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

4    I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action; my business address is: 1999 Avenue of the Stars, Fourth Floor,
5    Los Angeles, California 90067.

6    On May 17, 2011, I served the foregoing document(s) described as:

7    **DEFENDANT E*TRADE SECURITIES LLC'S NOTICE OF DEMURRER AND DEMURRER TO PLAINTIFFS' COMPLAINT; MEMORANDUM OF POINTS AND
8    AUTHORITIES IN SUPPORT**

9    on interested parties in this action by placing ☐ the original ☒ true copy(ies) thereof enclosed in sealed envelopes as stated below.

10

11

12    Daniel T. Bernhard, Esq.                          *Attorneys for Plaintiffs*
      FREELAND COOPER & FOREMAN LLP                      *WILLIAM BRIDGE, JR., and*
      150 Spear Street, Suite 1800                       *MICHELE PROFANT*
13    San Francisco, CA 94105
      Tel:   (415) 541-0200
14    Fax:   (415) 495-4332
      E-mail: bernhard@freelandlaw.com
15

16   ☒   **(BY MAIL)** The envelope was mailed with postage thereon fully prepaid. As follows:
         I am "readily familiar" with the firm's practice of collection and processing
17       correspondence for mailing. Under that practice it would be deposited with U.S. postal
         service on that same day with postage thereon fully prepaid at Los Angeles, California in
18       the ordinary course of business. I am aware that on motion of the party served, service is
         presumed invalid if postal cancellation date or postage meter date is more than one day
19       after date of deposit for mailing in affidavit.

20   ☐   **(BY FACSIMILE)** I delivered such document by facsimile to the following persons at
         the facsimile telephone numbers listed above.
21

22   ☐   **(BY HAND DELIVERY)** I delivered the within documents to Corporate Legal Services
         for delivery to the above address(es) with instructions that such envelope be delivered
         personally on May 17, 2011 to the above named individuals.
23

24   ☐   **(BY OVERNIGHT MAIL)** I am readily familiar with the firm's practice of collection
         and processing correspondence for mailing with an overnight courier service. Under that
25       practice it would be deposited with said overnight courier service on that same day with
         delivery charges thereon billed to sender's account, at Los Angeles, California in the
26       ordinary course of business. The envelope was sealed and placed for collection and
         mailing on that date following ordinary business practices.

27

28

WEST\223469172.1

1  ☒  **(STATE)**  I declare under penalty of perjury under the laws of the State of California that
   the above is true and correct.

2

3  ☐  **(FEDERAL)**  I declare that I am employed in the office of a member of the bar of this
   court at whose direction the service was made.

4  Executed on May 17, 2011, at Los Angeles, California.

5

6  Ann Lozinski
   [Print Name Of Person Executing Proof]                    [Signature]

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1    **DLA PIPER LLP (US)**
     EDWARD D. TOTINO (SBN 169237)
2    MONICA DOURNAEE (SBN 268109)
     1999 Avenue of the Stars, Suite 400
3    Los Angeles, California 90067-6023
     Tel: 310.595.3000
4    Fax: 310.595.3300

5    Attorneys for Defendant
     E*TRADE SECURITIES LLC

6

7

8                    **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

9                         **FOR THE COUNTY OF ALAMEDA**

10

11   WILLIAM BRIDGE, JR. and MICHELLE          CASE NO. RG11563509
     PROFANT,
12                                             *ASSIGNED FOR ALL PURPOSES TO:*
                  Plaintiffs,                  *Judge David Hunter*
13                                             *Dept. 520*
           v.
14                                             **DEFENDANT E*TRADE SECURITIES**
     E*TRADE SECURITIES LLC; PACIFIC           **LLC'S REQUEST FOR JUDICIAL**
15   INVESTMENT MANAGEMENT                      **NOTICE IN SUPPORT OF DEMURRER**
     COMPANY LLC; and DOES 1-10,               **TO PLAINTIFFS' COMPLAINT**
16   INCLUSIVE,

17                Defendants.                  Complaint Filed:  March 1, 2011
                                               Trial Date:       Not Set
18

19

20

21

22

23

24

25

26

27

28

DLA PIPER LLP (US)
LOS ANGELES

WEST\223454282.1

              DEFENDANT'S REQUEST FOR JUDICIAL NOTICE ISO DEMURRER

ENDORSED
FILED
ALAMEDA COUNTY

MAY 17 2011

CLERK OF THE SUPERIOR COURT
By _____ A. MENDOLA _____
                              Deputy

1    Defendant E*Trade Securities, LLC ("E*Trade") submits the following Request for

2    Judicial Notice in support of its Demurrer to Plaintiffs William Bridge, Jr. and Michele Profant's

3    (collectively, "Plaintiffs") Complaint.

4    Pursuant to the authorities cited herein, E*Trade respectfully request that the Court take

5    judicial notice of the following document:

6        1.    PIMCO California Prospectus and Statement of Additional Information ("PIMCO

7    Prospectus") filed on August 20, 2001 with the United States Securities and Exchange

8    Commission ("SEC") pursuant to section 497(h) of the federal Securities Act available at:

9    http://www.sec.gov/Archives/edgar/data/1140411/000092701601502627/d497.txt (last visited

10   May 12, 2011). A true and correct copy of the PIMCO Prospectus, is attached hereto as Exhibit

11   "A."

12       Under California Evidence Code section 452(h), a court may properly take judicial notice

13   of "[f]acts and propositions that are not reasonably subject to dispute and are capable of

14   immediate and accurate determination by resort to sources of reasonably indisputable accuracy."

15   Cal. Evid. Code § 452(h). The PIMCO Prospectus, as a document filed with a federal

16   administrative agency (the SEC), is both not reasonably subject to dispute and is capable of

17   immediate and accurate determination by resort to the SEC's publically available filings which

18   are easily found on the SEC's website. Indeed, California courts often take judicial notice of SEC

19   filings and other documents from federal administrative agencies. *See, e.g.*, *Kruss v. Booth*, 185

20   Cal. App. 4th 699, 710 (2010) (noting that the trial court properly took judicial notice of SEC

21   filings); *Smiley v. Citibank*, 11 Cal. 4th 138, 145 n. 2 (1995) (finding it proper to take judicial

22   notice of documents from federal administrative agencies).

23   ///

24   ///

25   ///

26   ///

27   ///

28

1         Accordingly, the Court has the authority to take notice of the PIMCO Prospectus in

2    support of E*Trade's Demurrer.

3    Dated: May 17, 2011             DLA PIPER LLP (US)

4

5                        By _____

6                           EDWARD D. TOTINO

                            MONICA N. DOURNAEE

7                           Attorneys for Defendant

                            E*TRADE SECURITIES LLC

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

WEST\223454282.1                -2-

DEFENDANT'S REQUEST FOR JUDICIAL NOTICE ISO DEMURRER

**Exhibit A, Page 52**

# EXHIBIT A

```
<DOCUMENT>
<TYPE>497
<SEQUENCE>1
<FILENAME>d6497.txt
<DESCRIPTION>PIMCO CALIFORNIA PROSPECTUS AND SAI
<TEXT>
<PAGE>
```

Filed Pursuant to Rule 497(h)
Registration No. 333-64826

PROSPECTUS                                                    August 20, 2001

--------------------------------------------------------------------

$158,000,000

++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++
+ [LOGO OF PIMCO]                                                            +
++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++
PIMCO California Municipal Income Fund
3,000 Shares Series A
2,900 Shares Series B
2,000 Shares Series C
Auction Preferred Shares
Liquidation Preference $25,000 Per Share
--------------------------------------------------------------------

Investment Objective. The Fund is a recently organized, non-diversified,
closed-end management investment company. The Fund's investment objective is to
provide current income exempt from federal and California income tax. In
pursuing this objective, the portfolio manager also seeks to preserve and
enhance the value of the Fund's holdings relative to the municipal bond market
generally, using proprietary analytical models that test and evaluate the
sensitivity of those holdings to changes in interest rates and yield
relationships.

Portfolio Contents. Under normal market conditions, the Fund will invest
substantially all (at least 90%) of its total assets in municipal bonds which
pay interest that, in the opinion of bond counsel to the issuer (or on the
basis of other authority believed by the Fund's portfolio manager to be
reliable), is exempt from federal and California income taxes. The Fund will
seek to avoid bonds generating interest potentially subjecting individuals to
the alternative minimum tax. The Fund will invest at least 80% of its net
assets in investment grade quality municipal bonds, including bonds that are
unrated but judged to be of investment grade quality by the Fund's portfolio
manager. The Fund may invest up to 20% of its net assets in municipal bonds
that are rated Ba/BB or B or that are unrated but judged to be of comparable
quality by the Fund's portfolio manager. The Fund cannot assure you that it
will achieve its investment objective.

Certain capitalized terms used in this Prospectus are defined in the Glossary
that appears at the end of this Prospectus.

Before buying any preferred shares you should read the discussion of the
material risks of investing in the Fund in "Risks" beginning on page 18. These
risks are summarized in "Special Risk Considerations" beginning on page 3.

Neither the Securities and Exchange Commission nor any state securities
commission has approved or disapproved of these securities or determined if
this prospectus is truthful or complete. Any representation to the contrary is
a criminal offense.

<TABLE>
<CAPTION>
                                                          Proceeds
                    Price to Public   Sales Load          to Fund (1)
           -----------------------------------------------------------
<S>             <C>               <C>            <C>
Per Share       $    25,000   $       250   $    24,750
           -----------------------------------------------------------
Total           $150,000,000  $1,500,000  $148,500,000
           -----------------------------------------------------------
</TABLE>
(1) Plus accumulated dividends, if any, from the date the Auction Preferred
Shares are issued, but before offering expenses payable by the Fund estimated
to be $221,000.

Auction Preferred Shares, Series A, Auction Preferred Shares, Series B and
Auction Preferred Shares, Series C (together "APS") are being offered by the
underwriters subject to certain conditions. The underwriters reserve the right
to withdraw, cancel or modify the offering in whole or in part. It is expected
that the APS will be delivered to the nominee of The Depository Trust Company
on or about August 23, 2001.

UBS Warburg

            A.G. Edwards & Sons, Inc.

                                          Merrill Lynch & Co.

<PAGE>

--------------------------------------------------------------------

(continued from previous page)

Investors in APS will be entitled to receive cash dividends at an annual rate

Exhibit A

that may vary for the successive dividend periods for such shares. The dividend rate on the Series A APS for the initial period from and including the date of issue to, but excluding, September 4, 2001, will be 2.05% per year. The dividend rate on the Series B APS for the initial period from and including the date of issue to, but excluding, September 6, 2001, will be 2.06% per year. The dividend rate on the Series C APS for the initial period from and including the date of issue to, but excluding, September 10, 2001, will be 2.05% per year. For each subsequent period, the Auction Agent will determine the dividend rate for a particular period by an auction conducted in accordance with the procedures described in this Prospectus and, in further detail, in Appendix D to the Statement of Additional Information (each an "Auction").

The APS, which have no history of public trading, will not be listed on an exchange or automated quotation system. Broker-Dealers may maintain a secondary trading market in the APS outside of Auctions; however, they have no obligation to do so, and there can be no assurance that a secondary market for the APS will develop or, if it does develop, that it will provide holders with a liquid trading market (i.e., trading will depend on the presence of willing buyers and sellers and the trading price is subject to variables to be determined at the time of the trade by such Broker-Dealers). A general increase in the level of interest rates may have an adverse effect on the secondary market price of the APS, and a selling shareholder that sells APS between Auctions may receive a price per share of less than $25,000. The Fund may redeem APS as described under "Description of APS--Redemption."

The APS will be senior in liquidation and distribution rights to the Fund's outstanding common shares. The Fund's common shares are traded on the New York Stock Exchange under the symbol "PCQ." This offering is conditioned upon the APS receiving a rating of "Aaa" from Moody's.

You should read this Prospectus, which contains important information about the Fund, before deciding whether to invest and retain it for future reference. A Statement of Additional Information, dated August 30, 2001, containing additional information about the Fund, has been filed with the Securities and Exchange Commission and is incorporated by reference in its entirety into this Prospectus, which means that it is part of the Prospectus for legal purposes. You can review the table of contents of the Statement of Additional Information on page 60 of this Prospectus. You may request a free copy of the Statement of Additional Information by calling (877) 819-2224 or by writing to the Fund, or obtain a copy (and other information regarding the Fund) from the Securities and Exchange Commission web site (http://www.sec.gov).

The APS do not represent a deposit or obligation of, and are not guaranteed or endorsed by, any bank or other insured depository institution, and are not federally insured by the Federal Deposit Insurance Corporation, the Federal Reserve Board or any other government agency.

You should rely only on the information contained or incorporated by reference in this Prospectus. The Fund has not, and the underwriters have not, authorized anyone to provide you with different information. If anyone provides you with different or inconsistent information, you should not rely on it. The Fund is not, and the underwriters are not, making an offer of the APS in any state where the offer is not permitted. You should not assume that the information contained in this Prospectus is accurate as of any date other than the date on the front of this Prospectus. The Fund's business, financial condition, results of operations and prospects may have changed since that date.

Until September 14, 2001 (25 days after the date of this Prospectus), all dealers that buy, sell or trade the APS, whether or not participating in this offering, may be required to deliver a prospectus. This is in addition to the dealers' obligation to deliver a prospectus when acting as underwriters and with respect to their unsold allotments or subscriptions.

---

<PAGE>

---

## TABLE OF CONTENTS

<TABLE>
<S>                                      <C>
Prospectus summary.........               1
The Fund...................              12
Use of proceeds............              12
Capitalization.............              12
Portfolio composition......              13
The Fund's Investments.....              14
Risks......................              18
How the Fund manages risk..              22
Rating agency guidelines...              24
Description of APS.........              26
Management of the Fund.....              49
Net asset value............              51
</TABLE>
<TABLE>
<S>                                      <C>
Taxes......................              51
Description of capital structure......  53
Anti-takeover and other provisions in
    the Declaration of Trust..........   57
Repurchase of Common Shares;
    conversion to open-end fund........  59

Underwriting............................    59
Custodian and transfer agents..........    59
Legal matters..........................    59
Table of contents for the Statement of
  Additional Information..............    60
Glossary...............................    61
</TABLE>

--------------------------------------------------------------------

<PAGE>


[This page intentionally left blank]


<PAGE>

Prospectus summary

This is only a summary. You should review the more detailed information
contained in this Prospectus. Certain capitalized terms used in this Prospectus
are defined in the Glossary that appears at the end of this Prospectus.

THE FUND

PIMCO California Municipal Income Fund (the "Fund") is a recently organized,
non-diversified, closed-end management investment company registered under the
Investment Company Act of 1940, as amended (the "1940 Act"). The Fund is
designed to provide tax benefits to investors who are residents of California.
See "The Fund." The Fund's common shares ("Common Shares") are traded on the
New York Stock Exchange under the symbol "PCQ." As of August 3, 2001, the Fund
had 17,486,667 Common Shares outstanding and net assets of $253,811,539.

THE OFFERING

The Fund is offering an aggregate of 2,000 Series A APS, 2,000 Series B APS and
2,000 Series C APS, each at a purchase price of $25,000 per share plus
accumulated dividends, if any, from the date of original issue. The APS are
being offered through a group of underwriters led by UBS Warburg LLC
(collectively, the "Underwriters"). See "Underwriting."

The APS will entitle their holders to receive cash dividends at an annual rate
that may vary for successive Dividend Periods. In general, except as described
under "Description of APS--Dividends," each Dividend Period is seven days.
The Auction Agent will determine the Applicable Rate for a particular period by
an Auction conducted on the Business Day immediately prior to the start of that
Dividend Period.

The APS are not listed on an exchange. Instead, investors may buy or sell APS
at an auction that normally is held weekly, by submitting orders to Broker-
Dealers that have entered into an agreement with the Auction Agent and the Fund
or to certain other Broker-Dealers. Bankers Trust Company, the Auction Agent,
reviews orders from Broker-Dealers on behalf of Existing Holders that wish to
sell, or hold at the auction rate, or hold only at a specified Applicable Rate,
and on behalf of Potential Holders that wish to buy, APS. The Auction Agent
then determines the lowest Applicable Rate that will result in all of the
outstanding APS continuing to be held. The first Auction Date for Series A APS
will be August 31, 2001, the first Auction Date for Series B APS will be
September 5, 2001 and the first Auction Date for Series C APS will be September
7, 2001, each being the Business Day before the Initial Dividend Payment Date
for the Initial Dividend Period for the relevant series of APS (September 4,
2001 for Series A, September 6, 2001 for Series B and September 10, 2001 for
Series C). The auction day for Series A APS generally will be Monday, for
Series B APS generally will be Wednesday and for Series C APS generally will be
Friday, unless the then-current Dividend Period is a Special Dividend Period,
or the day that normally would be the Auction Date or the first day of the
subsequent Dividend Period is not a Business Day.

INVESTMENT OBJECTIVE

The Fund's investment objective is to provide current income exempt from
federal and California income tax. In pursuing this objective, the portfolio
manager also seeks to preserve and enhance the value of the Fund's holdings
relative to the municipal bond market generally, using proprietary analytical
models that test and evaluate the sensitivity of those holdings to changes in
interest rates and yield relationships. Under normal market conditions, the
Fund will invest substantially all (at least 90%) of its total assets in
municipal bonds which pay interest that, in the opinion of bond counsel to

                                                                            1

<PAGE>

the issuer (or on the basis of other authority believed by the Fund's portfolio
manager to be reliable) is exempt from federal and California income taxes
("California Municipal Bonds"). The Fund will seek to avoid bonds generating
interest potentially subjecting individuals to the alternative minimum tax. The
Fund will invest at least 80% of its net assets in municipal bonds that at the
time of investment are investment grade quality. Investment grade quality bonds
are bonds rated within the four highest grades (Baa or BBB or better by
Moody's, S&P or Fitch), or bonds that are unrated but judged to be of
comparable quality by the Fund's portfolio manager. The Fund may invest up to
20% of its net assets in municipal bonds that, at the time of investment, are

rated Ba/BB or B by Moody's, S&P or Fitch or that are unrated but judged to be
of comparable quality by the Fund's portfolio manager. Bonds of below
investment grade quality are regarded as having predominantly speculative
characteristics with respect to capacity to pay interest and repay principal,
and are commonly referred to as "junk bonds". Bonds in the lowest investment
grade category may also be considered to possess some speculative
characteristics.

The Fund may invest in "structured" notes, which are privately negotiated debt
obligations where the principal and/or interest is determined by reference to
the performance of a benchmark asset or market, such as selected securities or
an index of securities, or the differential performance of two assets or
markets, such as indices reflecting taxable and tax-exempt bonds. The Fund
currently intends that any use of structured notes will be for the purpose of
reducing the interest rate sensitivity of the Fund's portfolio (and thereby
decreasing the Fund's exposure to interest rate risk) and, in any event, that
the interest income on the notes will normally be exempt from federal and
California income tax.

The Fund cannot assure you that it will attain its investment objective. See
"The Fund's investments."

INVESTMENT MANAGER

PIMCO Advisors L.P. ("PIMCO Advisors") serves as the investment manager of the
Fund. Subject to the supervision of the Board of Trustees, PIMCO Advisors is
responsible for managing, either directly or through others selected by it, the
investment activities of the Fund and the Fund's business affairs and other
administrative matters. PIMCO Advisors is located at 1345 Avenue of the
Americas, New York, New York 10105. Organized in 1987, PIMCO Advisors provides
investment management and advisory services to private accounts of
institutional and individual clients and to mutual funds. As of June 30, 2001,
PIMCO Advisors and its subsidiary partnerships had approximately $276 billion
in assets under management.

PIMCO Advisors has retained its affiliate, Pacific Investment Management
Company LLC ("PIMCO"), as a sub-adviser to manage the Fund's portfolio
investments. See "Portfolio Manager" below.

PORTFOLIO MANAGER

PIMCO serves as the Fund's sub-adviser responsible for managing the Fund's
portfolio investments, and is sometimes referred to herein as the "portfolio
manager." Subject to the supervision of PIMCO Advisors, PIMCO has full
investment discretion and makes all determinations with respect to the
investment of the Fund's assets.

PIMCO is located at 840 Newport Center Drive, Newport Beach, California 92660.
Organized in 1971, PIMCO provides investment management and advisory services
to private accounts of institutional and individual clients and to mutual
funds. As of June 30, 2001, PIMCO had approximately $222 billion in assets
under management.

PIMCO Advisors (and not the Fund) will pay a portion of the fees it receives to
PIMCO in return for PIMCO's services.

2

<PAGE>

LEVERAGE

The Fund utilizes financial leverage on an ongoing basis for investment
purposes. After completion of the offering of APS, the Fund anticipates its
total leverage from the issuance of APS will be approximately 37%. This amount
may change, but total leverage will not exceed 50% of the Fund's total assets.
Although the Fund may in the future offer other Preferred Shares, the Fund does
not currently intend to offer Preferred Shares other than Series A APS, Series
B APS and Series C APS. The Fund may also invest in RIBS and other derivative
instruments, each of which will amplify the effects of leverage in the Fund's
portfolio.

The Fund generally will not utilize leverage if it anticipates that it would
result in a lower return to Common Shareholders over time. Use of financial
leverage creates an opportunity for increased income for Common Shareholders,
but, at the same time, creates the possibility for greater loss (including the
likelihood of greater volatility of net asset value and market price of the
shares and of dividends), and there can be no assurance that a leveraging
strategy will be successful during any period in which it is employed. Because
the fees paid to PIMCO Advisors and PIMCO will be calculated on the basis of
the Fund's managed assets, the fees will be higher when leverage is utilized,
giving PIMCO Advisors and PIMCO an incentive to utilize leverage. See "Risks--
Leverage Risk."

SPECIAL RISK CONSIDERATIONS

Risks of investing in APS include:

Auction Risk

You may not be able to sell your APS at an auction if the Auction fails, that
is, if there are more APS offered for sale than there are buyers for those
shares. As a result, your investment in APS may be illiquid. Neither the
Broker-Dealers nor the Fund are obligated to purchase APS in an Auction or
otherwise, nor is the Fund required to redeem APS in the event of a failed

Auction.

Ratings and Asset Coverage Risk

A Rating Agency could downgrade the APS, which could affect their liquidity and value. In addition, the Fund may be forced to redeem your APS to meet regulatory or Rating Agency requirements. The Fund may also voluntarily redeem APS under certain circumstances.

Secondary Market Risk

You could receive less than the price you paid for your APS if you sell them outside of an Auction, especially when market interest rates are rising. Although the Broker-Dealers may maintain a secondary trading market in the APS outside of Auctions, they are not obligated to do so and no secondary market may develop or exist at any time for the APS.

General risks of investing in the Fund include:

Limited Operating History

The Fund is a recently organized, non-diversified, closed-end management investment company which has been operational for less than two months.

Interest Rate Risk

Interest rate risk is the risk that the municipal bonds in the Fund's portfolio will decline in value because of increases in market interest rates. The prices of longer-term bonds generally fluctuate more

3

<PAGE>

than prices of shorter-term bonds as interest rates change. Because the Fund will invest primarily in long-term bonds, the Fund's net asset value will fluctuate more in response to changes in market interest rates than if the Fund invested primarily in shorter-term bonds. If long-term rates rise, the value of the Fund's investment portfolio may decline, reducing asset coverage on the APS.

Credit Risk

Credit risk is the risk that one or more municipal bonds in the Fund's portfolio will decline in price, or fail to pay interest or principal when due, because the issuer of the bond experiences a decline in its financial status. Any default by an issuer of a municipal bond could have a negative impact on the Fund's ability to pay dividends on the APS and could result in the redemption of some or all of the APS.

Municipal Bond Market Risk

The amount of public information available about the municipal bonds in the Fund's portfolio is generally less than that for corporate equities or bonds, and the investment performance of the Fund may therefore be more dependent on the analytical abilities of PIMCO than would be a stock fund or taxable bond fund. The secondary market for municipal bonds, particularly the below investment grade bonds in which the Fund may invest, also tends to be less well-developed and less liquid than many other securities markets, which may adversely affect the Fund's ability to sell its bonds at attractive prices.

Reinvestment Risk

Income from the Fund's municipal bond portfolio will decline if and when the Fund invests the proceeds from matured, traded or called bonds at market interest rates that are below the portfolio's current earnings rate. This could impact the Fund's net asset value and reduce asset coverage on the APS.

Inflation Risk

As inflation increases, the real value of the APS and distributions, as well as the value of the Fund's portfolio, could decline.

Leverage Risk

The Fund utilizes financial leverage for investment purposes. Leverage risk includes the risk associated with the issuance of APS to leverage the Fund's Common Shares. The Fund may also invest in MBS and other derivative instruments, which will amplify the effects of leverage. If the dividend rate on the APS exceeds the net rate of return on the Fund's portfolio, the leverage will result in a lower net asset value than if the Fund were not leveraged, and the Fund's ability to pay dividends and to meet its asset coverage requirements on the APS would be reduced.

Because the fees received by PIMCO Advisors and PIMCO are based on the Fund's managed assets, the fees will be higher when leverage is utilized, giving PIMCO Advisors and PIMCO an incentive to utilize leverage.

Anti-Takeover Provisions

The Fund's Declaration of Trust and Amended By-Laws include provisions that could have the effect of limiting the ability of other entities or persons to acquire control of the Fund or to change the composition of the Board of Trustees.

Certain Affiliations

Exhibit A, Page 58

Because certain broker-dealers may be considered affiliated persons of the Fund, PIMCO Advisors and/or PIMCO, the Fund's ability to utilize such broker-dealers is subject to restrictions and, in some cases, is prohibited. This could limit the Fund's ability to engage in securities transactions and take advantage of market opportunities.

4
<PAGE>

Risks of investing in a California fund include:

Concentration Risk
The Fund's policy of investing substantially all of its assets in California Municipal Bonds makes the Fund more susceptible to adverse economic, political or regulatory occurrences affecting the issuers of such bonds.

Non-Diversification Risk
Because the Fund is classified as "non-diversified" under the 1940 Act, it can invest a greater portion of its assets in obligations of a single issuer. As a result, the Fund will be more susceptible than a more widely diversified fund to any single corporate, economic, political or regulatory occurrence.

For additional information about the risks of investing in APS and in the Fund, see "Risks" below.

DIVIDENDS ON APS

The APS will entitle their holders to receive cash dividends at a rate per annum that may vary for the successive Dividend Periods for such shares. In general, except as described below, each Dividend Period for each series of APS subsequent to the Initial Dividend Period will be seven days in length. The Applicable Rate for a particular Dividend Period will be determined by an Auction conducted on the Business Day next preceding the start of such Dividend Period.

Through their Broker-Dealers, Beneficial Owners and Potential Beneficial Owners of APS may participate in Auctions; although, except in the case of Special Dividend Periods of longer than 91 days, Beneficial Owners desiring to continue to hold all of their APS regardless of the Applicable Rate resulting from Auctions need not participate. For an explanation of Auctions and the method of determining the Applicable Rate, see "Description of APS--The Auction."

Except as described herein, investors in APS will not receive certificates representing ownership of their shares. Ownership of APS will be maintained in book-entry form by the Securities Depository or its nominee for the account of the investor's Agent Member. The investor's Agent Member, in turn, will maintain records of such investor's beneficial ownership of APS. Accordingly, references herein to purchases, sales or ownership in or purchase, sale or ownership of APS are to purchases, sales or ownership of those shares by Beneficial Owners.

After the Initial Dividend Period, each Subsequent Dividend Period for each series of APS will generally consist of seven days (a "7-day Dividend Period"); provided, however, that prior to any Auction, the Fund may elect, subject to certain limitations described herein, upon giving notice to holders thereof, a Special Dividend Period for any or all series. A "Special Dividend Period" is a Dividend Period consisting of a specified number of days, evenly divisible by seven and not fewer than fourteen nor more than 364 (a "Short Term Dividend Period") or a Dividend Period consisting of a specified period of one whole year or more but not greater than five years (a "Long Term Dividend Period"). Dividends on the APS offered hereby are cumulative from the Date of Original Issue and are payable when, as and if declared by the Board of Trustees of the Fund, out of funds legally available therefor, commencing on the Initial Dividend Payment Date. In the case of Dividend Periods that are not Special Dividend Periods, dividends will be payable generally on each succeeding Tuesday for Series A APS, on each succeeding Thursday for Series B APS and on each succeeding Monday for Series C APS, subject to certain exceptions.

Dividends for the APS will be paid through the Securities Depository on each Dividend Payment Date. The Securities Depository's normal procedures provide for it to distribute dividends in same-day funds

5
<PAGE>

to Agent Members, who are in turn expected to distribute such dividends to the person for whom they are acting as agent in accordance with the instructions of such person. See "Description of APS--Dividends."

For each Subsequent Dividend Period, the cash dividend rate on each series of APS will be the Applicable Rate that the Auction Agent advises the Fund has resulted from an Auction. See "Description of APS--Dividends." The first Auction for each series of the APS is scheduled to be held on the ending date for the Initial Dividend Period as set forth above.

The Amended By-Laws provide that until the Fund gives a Request for Special Dividend Period and the related Notice of Special Dividend Period, only 7-Day Dividend Periods will be applicable to each series of APS. While the Fund does not currently intend to give a Request for Special Dividend Period with respect to any series of APS, it may so elect in the future subject to, and on, the conditions discussed under "Description of the APS--Dividends--Notification of Dividend Period."

A Special Dividend Period will not be effective for a series of APS unless sufficient Clearing Bids exist at the Auction in respect of such Special Dividend Period. If Sufficient Clearing Bids do not exist at such Auction, the Dividend Period commencing on the Business Day succeeding such Auction will be a 7-Day Dividend Period, and the holders of the APS outstanding immediately prior to such Auction will be required to continue to hold some or all of such shares for such Dividend Period. In addition, the Fund may not give a Notice of Special Dividend Period with respect to the APS, or if the Fund has given a Notice of Special Dividend Period for the APS, the Fund will be required to give a Notice of Revocation in respect thereof, if (i) either the 1940 Act APS Asset Coverage is not satisfied or the Fund fails to maintain Moody's Eligible Assets with an aggregate Discounted Value at least equal to the APS Basic Maintenance Amount, in each case on each of the two Valuation Dates immediately preceding the Business Day prior to the related Auction Date for the APS or (ii) sufficient funds for the payment of dividends payable on the immediately succeeding Dividend Payment Date have not been irrevocably deposited with the Auction Agent by the close of business on the third Business Day preceding the related Auction Date.

ADVANCE NOTICE OF ALLOCATION OF TAXABLE INCOME; INCLUSION OF TAXABLE INCOME IN DIVIDENDS

Dividends paid by the Fund, to the extent paid from tax-exempt income earned on municipal bonds, will be exempt from federal income tax, although a portion of those dividends may be a tax preference item for individuals for purposes of the federal alternative minimum tax. In addition, for corporations, interest on all tax-exempt obligations is taken into account in the computation of income subject to the federal alternative minimum tax. Although the Fund will seek to avoid portfolio investments that pay interest that is taxable to individuals under the federal alternative minimum tax, the Fund may not succeed in this regard. The Fund is required to allocate net capital gains and other income subject to federal income tax, if any, proportionately among the Fund's Common Shares and APS. Except as noted below and under "Description of APS--Auction Procedures," whenever the Fund is aware that it will include any net capital gains or other income subject to federal income tax, but not including for this purpose the alternate minimum tax ("Taxable Income"), in any dividend on the APS, the Fund will notify the Auction Agent prior to the Auction establishing the Applicable Rate for such dividend. The Auction Agent in turn will notify each Broker-Dealer whenever it receives any such notice from the Fund, and each Broker-Dealer will notify its Beneficial Owners and Potential Beneficial Owners, as provided in its Broker-Dealer Agreement. In the alternative, the Fund also may include such Taxable Income in a dividend on the APS without giving advance notice thereof if it increases the dividend by an amount sufficient to offset substantially the tax effect thereof or, in certain circumstances, makes a Gross-up Dividend, as described in the next section. The amount of Taxable Income otherwise

6
<PAGE>

allocable to the APS will depend upon the amount of such income realized by the Fund and other factors, but generally is not expected to be significant. See "Taxes" and "Description of APS--Auction Procedures--Auction Date; Advance Notice of Allocation of Taxable Income, Inclusion of Taxable Income in Dividends."

GROSS-UP DIVIDENDS

The Fund may retroactively allocate any net capital gains or other Taxable Income to the APS without giving the advance notice described in the preceding section. If the Fund does so solely by reason of the fact that such allocation is made as a result of the redemption of all or a portion of the outstanding APS or the liquidation of the Fund, the Fund will make certain payments to holders of the APS to which such allocation was made to offset substantially the tax effect thereof. Otherwise, the Fund does not expect to make payments to holders of the APS to offset the tax effect of any reallocation of net capital gains or other taxable income. See "Description of APS--Dividends--Gross-up Dividends" and "Taxes."

DETERMINATION OF MAXIMUM APPLICABLE RATES

Except during a Non-Payment Period, the Applicable Rate for any Dividend Period for APS will not be more than the Maximum Applicable Rate applicable to such shares. The Maximum Applicable Rate for each series of APS will depend on the credit rating assigned to such shares and on the duration of the Dividend Period. The Maximum Applicable Rate will be the Applicable Percentage of the Reference Rate. The Reference Rate is (i) with respect to any 7-Day Dividend Period or any Short Term Dividend Period having 28 or fewer days, the higher of the applicable "AA" Composite Commercial Paper Rate and the Taxable Equivalent of the Short-Term Municipal Obligation Rate, (ii) with respect to any Short Term Dividend Period having more than 28 but fewer than 183 days, the applicable "AA" Composite Commercial Paper Rate, (iii) with respect to any Short Term Dividend Period having 183 or more but fewer than 364 days, the applicable U.S. Treasury Bill Rate and (iv) with respect to any Long Term Dividend Period, the applicable U.S. Treasury Note Rate. The Applicable Percentage will be determined based on (i) the credit rating assigned on such date to the APS by Moody's (or, if Moody's shall not make such rating available, the equivalent of such rating by a Substitute Rating Agency) and (ii) whether the Fund has provided notification to the Auction Agent prior to the Auction establishing the Applicable Rate for any dividend that net capital gains or other taxable income will be included in such dividend on the APS, as follows:

<TABLE>
<CAPTION>

Exhibit A, Page 60

| Moody's Credit Ratings on APS | Applicable Percentage of Reference Rate-- No Notification | Applicable Percentage of Reference Rate-- Notification |
| --- | --- | --- |
| <S> | <C> | <C> |
| Aa3 or higher............................... | 110% | 150% |
| A........................................... | 125 | 160 |
| Baa......................................... | 150 | 250 |
| Below Baa................................... | 200 | 275 |
| </TABLE> | | |

There is no minimum Applicable Rate in respect of any Dividend Period. The
Applicable Rate for any Dividend Period commencing during any Non-Payment
Period, and the rate used to calculate the late charge described under
"Description of APS--Dividends--Non-Payment Period; Late Charge," initially
will be 200% of the Reference Rate (or 275% of such rate if the Fund has
provided notification to the Auction Agent prior to the Auction establishing
the Applicable Rate for any dividend that net capital gains or other taxable
income will be included in such dividend on APS).

7

<PAGE>

AUCTION PROCEDURES

     Separate Auctions will be conducted for each series of APS. Unless otherwise
permitted by the Fund, Beneficial Owners and Potential Beneficial Owners of APS
may only participate in Auctions through their Broker-Dealers. Broker-Dealers
will submit the Orders of their respective customers who are Beneficial Owners
and Potential Beneficial Owners to the Auction Agent, designating themselves as
Existing Holders in respect of shares subject to Orders submitted or deemed
submitted to them by Beneficial Owners and as Potential Holders in respect of
shares subject to Orders submitted to them by Potential Beneficial Owners. On
or prior to each Auction Date for the APS (the Business Day next preceding the
first day of each Dividend Period), each Beneficial Owner may submit Orders to
its Broker-Dealer as follows:

     .Hold Order--indicating its desire to hold the APS without regard to the
     Applicable Rate for the next Dividend Period for such shares.

     .Bid--indicating its desire to hold the APS, provided that the Applicable Rate
     for the next Dividend Period for such shares is not less than the rate per
     annum specified in such Bid.

     .Sell Order--indicating its desire to sell the APS without regard to the
     Applicable Rate for the next Dividend Period for such shares.

     A Beneficial Owner may submit different types of Orders to its Broker-Dealer
with respect to the APS then held by such Beneficial Owner, provided that the
total number of APS covered by such Orders does not exceed the number of APS
held by such Beneficial Owner. If, however, a Beneficial Owner offers through
its Broker-Dealer to purchase additional APS in such Auction, such Beneficial
Owner, for purposes of such offer to purchase additional shares, will be
treated as a Potential Beneficial Owner as described below. Bids by Beneficial
Owners through their Broker-Dealers with rates per annum higher than the
Maximum Applicable Rate will be treated as Sell Orders. A Hold Order (in the
case of an Auction relating to a Dividend Period of 91 days or less) or a Sell
Order (in the case of an Auction relating to a Special Dividend Period of
longer than 91 days) shall be deemed to have been submitted on behalf of a
Beneficial Owner if an Order with respect to the APS then held by such
Beneficial Owner is not submitted on behalf of such Beneficial Owner for any
reason, including the failure of a Broker-Dealer to submit such Beneficial
Owner's Order to the Auction Agent.

     Potential Beneficial Owners of APS may submit Bids through their Broker-Dealers
in which they offer to purchase APS, provided that the Applicable Rate for the
next Dividend Period for such shares is not less than the rate per annum
specified in such Bid. A Bid by a Potential Beneficial Owner with a rate per
annum higher than the Maximum Applicable Rate will not be considered.

     Neither the Fund nor the Auction Agent will be responsible for a Broker-
Dealer's failure to act in accordance with the instructions of Beneficial
Owners or Potential Beneficial Owners or failure to comply with any of the
foregoing.

     A Broker-Dealer also may hold APS for its own account as a Beneficial Owner. A
Broker-Dealer thus may submit Orders to the Auction Agent as a Beneficial Owner
or a Potential Beneficial Owner and therefore participate in an Auction as an
Existing Holder or Potential Holder on behalf of both itself and its customers.
Any Order placed with the Auction Agent by a Broker-Dealer as or on behalf of a
Beneficial Owner or a Potential Beneficial Owner will be treated in the same
manner as an Order placed with a Broker-Dealer by a Beneficial Owner or a
Potential Beneficial Owner. Similarly, any failure by a Broker-Dealer to submit
to the Auction Agent an Order in respect of any APS held by it or its customers
who are Beneficial Owners will be treated in this same manner as a Beneficial
Owner's failure to submit to its Broker-Dealer an Order in respect of APS held
by it, as described above.

8

<PAGE>

     Inasmuch as a Broker-Dealer participates in an Auction as an Existing Holder or
a Potential Holder only to represent the interests of a Beneficial Owner or

Potential Beneficial Owner, whether it be a customer or itself, all discussion herein relating to the consequences of an Auction for Existing Holders and Potential Holders also applies to the underlying beneficial ownership interests represented thereby.

If Sufficient Clearing Bids exist in an Auction for a series of APS (that is, in general, the number of APS subject to Bids by Potential Holders with rates equal to or lower than the Maximum Applicable Rate is at least equal to the number of APS subject to Sell Orders by Existing Holders), the Applicable Rate will be the lowest rate per annum specified in the Submitted Bids which, taking into account such rate per annum and all lower rates per annum bid by Existing Holders and Potential Holders, would result in Existing Holders and Potential Holders owning all of the APS available for purchase in the Auction. If Sufficient Clearing Bids do not exist, the Dividend Period next following the Auction automatically will be a 7-Day Dividend Period and the Applicable Rate will be the Maximum Applicable Rate, and in such event, Existing Holders that have submitted Sell Orders will not be able to sell in the Auction all, and may not be able to sell any, APS subject to such Sell Orders. Thus, in certain circumstances, Existing Holders and, thus, the Beneficial Owners they represent may not have liquidity of investment. If all Existing Holders submit (or are deemed to have submitted) Hold Orders in an Auction, the Dividend Period next following the Auction automatically shall be the same length as the immediately preceding Dividend Period, and the Applicable Rate will be 48% of the Reference Rate (as defined under "Determination of Maximum Applicable Rates" above) in effect on the date of the Auction (or 60% of such rate if the Fund has provided notification to the Auction Agent prior to the Auction establishing the Applicable Rate for any dividend that net capital gains or other taxable income will be included in such dividend on APS).

The Auction Procedures include a pro rata allocation of shares for purchase and sale, which may result in an Existing Holder selling or holding, or a Potential Holder purchasing, a number of APS that is less than the number of APS specified in its Order. To the extent the allocation has this result, a Broker-Dealer will be required to make appropriate pro rata allocations among its customers and itself.

A Sell Order by an Existing Holder will constitute an irrevocable offer to sell the APS subject thereto, and a Bid placed by an Existing Holder also will constitute an irrevocable offer to sell the APS subject thereto if the rate per annum specified in the Bid is higher than the Applicable Rate determined in the Auction, in such case at a price per share equal to $25,000. A Bid placed by a Potential Holder will constitute an irrevocable offer to purchase the APS subject thereto at a price per share equal to $25,000 if the rate per annum specified in such Bid is less than or equal to the Applicable Rate determined in the Auction. Settlement of purchases and sales will be made on the next Business Day (also a Dividend Payment Date) after the Auction Date through the Securities Depository. Purchasers will make payment through their Agent Members in same-day funds to the Securities Depository against delivery by book-entry to their Agent Members. The Securities Depository will make payment to the sellers' Agent Members in accordance with the Securities Depository's normal procedures, which now provide for payment in same-day funds. See "Description of APS--The Auction."

ASSET MAINTENANCE

Under the Amended By-Laws, the Fund must maintain (i) Moody's Eligible Assets having in the aggregate a Discounted Value at least equal to the APS Basic Maintenance Amount and (ii) 1940 Act APS Asset Coverage of at least 200%. See "Description of APS--Asset Maintenance."

The Fund estimates that, based on the composition of its portfolio at August 3, 2001, 1940 Act APS Asset Coverage with respect to APS would be approximately 263% immediately after the issuance of the APS offered hereby in an amount representing approximately 37% of the Fund's capital (including the capital attributable to the APS).

<PAGE>

The Discount Factors and guidelines for calculating the Discounted Value of the Fund's portfolio for purposes of determining whether the APS Basic Maintenance Amount has been satisfied have been established by Moody's in connection with the Fund's receipt of a rating of "Aaa" on the APS on their Date of Original Issue. See "Rating Agency Guidelines."

MANDATORY REDEMPTION

If the APS Basic Maintenance Amount or the 1940 Act APS Asset Coverage is not maintained or restored as specified herein, the APS will be subject to mandatory redemption, out of funds legally available therefor, at the Mandatory Redemption Price of $25,000 per share plus an amount equal to dividends thereon (whether or not earned or declared) accumulated but unpaid to the date fixed for redemption. In addition, holders of APS may be entitled to receive Gross-up Dividends in the event of redemption of such APS as described herein. See "Description of APS--Dividends--Gross-up Dividends." Any such redemption will be limited to the minimum number of APS necessary to restore the APS Basic Maintenance Amount or the 1940 Act APS Asset Coverage, as the case may be. The Fund's ability to make such a mandatory redemption may be restricted by the provisions of the 1940 Act. See "Description of APS--Redemption--Mandatory Redemption."

OPTIONAL REDEMPTION

The APS are redeemable at the option of the Fund, as a whole or in part, on any

Exhibit A, Page 62

Dividend Payment Date (except during the Initial Dividend Period or a Non-Call Period) at the Optional Redemption Price of $25,000 per share, plus an amount equal to dividends thereon (whether or not earned or declared) accumulated but unpaid to the date fixed for redemption plus the premium, if any, resulting from the designation of a Premium Call Period. See "Description of APS-- Redemption--Optional Redemption." In addition, holders of APS may be entitled to receive Gross-up Dividends in the event of redemption of such APS as described herein. See "Description of APS--Dividends--Gross-up Dividends."

LIQUIDATION PREFERENCE

The liquidation preference of the APS will be $25,000 per share, plus an amount equal to accumulated but unpaid dividends (whether or not earned or declared). See "Description of APS--Liquidation Rights." In addition, holders of APS may be entitled to receive Gross-up Dividends in the event of the liquidation of the Fund as provided herein. See "Description of APS--Dividends--Gross-up Dividends."

RATING

It is a condition to their issuance that the APS be issued with a credit quality rating of "Aaa" from Moody's. The Fund may at some future time seek to have the APS rated by an additional or substitute Rating Agency. See "Rating Agency Guidelines."

VOTING RIGHTS

The 1940 Act requires that the holders of APS and any other Preferred Shares, voting as a class, have the right to elect at least two trustees at all times and to elect a majority of the trustees at any time when two years' dividends on the APS or any other Preferred Shares are unpaid. The holders of APS and any other Preferred Shares will vote as a separate class on certain other matters as required under the Fund's Declaration of Trust and Amended By-Laws and under the 1940 Act. See "Description of APS--Voting Rights," "Description of Capital structure" and "Anti-takeover and other provisions in the Declaration of Trust."

10
<PAGE>

TAX CONSIDERATIONS

Interest on certain "private activity" municipal bonds is treated as a tax preference item for individuals for purposes of the federal alternative minimum tax. In addition, for corporations, interest on all tax-exempt obligations is taken into account in the computation of income subject to the federal alternative minimum tax. The Fund will seek to avoid portfolio investments that pay interest that is taxable to individuals under the federal alternative minimum tax. Nonetheless, the Fund may not be successful in this regard. Therefore, if your goal is to avoid or limit your receipt of income that is taxable under the federal alternative minimum tax, you should discuss with your tax adviser whether the Fund is an appropriate investment for you. Moreover, distributions of any taxable net investment income and net short-term capital gain are taxable as ordinary income. See "Taxes."

11

<PAGE>

-----------------------------------------------------------------------

The Fund

The Fund is a recently organized, non-diversified, closed-end management investment company registered under the 1940 Act. The Fund was organized as a Massachusetts business trust on May 10, 2001 pursuant to the Fund's Declaration of Trust, which is governed by the laws of The Commonwealth of Massachusetts. The Fund's principal office is located at 1345 Avenue of the Americas, New York, New York 10105, and its telephone number is (212) 739-3369. The Fund is designed to provide tax benefits to investors who are residents of California.

The Fund commenced operations on June 29, 2001 upon the closing of an initial public offering of 15,200,000 of its Common Shares. The proceeds of such offering were approximately $217,740,000 after the payment of organizational and offering expenses. In connection with the initial public offering of the Fund's Common Shares, the underwriters were granted an option to purchase up to an additional 2,280,000 additional common shares to cover over-allotments. On July 23, 2001, the underwriters purchased, at a price of $14.325 per Common Share, an additional 2,280,000 Common Shares of the Fund pursuant to the over-allotment option.

Use of proceeds

The net proceeds of the offering of APS will be approximately $348,279,000 after payment of the estimated offering costs (not expected to exceed $221,000). The Fund will invest the net proceeds of the offering in accordance with the Fund's investment objective and policies discussed below under "The Fund's investments." It is presently anticipated that the Fund will be able to invest substantially all of the net proceeds in municipal bonds that meet the investment objective and policies within three months after the completion of the offering. Pending such investment, it is anticipated that the proceeds will be invested in short-term, tax-exempt securities.

Capitalization

The following table sets forth the unaudited capitalization of the Fund as of August 3, 2001 and as adjusted to give effect to the issuance of the APS offered hereby (including estimated offering expenses and sales load of $4,721,000).

<TABLE>
<CAPTION>

|  | As of August 3, 2001 | |
|  | Actual | As Adjusted |
| --- | --- | --- |
| <S> | <C> | <C> |
| Shareholders' Equity | | |
| Auction Preferred Shares, no par value (no shares issued; 6,000 shares issued, as adjusted, at $25,000 per share liquidation preference)... | $ 0 | $150,000,000 |
| Common Shares, no par value, 17,488,687 shares outstanding.......................................... | $249,976,605 | $248,255,605 |
| Undistributed net investment income....................... | $ 537,041 | $ 537,041 |
| Net realized gain on investments......................... | $ 0 | $ 0 |
| Net unrealized appreciation of investments.............. | $ 3,297,893 | $ 3,297,893 |
| Net assets............................................... | $253,811,539 | $402,090,539 |

</TABLE>

12
<PAGE>

Portfolio composition

As of August 3, 2001, approximately 99.8% of the market value of the Fund's portfolio was invested in long-term municipal bonds and approximately 0.2% of the market value of the Fund's portfolio was invested in cash. The following table sets forth certain information with respect to the composition of the Fund's investment portfolio as of August 3, 2001.

<TABLE>
<CAPTION>

| S&P* | Moody's* | Number of Issues | Value (in Thousands) | Percent |
| --- | --- | --- | --- | --- |
| <S> | <C> | <C> | <C> | <C> |
| AAA | Aaa | 16 | $152,832 | 36.1% |
| AA | Aa1, Aa | 2 | 14,502 | 5.1 |
| A | A1 | 16 | 66,873 | 20.4 |
| BBB | Baa1 | 15 | 45,528 | 15.9 |
| BB | Ba1 | 0 | 0 | 0.0 |
| B | B1 | 0 | 0 | 0.0 |
| NR+ | NR+ | 25 | 54,918 | 19.3 |
| Cash | | | 557 | 0.2 |
| Total | | 74 | $285,210 | 100.0% |

</TABLE>

* Ratings: Using the higher of S&P's or Moody's ratings on the Fund's municipal bonds. S&P rating categories may be modified further by a plus (+) or minus (-) in AA, A, BBB, BB, B and C ratings. Moody's rating categories may be modified further by a 1, 2, or 3 in Aa, A, Baa, Ba and B ratings.

+ Securities that are not rated by S&P or Moody's. Such municipal bonds may be rated by Rating Agencies other than S&P or Moody's, or may not be rated by any such Rating Agency. With respect to the percentage of the Fund's assets invested in such securities, PIMCO believes that these are of comparable quality to municipal bonds rated investment grade (that is, rated within the four highest grades by Moody's, S&P or Fitch). This determination is based on PIMCO's own internal evaluation and does not necessarily reflect how such securities would be rated by S&P or Moody's if either were to rate the securities.

13
<PAGE>

The Fund's investments

INVESTMENT OBJECTIVE AND POLICIES

The Fund's investment objective is to provide current income exempt from federal and California income tax. In pursuing this objective, PIMCO also seeks to preserve and enhance the value of the Fund's holdings relative to the municipal bond market generally, using proprietary analytical models that test and evaluate the sensitivity of those holdings to changes in interest rates and yield relationships.

PIMCO may at times believe that bonds associated with a particular municipal

market sector (for example, electric utilities), issued by a particular municipal issuer, or having particular structural characteristics, are undervalued. PIMCO may purchase such a bond for the Fund's portfolio because it represents a market sector or issuer that PIMCO considers undervalued, even if the value of the particular bond appears to be consistent with the value of similar bonds. Municipal bonds of particular types (e.g., hospital bonds, industrial revenue bonds or bonds issued by a particular municipal issuer) may be undervalued because there is a temporary excess of supply in that market sector, or because of a general decline in the market price of municipal bonds of the market sector for reasons that do not apply to the particular municipal bonds that are considered undervalued. The Fund's investment in municipal bonds may be based on PIMCO's belief that their yield and/or total return potential is higher than that available on bonds bearing similar levels of interest rate risk, credit risk and other forms of risk, or that their value relative to the municipal bond market is less sensitive to these risks. The Fund attempts to increase its portfolio value relative to the municipal bond market generally by prudent selection of municipal bonds regardless of the direction the market may move. Any capital appreciation realized by the Fund will generally result in the distribution of taxable capital gains to holders of APS.

Under normal market conditions, the Fund will invest substantially all (at least 90%) of its total assets in California Municipal Bonds.

The Fund will seek to avoid bonds generating interest potentially subjecting individuals to the alternative minimum tax. The Fund will invest at least 80% of its net assets in investment grade quality municipal bonds. Investment grade quality means that such bonds are rated, at the time of investment, within the four highest grades (Baa or BBB or better by Moody's, S&P or Fitch) or are unrated but judged to be of comparable quality by PIMCO. The Fund may invest up to 20% of its net assets in municipal bonds that are rated, at the time of investment, Ba/BB or B by Moody's, S&P or Fitch or that are unrated but judged to be of comparable quality by PIMCO. Bonds of below investment grade quality (Ba/BB or below) are commonly referred to as "junk bonds." Bonds of below investment grade quality are regarded as having predominantly speculative characteristics with respect to capacity to pay interest and repay principal. Bonds in the lowest investment grade category may also be considered to possess some speculative characteristics by certain rating agencies. The foregoing credit quality policies apply only at the time a security is purchased, and the Fund is not required to dispose of a security in the event that a rating agency or PIMCO downgrades its assessment of the credit characteristics of a particular issue. In determining whether to retain or sell such a security, PIMCO may consider such factors as PIMCO's assessment of the credit quality of the issuer of such security, the price at which such security could be sold and the rating, if any, assigned to such security by other rating agencies. A general description of Moody's, S&P's and Fitch's ratings of municipal bonds is set forth in Appendix A to the Statement of Additional Information. See "Municipal Bonds" below for a general description of the economic and credit characteristics of municipal issuers in California. The Fund may also invest in securities of other open- or closed-end investment companies that invest primarily in municipal

--------------------------------------------------------------------

14
<PAGE>

The Fund's Investments

--------------------------------------------------------------------

bonds of the types in which the Fund may invest directly. As a stockholder in an investment company, the Fund would bear its ratable share of that investment company's expenses in addition to the Fund's own expenses. See "--Other Investment Companies" below.

The Fund may purchase municipal bonds that are additionally secured by insurance, bank credit agreements, or escrow accounts. The credit quality of companies which provide such credit enhancements will affect the value of those securities. Although the insurance feature reduces certain financial risks, the premiums for insurance and the higher market price paid for insured obligations may reduce the Fund's income. Insurance generally will be obtained from insurers with a claims-paying ability rated Aaa by Moody's or AAA by S&P or Fitch. The insurance feature does not guarantee the market value of the insured obligations or the net asset value of the APS or the Common Shares.

Upon PIMCO's recommendation, temporarily or for defensive purposes and in order to keep the Fund's cash fully invested, including the period during which the net proceeds of this offering are being invested, the Fund may invest a substantial portion of its net assets in short-term investments including high-quality, short-term securities that may be either tax-exempt or taxable. The Fund intends to invest in taxable short-term investments only in the event that suitable tax-exempt short-term investments are not available at reasonable prices and yields. Investment in taxable short-term investments would result in a portion of your dividends being subject to federal and California income taxes. However, as discussed below under "Description of APS--Auction Procedures--Auction Date; Advance Notice of Allocation of Taxable Income; Inclusion of Taxable Income in Dividends," dividends on APS will generally increase if Taxable Income is included in a dividend.

The Fund cannot change its investment objective without the approval of the holders of a "majority of the outstanding" Common Shares and any Preferred Shares (including the APS) voting together as a single class, and of the holders of a "majority of the outstanding" Preferred Shares (including the APS) voting as a separate class. A "majority of the outstanding" shares (whether voting together as a single class or voting as a separate class) means (i) 67%

or more of such shares present at a meeting, if the holders of more than 50% of those shares are present or represented by proxy, or (ii) more than 90% of such shares, whichever is less. See "Description of APS--Voting Rights" in this Prospectus for additional information with respect to the voting rights of holders of APS.

The Fund will seek to avoid portfolio investments that pay interest that is taxable to individuals under the federal alternative minimum tax. Nonetheless, the Fund may not be successful in this regard and if you are, or as a result of an investment in the Fund would become, subject to the federal alternative minimum tax, the APS may not be a suitable investment for you. Special alternative minimum tax rules apply to corporate holders. In addition, capital gain dividends will be subject to capital gains taxes. See "Taxes."

MUNICIPAL BONDS

Municipal bonds are either general obligation or revenue bonds and typically are issued to finance public projects (such as roads or public buildings), to pay general operating expenses, or to refinance outstanding debt. General obligation bonds are backed by the full faith and credit, or taxing authority, of the issuer and may be repaid from any revenue source; revenue bonds may be repaid only from the revenues of a specific facility or source. The Fund also may purchase municipal bonds that represent lease obligations. These carry special risks because the issuer of the bonds may not be obligated to appropriate money annually to make payments under the lease. In order to reduce this risk, the Fund will only purchase municipal bonds representing lease obligations where PIMCO believes the issuer has a strong incentive to continue making appropriations until maturity.

------------------------------------------------------------------------

15

<PAGE>

The Fund's investments.

------------------------------------------------------------------------

The California Municipal Bonds in which the Fund will invest are generally issued by the state of California, a city in California, or a political subdivision, agency, authority or instrumentality of such state or city.

The yields on municipal bonds depend on a variety of factors, including prevailing interest rates and the condition of the general money market and the municipal bond market, the size of a particular offering, the maturity of the obligation and the rating of the issue. The market value of municipal bonds will vary with changes in interest rate levels and as a result of changing evaluations of the ability of their issuers to meet interest and principal payments.

The Fund will invest primarily in municipal bonds with long-term maturities in order to maintain a weighted average maturity of 15-30 years, but the weighted average maturity of obligations held by the Fund may be shortened, depending on market conditions.

WHEN-ISSUED, DELAYED DELIVERY AND FORWARD COMMITMENT TRANSACTIONS

The Fund may buy and sell municipal bonds on a when-issued, delayed delivery or forward commitment basis, making payment or taking delivery at a later date, normally within 45 days of the trade date. This type of transaction may involve an element of risk because no interest accrues on the bonds prior to settlement and, since bonds are subject to market fluctuations, the value of the bonds at time of delivery may be less (or more) than cost. When such purchases are outstanding, the Fund will segregate until the settlement date, assets determined to be liquid by PIMCO in accordance with procedures established by the Board of Trustees, in an amount sufficient to meet the purchase price. In addition, the Fund's ability to engage in these types of transactions is limited by the Moody's guidelines discussed under "Rating agency guidelines."

STRUCTURED NOTES

The Fund may invest in "structured" notes, which are privately negotiated debt obligations where the principal and/or interest is determined by reference to the performance of a benchmark asset or market, such as selected securities or an index of securities, or the differential performance of two assets or markets, such as indices reflecting taxable and tax-exempt bonds. Depending on the terms of the note, the Fund may forgo all or part of the interest and principal that would be payable on a comparable conventional note. The rate of return on structured notes may be determined by applying a multiplier to the performance or differential performance of the referenced index(es) or other asset(s). Application of a multiplier involves leverage which will serve to magnify the potential for gain and the risk of loss.

The Fund currently intends that any use of structured notes will be for the purpose of reducing the interest rate sensitivity of the Fund's portfolio (and thereby decreasing the Fund's exposure to interest rate risk) and, in any event, that the interest income on the notes will normally be exempt from federal and California income tax. The Fund will only invest in structured notes if it has received an opinion of counsel for the issuer (or the advice of another authority believed by PIMCO to be reliable) that the interest income on the notes will be exempt from federal income tax. Like other sophisticated strategies, the Fund's use of structured notes may not work as intended; for example, by reducing the duration of the Fund's portfolio, structured notes may limit the Fund's return when having a longer duration would be beneficial (for

Exhibit A, Page 66

instance, when interest rates decline).

VARIABLE AND FLOATING RATE SECURITIES

Variable and floating rate securities provide for a periodic adjustment in the interest rate paid on the obligations. The Fund may invest in floating rate debt instruments ("floaters") and engage in credit spread trades. While floaters provide a certain degree of protection against rises in interest rates, the Fund will participate in any decline in interest rates as well, although this is no guarantee that the

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

16
<PAGE>

The Fund's investments

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

interest rates earned by the Fund on its investments will be greater than the dividend rate payable with respect to the APS. A credit spread trade is an investment position relating to a difference in the prices or interest rates of two bonds or other securities, where the value of the investment position is determined by changes in the difference between such prices or interest rates, as the case may be, of the respective securities.

RESIDUAL INTEREST MUNICIPAL BONDS (RIBS)

The Fund may also invest up to 10% of its assets in RIBS, whose interest rates bear an inverse relationship to the interest rate on another security or the value of an index. An investment in RIBS typically will involve greater risk than an investment in a fixed rate bond. Because changes in the interest rate on the other security or index inversely affect the residual interest paid on a RIB, the value of a RIB is generally more volatile than that of a fixed rate bond. RIBS have interest rate adjustment formulas which generally reduce or, in the extreme, eliminate the interest paid to the Fund when short-term interest rates rise, and increase the interest paid to the Fund when short-term interest rates fall. RIBS have varying degrees of liquidity, and the market for these securities is volatile. These securities generally will underperform the market for fixed rate bonds in a rising interest rate environment, but tend to outperform the market for fixed rate bonds when interest rates decline or remain relatively stable. Although volatile, RIBS typically offer the potential for yields exceeding the yields available on fixed rate bonds with comparable credit quality, coupon, call provisions and maturity. The Fund may also invest in RIBS for the purpose of increasing the Fund's leverage. Should short-term interest rates rise, the combination of the Fund's investment in RIBS and its use of other forms of leverage (including through the issuance of APS or the use of other derivative instruments) likely will adversely affect the Fund's net asset value. Trusts in which RIBS may be held could be terminated, in which case the residual bond holder would take possession of the underlying bond on an unleveraged basis.

OTHER INVESTMENT COMPANIES

The Fund may invest up to 10% of its net assets in securities of other open- or closed-end investment companies that invest primarily in municipal bonds of the types in which the Fund may invest directly. The Fund may invest in other investment companies either during periods when it has large amounts of uninvested cash, such as the period shortly after the Fund receives the proceeds of the offering of its APS, during periods when there is a shortage of attractive, high-yielding municipal bonds available in the market, or when PIMCO believes share prices of other investment companies offer attractive values. The Fund may invest in investment companies that are advised by PIMCO or its affiliates to the extent permitted by applicable law and/or pursuant to exemptive relief from the Securities and Exchange Commission. As a stockholder in an investment company, the Fund will bear its ratable share of that investment company's expenses, and would remain subject to payment of the Fund's management fees and other expenses with respect to assets so invested. PIMCO will take expenses into account when evaluating the investment merits of an investment in an investment company relative to available municipal bond investments. In addition, the securities of other investment companies may also be leveraged and will therefore be subject to the risks associated with leverage. The net asset value and market value of leveraged shares will be more volatile and the yield to shareholders will tend to fluctuate more than the yield generated by unleveraged shares.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

17

<PAGE>

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Risks

Risk is inherent in all investing. Investing in any investment company security involves risk, including the risk that you may receive little or no return on your investment or even that you may lose part or all of your investment. Therefore, before purchasing APS, you should consider carefully the following risks that you assume when you invest in the Fund.

AUCTION RISK

You may not be able to sell your APS at an Auction if the Auction fails; that
is, if there are more APS offered for sale than there are buyers for those
shares. If Sufficient Clearing Bids do not exist in an Auction, the Applicable
Rate will be the Maximum Applicable Rate, and in such event, owners of APS
wishing to sell will not be able to sell all, and may not be able to sell any,
of such shares in the Auction. As a result, your investment in APS may be
illiquid. Neither the Broker-Dealers nor the Fund is obligated to purchase APS
in an Auction or otherwise, nor is the Fund required to redeem APS in the event
of a failed Auction. Also, if you place bid orders (orders to retain APS) at an
Auction only at a specified rate, and that bid rate exceeds the Applicable Rate
set at the Auction, you will not retain your APS. Finally, if you elect to
retain APS without specifying a rate below which you would not wish to continue
to hold those APS, and the Auction sets a below-market rate, you may receive a
lower rate of return on your APS than the market rate. See "Description of
APS--The Auction" and "Description of APS--Auction Procedures."

## RATINGS AND ASSET COVERAGE RISK

While Moody's is expected to assign a rating of "Aaa" to the APS, the ratings
would not eliminate or necessarily mitigate the risks of investing in the APS.
A Rating Agency could downgrade the APS, which may make your shares less liquid
at an Auction or in the secondary market. In addition, the Fund may be forced
to redeem your APS to meet regulatory or Rating Agency requirements. The Fund
may also voluntarily redeem APS under certain circumstances. See "Description
of APS--Redemption." In addition, as a condition to its receipt of an "Aaa"
rating on the APS, the Fund has agreed to certain investment limitations, which
may restrict the Fund from making investments that PIMCO believes would benefit
the Fund. See "Rating Agency Guidelines" for a description of the asset
maintenance and other tests the Fund must meet.

## SECONDARY MARKET RISK

The Broker-Dealers may maintain a secondary trading market in the APS outside
of Auctions; however, they have no obligation to do so and there can be no
assurance that a secondary market for the APS will develop or, if it does
develop, that it will provide holders with a liquid trading market (i.e.,
trading will depend on the presence of willing buyers and sellers and the
trading price is subject to variables to be determined at the time of the trade
by the Broker-Dealers). The APS will not be registered on any stock exchange or
on any automated quotation system. If you try to sell any of your APS between
Auctions, you may not be able to sell any or all of your shares, or you may
receive a purchase price of less than $25,000 per share. An increase in the
level of interest rates, particularly during any Long Term Dividend Period,
likely will have an adverse effect on the secondary market price of the APS .

## LIMITED OPERATING HISTORY

The Fund is a recently organized, non-diversified, closed-end management
investment company which has been operational for less than two months.

## INTEREST RATE RISK

Interest rate risk is the risk that bonds (and the Fund's net assets) will
decline in value because of changes in interest rates. Generally, municipal
bonds will decrease in value when interest rates rise and

----------------------------------------------------

18
<PAGE>

Risks

----------------------------------------------------

increase in value when interest rates decline. The value of the longer-term
bonds in which the Fund generally invests normally fluctuates more in response
to changes in interest rates than does the value of shorter-term bonds. Because
the Fund will invest primarily in long-term bonds, the Fund's net asset value
will fluctuate more in response to changes in market interest rates than if the
Fund invested primarily in shorter-term bonds. The Fund may invest up to 10% of
its assets in RIBS. Compared to similar fixed rate municipal obligations, the
value of RIBS will fluctuate to a greater extent in response to changes in
prevailing long-term interest rates. Moreover, the income earned on RIBS will
fluctuate in response to changes in prevailing short-term interest rates. Thus,
when RIBS are held by the Fund, an increase in short- or long-term market
interest rates will adversely affect the income received from such bonds or the
net asset value of the Fund's shares.

The APS pay dividends based on short-term interest rates. The Fund will use the
proceeds from the issuance of APS to buy municipal bonds, which generally pay
interest based on longer-term yields. Long-term municipal bond yields are
typically, although not always, higher than short-term interest rates. If
short-term interest rates rise, the dividend rate on the APS may rise so that
the amount of dividends paid to APS shareholders exceeds the income from the
portfolio securities purchased with the proceeds from the APS. Because income
from the Fund's entire investment portfolio (not just the portion of the
portfolio purchased with the proceeds of the APS offering) is available to pay
APS dividends, however, APS dividend rates would need to greatly exceed the
Fund's net portfolio income before the Fund's ability to pay APS dividends
would be jeopardized. If long-term rates rise, the value of the Fund's
investment portfolio will decline, reducing the amount of assets serving as
asset coverage for the APS.

The Fund may utilize certain strategies, including investments in structured notes, for the purpose of reducing the interest rate sensitivity of the portfolio and decreasing the Fund's exposure to interest rate risk, although there is no assurance that it will do so or that such strategies will be successful. See "How the Fund manages risk--Hedging and Related strategies."

## CREDIT RISK

Credit risk is the risk that an issuer of a municipal bond will become unable to meet its obligation to make interest and principal payments. Because the primary source of income for the Fund is the interest and principal payments on the municipal bonds in which it invests, any default by an issuer of a municipal bond could have a negative impact on the Fund's ability to pay dividends on the APS and could result in the redemption of some or all of the APS. In general, lower-rated municipal bonds carry a greater degree of risk that the issuer will lose its ability to make interest and principal payments, which could have a negative impact on the Fund's net asset value or dividends. The Fund may invest up to 20% of its total net assets in municipal bonds that are rated BB/Ba or B by Moody's, S&P or Fitch or that are unrated but judged to be of comparable quality by PIMCO. Bonds rated Ba/BB or B are regarded as having predominantly speculative characteristics with respect to capacity to pay interest and repay principal, and these bonds are commonly referred to as "junk bonds." The prices of these lower-grade bonds are more sensitive to negative developments, such as a decline in the issuer's revenues or a general economic downturn, than are the prices of higher-grade securities. Bonds in the lowest investment grade category may also be considered to possess some speculative characteristics by certain Rating Agencies.

## CONCENTRATION RISK

As described above, except to the extent the Fund invests in temporary investments, the Fund will invest substantially all of its net assets in California Municipal Bonds. The Fund is therefore susceptible

---

19

<PAGE>

## Risks

---

to political, economic, regulatory and other factors affecting issuers of California Municipal Bonds, their ability to meet their obligations and the economic condition of the facility or specific revenue source from whose revenues payments of obligations may be made. The ability of state, county, or local governments or other issuers of California Municipal Bonds to meet their obligations will depend primarily on the availability of tax and other revenues to those entities. The amounts of tax and other revenues available to issuers of California Municipal Bonds may be affected from time to time by economic, political and demographic conditions that specifically impact California. In addition, there are constitutional and statutory restrictions that limit the power of certain issuers to raise revenues or increase taxes. The availability of federal, state and local aid to issuers of California Municipal Bonds may also affect their ability to meet their obligations. The creditworthiness of obligations issued by local California issuers may be unrelated to the creditworthiness of obligations issued by the State of California and there is no obligation on the part of the State to make payment on such local obligations in the event of default. Any reduction in the actual or perceived ability of an issuer of California Municipal Bonds to meet its obligations (including a reduction in the rating of its outstanding securities) would likely affect adversely the market value and marketability of its obligations and could adversely affect the values of other California Municipal Bonds as well. Moreover, in such circumstances, the value of the Fund's shares may fluctuate more widely than the value of shares of a more diversified fund which invests in a number of different states.

The foregoing information constitutes only a brief summary of some of the general factors which may impact certain issuers of California Municipal Bonds and does not purport to be a complete or exhaustive description of all adverse conditions to which the issuers of such bonds held by the Fund are subject. Additionally, many factors including national economic, social and environmental policies and conditions, which are not within the control of the issuers of California Municipal Bonds, could affect or could have an adverse impact on the financial condition of the issuers. The Fund is unable to predict whether or to what extent such factors or other factors may affect the issuers of California Municipal Bonds; the market value or marketability of such bonds or the ability of the respective issuers of the bonds acquired by the Fund to pay interest on or principal of such bonds. This information has not been independently verified.

For a more detailed description of these and other risks affecting investment in California Municipal Bonds, see "Appendix B--Factors pertaining to California" in the Statement of Additional Information.

## MUNICIPAL BOND MARKET RISK

Investing in the municipal bond market involves certain risks. The amount of public information available about the municipal bonds in the Fund's portfolio is generally less than that for corporate equities or bonds, and the investment performance of the Fund may therefore be more dependent on the analytical abilities of PIMCO than would be a stock fund or taxable bond fund. The secondary market for municipal bonds, particularly the below investment grade bonds in which the Fund may invest, also tends to be less well developed or

liquid than many other securities markets, which may adversely affect the Fund's ability to sell its bonds at attractive prices.

The ability of municipal issuers to make timely payments of interest and principal may be diminished during general economic downturns and as governmental cost burdens are reallocated among federal, state and local governments. In addition, laws enacted in the future by Congress or state legislatures or referenda could extend the time for payment of principal and/or interest, or impose other constraints on enforcement of such obligations, or on the ability of municipal issuers to levy taxes. Issuers of municipal securities might seek protection under the bankruptcy laws. In the event of bankruptcy of such an issuer, the Fund could experience delays in collecting principal and interest and the Fund may

-------------------------------------------------------------------------

20
<PAGE>

Risks

-------------------------------------------------------------------------

not, in all circumstances, be able to collect all principal and interest to which it is entitled. To enforce its rights in the event of a default in the payment of interest or repayment of principal, or both, the Fund may take possession of and manage the assets securing the issuer's obligations on such securities, which may increase the Fund's operating expenses. Any income derived from the Fund's ownership or operation of such assets may not be tax-exempt.

NON-DIVERSIFICATION RISK

Because the Fund is classified as "non-diversified" under the 1940 Act, it can invest a greater portion of its assets in obligations of a single issuer. As a result, to the extent the Fund invests a relatively high percentage of its assets in obligations of a limited number of issuers, the Fund will be more susceptible than a more widely diversified fund to any single corporate, economic, political or regulatory occurrence. See "The Fund's Investments." The Fund must satisfy certain asset diversification rules in order to qualify as a regulated investment company for federal income tax purposes.

REINVESTMENT RISK

Reinvestment risk is the risk that income from the Fund's bond portfolio will decline if and when the Fund invests the proceeds from matured, traded or called bonds at market interest rates that are below the portfolio's current earnings rate. A decline in income could affect the Fund's net asset value or reduce asset coverage on the APS.

INFLATION RISK

Inflation risk is the risk that the value of assets or income from an investment will be worth less in the future as inflation decreases the value of money. As inflation increases, the real value of the APS and distributions can decline. However, during any periods of rising inflation, APS dividend rates would likely increase, which would tend to offset this risk.

LEVERAGE RISK

The Fund utilizes financial leverage on an ongoing basis for investment purposes. Leverage risk includes the risk associated with the issuance of APS to leverage the Fund's Common Shares. If the dividend rate on the APS exceeds the net rate of return on the Fund's portfolio, the leverage will result in a lower net asset value than if the Fund were not leveraged, and the Fund's ability to pay dividends and meet its asset coverage requirements on the APS would be reduced. Because the long-term bonds included in the Fund's portfolio will typically pay fixed rates of interest while the dividend rate on the APS will be adjusted periodically, this could occur even when both long-term and short-term municipal rates rise. Similarly, any decline in the net asset value of the Fund's investments could result in the Fund being in danger of failing to meet its asset coverage requirements or of losing its expected "Aaa" rating on the APS or, in an extreme case, the Fund's current investment income might not be sufficient to meet the dividend requirements on the APS. In order to counteract such an event, the Fund might need to liquidate investments in order to fund a redemption of some or all of the APS.

While the Fund may from time to time consider reducing leverage in response to actual or anticipated changes in interest rates in an effort to mitigate the increased volatility of current income and net asset value associated with leverage, there can be no assurance that the Fund will actually reduce leverage in the future or that any reduction, if undertaken, will be effective. Changes in the future direction of interest rates are very difficult to predict accurately. If the Fund were to reduce leverage based on a prediction about future changes to interest rates, and that prediction turned out to be incorrect, the reduction in leverage would likely operate to reduce the Fund's net asset value relative to the circumstance where the Fund had not reduced leverage. The Fund may decide that this risk outweighs

-------------------------------------------------------------------------

21
<PAGE>

Risks

Exhibit A, Page 70

the likelihood of achieving the desired reduction to volatility in income and net asset value if the prediction were to turn out to be correct, and determine not to reduce leverage as described above.

The Fund may also invest up to 10% of its assets in RIBS and invest in other derivative instruments, which may amplify the effects of leverage and, during periods of rising short-term interest rates, may adversely affect the Fund's net asset value. See "The Funds Investments--Residual Interest Municipal Bonds (RIBS)" and the Statement of Additional Information under "Investment objective and policies--Derivative Instruments."

Because the fees paid to PIMCO Advisors and PIMCO will be calculated on the basis of the Fund's managed assets, the fees will be higher when leverage is utilized, giving PIMCO Advisors and PIMCO an incentive to utilize leverage.

ANTI-TAKEOVER PROVISIONS

The Fund's Declaration of Trust and Amended By-Laws include provisions that could have the effect of limiting the ability of other entities or persons to acquire control of the Fund or to change the composition of the Board of Trustees. See "Anti-takeover and other provisions in the Declaration of Trust."

CERTAIN AFFILIATIONS

Certain broker-dealers may be considered to be affiliated persons of the Fund, PIMCO Advisors and/or PIMCO due to their possible affiliations with Allianz AG, the ultimate parent of PIMCO Advisors and PIMCO. Absent an exemption from the Securities and Exchange Commission or other regulatory relief, the Fund is generally precluded from effecting certain principal transactions with affiliated brokers, and its ability to purchase securities being underwritten by an affiliated broker or a syndicate including an affiliated broker or to utilize affiliated brokers for agency transactions is subject to restrictions. This could limit the Fund's ability to engage in securities transactions and take advantage of market opportunities. Similar prohibitions apply to trades with the Underwriters or their affiliates during the offering of APS.

How the Fund manages risk

INVESTMENT LIMITATIONS

The Fund has adopted certain investment limitations designed to limit investment risk. These limitations (one of which is described below) are fundamental and may not be changed without the approval of the holders of a majority of the outstanding Common Shares and any Preferred Shares (including APS) voting together as a single class, and the approval of the holders of a majority of any Preferred Shares (including APS) voting as a separate class. Among other restrictions, the Fund may not concentrate its investments in a particular industry, as that term is used in the 1940 Act and as interpreted, modified, or otherwise permitted by regulatory authority having jurisdiction from time to time.

The Fund's industry concentration policy does not preclude it from focusing investments in issuers in a group of related industries (such as different types of utilities).

The Fund is subject to guidelines which are more limiting than the investment restrictions set forth above and in the Statement of Additional Information in order to obtain and maintain a rating of

22
<PAGE>

How the Fund manages risk

"Aaa" from Moody's on the APS, and may become subject to additional guidelines in the future. See "Rating agency guidelines." The Fund does not anticipate that such guidelines will have a material adverse effect on the Fund's ability to achieve its investment objective. See "Rating agency guidelines," "Investment objective and policies" and "Investment restrictions" in the Statement of Additional Information for information about these guidelines and a complete list of the fundamental investment policies of the Fund.

QUALITY OF INVESTMENTS

The Fund will invest at least 80% of its net assets in bonds of investment grade quality at the time of investment. Investment grade quality means that such bonds are rated by Rating Agencies within the four highest grades (Baa or BBB or better by Moody's, S&P or Fitch) or are unrated but judged to be of comparable quality by PIMCO.

MANAGEMENT OF INVESTMENT PORTFOLIO AND CAPITAL STRUCTURE TO LIMIT LEVERAGE RISK

The Fund may take certain actions if short-term interest rates increase or market conditions otherwise change (or the Fund anticipates such an increase or change) and the Fund's leverage begins (or is expected) to adversely affect Common Shareholders. In order to attempt to offset such a negative impact of leverage on Common Shareholders, the Fund may shorten the average maturity or duration of its investment portfolio (by investing in shorter-term, high-

quality securities) or may extend the maturity of outstanding Preferred Shares (including the APS). The Fund may also attempt to reduce leverage by redeeming or otherwise purchasing Preferred Shares (subject to any restrictions discussed under "Description of APS--Redemption") or by reducing any holdings in RIBS or other instruments that create leverage. The success of any such attempt to limit leverage risk depends on PIMCO's ability to accurately predict interest rate or other market changes. Because of the difficulty of making such predictions, the Fund may not be successful in managing its interest rate exposure in the manner described above.

If market conditions suggest that additional leverage would be beneficial, the Fund may issue additional Preferred Shares or utilize other forms of leverage, such as RIBS or other derivative instruments.

HEDGING AND RELATED STRATEGIES

The Fund may use various investment strategies designed to limit the risk of bond price fluctuations and to preserve capital. For instance, the Fund may invest in structured notes for the purpose of reducing the interest rate sensitivity of the Fund's portfolio and, thereby, decreasing the Fund's exposure to interest rate risk. The Fund currently intends that the income on these notes will normally be exempt from federal and California income tax. Other hedging strategies that the Fund may use include: financial futures contracts, short sales, swap agreements or options thereon; options on financial futures; and options based on either an index of municipal securities or on taxable debt securities whose prices, PIMCO believes, correlate with the prices of the Fund's investments. Income earned by the Fund from many hedging activities will be treated as capital gain and, if not offset by net realized capital loss, will be distributed to shareholders in taxable distributions. If effectively used, hedging strategies will offset in varying percentages losses incurred on the Fund's investments due to adverse interest rate changes. There is no assurance that these hedging strategies will be available at any time or that PIMCO will determine to use them for the Fund. In addition, in accordance with the Rating Agency guidelines described below, the Fund's use of hedging transactions is limited to the types of transactions listed under the definition of "Moody's Hedging Transactions" in the glossary.

--------------------------------------------------------------------

                                                                23

<PAGE>

--------------------------------------------------------------------

Rating Agency guidelines

The Fund is required under Moody's guidelines to maintain assets having in the aggregate a Discounted Value at least equal to the APS Basic Maintenance Amount. Moody's has established guidelines for determining Discounted Value. To the extent any particular portfolio holding does not satisfy Moody's guidelines, all or a portion of such holding's value will be included in the calculation of Discounted Value (as defined by Moody's). The amount of such assets included in the portfolio at any time may vary depending upon the rating, diversification and other characteristics of the eligible assets included in the portfolio, although it is not anticipated that in the normal course of business the value of such assets would exceed 20% of the Fund's total assets. The Moody's guidelines also impose other limitations on the Fund's investments.

The Fund is also required under the 1940 Act and Rating Agency guidelines to maintain, with respect to shares of APS, asset coverage of at least 200% with respect to senior securities which are shares, including APS (or such other asset coverage as may in the future be specified in the 1940 Act as the minimum asset coverage for senior securities which are shares of a closed-end investment company as a condition of declaring dividends on its common shares) ("1940 Act APS Asset Coverage").

In the event the Fund does not timely cure a failure to maintain (a) a Discounted Value of its portfolio equal to the APS Basic Maintenance Amount or (b) the 1940 Act APS Asset Coverage, in each case in accordance with the requirements of the Rating Agency or Agencies then rating the shares of APS, the Fund will be required by the Amended By-Laws to redeem shares of APS as described under "Description of APS--Redemption--Mandatory Redemption."

The Moody's guidelines restrict the Fund's use of some types of investment strategies. For example, the guidelines limit the Fund's use of futures, options and other derivative transactions for hedging or investment purposes, prevent the Fund from entering into hedging transactions other than Moody's Hedging Transactions, restrict the use of forward commitments and similar transactions, and limit the percentage of the Fund's assets that may be invested in any one issuer or type or class of issuer.

The Moody's guidelines also prohibit the Fund from taking some types of actions unless it has received written confirmation from Moody's that such actions would not impair the ratings then assigned to the APS. These include restrictions on borrowing money, engaging in short sales, lending portfolio securities, issuing any class or series of shares ranking prior to or on a parity with the APS with respect to the payment of dividends or the distribution of assets upon dissolution, liquidation or winding up of the Fund or merging or consolidating into or with any other entity.

The restrictions in the Moody's guidelines may limit the Fund's ability to make investments that PIMCO believes would benefit the Fund. The descriptions of the

Moody's guidelines in this section and in "Description of APS--Asset
Maintenance" are summaries only and are not complete. The Moody's guidelines
are set forth in their entirety in the Fund's Amended By-Laws, which have been
filed as an exhibit to the Registration Statement of which this Prospectus is a
part.

The Fund may, but is not required to, adopt any modifications to the guidelines
that may hereafter be established by Moody's. Failure to adopt any such
modifications, however, may result in a change in

24
<PAGE>

Rating agency guidelines

the ratings described above or a withdrawal of ratings altogether. In addition,
any Rating Agency providing a rating for the APS may, at any time, change or
withdraw any such rating. The Board may, without shareholder approval, amend,
alter or repeal any or all of the definitions and related provisions which have
been adopted by the Fund pursuant to the Rating Agency guidelines in the event
the Fund receives written confirmation from Moody's that any such amendment,
alteration or repeal would not impair the ratings then assigned by Moody's to
the APS.

As recently described by Moody's, a preferred stock rating is an assessment of
the capacity and willingness of an issuer to pay preferred stock obligations.
The ratings on the APS are not recommendations to purchase, hold or sell those
shares, inasmuch as the ratings do not comment as to market price or
suitability for a particular investor. The Rating Agency guidelines described
above also do not address the likelihood that an owner of shares of APS will be
able to sell such shares in an Auction or otherwise. The ratings are based on
current information furnished to Moody's by the Fund and/or PIMCO and
information obtained from other sources. The ratings may be changed, suspended
or withdrawn as a result of changes in, or the unavailability of, such
information. The Fund's Common Shares have not been rated by a Rating Agency.

A Rating Agency's guidelines will apply to the APS only so long as such Rating
Agency is rating such shares. The Fund will pay certain fees to Moody's for
rating the APS. The Fund may at some future time seek to have the APS rated by
an additional or substitute Rating Agency.

25

<PAGE>

Description of APS

The following is a brief description of the terms of the APS. This description
does not purport to be complete and is subject to and qualified in its entirety
by reference to the Fund's Declaration of Trust and Amended By-Laws, including
the provisions thereof establishing the APS. The Fund's Declaration of Trust
and the form of Amended By-Laws establishing the terms of the APS have been
filed as exhibits to the Registration Statement of which this Prospectus is a
part.

Each series of APS will be Preferred Shares that entitle their holders to
receive dividends when, as and if declared by the Board of Trustees, out of
funds legally available therefor, at a rate per annum that may vary for the
successive Dividend Periods for each such series. After the Initial Dividend
Period, each subsequent Dividend Period for each series of APS generally will
be a 7-Day Dividend Period; provided, however, that prior to any Auction, the
Fund may elect, subject to certain limitations described herein, upon giving
notice to holders thereof, a Special Dividend Period. The Applicable Rate for a
particular Dividend Period for a series of APS will be determined by an Auction
conducted on the Business Day before the start of such Dividend Period.
Beneficial Owners and Potential Beneficial Owners of APS may participate in
Auctions thereof, although, except in the case of Special Dividend Periods of
longer than 91 days, Beneficial Owners desiring to continue to hold all of
their APS regardless of the Applicable Rate resulting from Auctions need not
participate. For an explanation of Auctions and the method of determining the
Applicable Rate, see "--The Auction."

The nominee of the Securities Depository is expected to be the sole holder of
record of each series of APS. Accordingly, each purchaser of APS must rely on
(i) the procedures of the Securities Depository and, if such purchaser is not a
member of the Securities Depository, such purchaser's Agent Member, to receive
dividends, distributions and notices and to exercise voting rights (if and when
applicable) and (ii) the records of the Securities Depository and, if such
purchaser is not a member of the Securities Depository, such purchaser's Agent
Member, to evidence its beneficial ownership of the APS.

When issued and sold, the APS of each series will have a liquidation preference
of $25,000 per share plus an amount equal to accumulated but unpaid dividends
(whether or not earned or declared) and will be fully paid and, except as
discussed under "Anti-takeover" and other provisions in the Declaration of
Trust below, non-assessable. See "Description of APS--Liquidation Rights." The

APS will not be convertible into Common Shares or other shares of beneficial interest of the Fund, and the holders thereof will have no preemptive rights. The APS will not be subject to any sinking fund but will be subject to redemption at the option of the Fund at the Optional Redemption Price on any Dividend Payment Date for such series (except during the Initial Dividend Period and during a Non-Call Period) and, in certain circumstances, will be subject to mandatory redemption by the Fund at the Mandatory Redemption Price stated herein. See "--Redemption."

In addition to serving as the Auction Agent in connection with the Auction Procedures described below, Bankers Trust Company will be the transfer agent, registrar, dividend paying agent and redemption agent for each series of APS. The Auction Agent, however, will serve merely as the agent of the Fund, acting in accordance with the Fund's instructions, and will not be responsible for any evaluation or verification of any matters certified to it.

Except in an Auction, the Fund will have the right (to the extent permitted by applicable law) to purchase or otherwise acquire any APS so long as the Fund is current in the payment of dividends on APS and on any other shares of beneficial interest of the Fund ranking on a parity with the APS with respect to the payment of dividends or upon liquidation.

--------------------------------------------------------------------

26
<PAGE>

Description of APS

--------------------------------------------------------------------

THE AUCTION

General

Holders of the APS of each series will be entitled to receive cumulative cash dividends on their shares when, as and if declared by the Board of Trustees of the Fund, out of the funds legally available therefor, on the Initial Dividend Payment Date with respect to the Initial Dividend Period for such series and, thereafter, on each Dividend Payment Date with respect to a Subsequent Dividend Period for each series (generally a period of seven days subject to certain exceptions set forth under "--Dividends--General") at the rate per annum equal to the Applicable Rate for each such Dividend Period.

The provisions of the Amended By-Laws establishing the terms of the APS offered hereby will provide that the Applicable Rate for each Dividend Period after the Initial Dividend Period for each series will be equal to the rate per annum that the Auction Agent advises has resulted on the Business Day preceding the first day of such Dividend Period due to implementation of the Auction Procedures set forth in the Amended By-Laws in which persons determine to hold or offer to purchase or sell the APS. The Auction Procedures are attached as Appendix D to the Statement of Additional Information. Each periodic operation of such procedures with respect to the APS is referred to herein as an "Auction." If, however, the Fund should fail to pay or duly provide for the full amount of any dividend on or the redemption price of the APS called for redemption, the Applicable Rate for the APS will be determined as set forth under "Dividends--Non-Payment Period; Late Charge."

Auction Agency Agreement

The Fund will enter into the Auction Agency Agreement with the Auction Agent, which provides, among other things, that the Auction Agent will follow the Auction Procedures for the purpose of determining the Applicable Rate for each series of APS. The Fund will pay the Auction Agent compensation for its services under the Auction Agency Agreement.

The Auction Agent will act as agent for the Fund in connection with Auctions. In the absence of bad faith or negligence on its part, the Auction Agent will not be liable for any action taken, suffered or omitted, or for any error of judgment made, by it in the performance of its duties under the Auction Agency Agreement, and will not be liable for any error of judgment made in good faith unless the Auction Agent shall have been negligent in ascertaining the pertinent facts. Pursuant to the Auction Agency Agreement, the Fund is required to indemnify the Auction Agent for certain losses and liabilities incurred by the Auction Agent without negligence or bad faith on its part in connection with the performance of its duties under such agreement.

The Auction Agent may terminate the Auction Agency Agreement upon notice to the Fund, which termination may be no earlier than 60 days following delivery of such notice. If the Auction Agent resigns, the Fund will use its best efforts to enter into an agreement with a successor Auction Agent containing substantially the same terms and conditions as the Auction Agency Agreement. The Fund may terminate the Auction Agency Agreement, provided that prior to such termination the Fund shall have entered into such an agreement with respect thereto with a successor Auction Agent.

Broker-Dealer Agreements

The Auctions require the participation of one or more broker-dealers. The Auction Agent will enter into agreements (collectively, the "Broker-Dealer Agreements") with one or more broker-dealers, or other entities permitted by law to perform the functions required of a Broker-Dealer in the Auction Procedures (collectively, the "Broker-Dealers"), selected by the Fund, which

Exhibit A, Page 74

provide for the

--------------------------------------------------------------

27

<PAGE>

Description of APS

--------------------------------------------------------------

participation of such Broker-Dealers in Auctions and pursuant to which Broker-Dealers agree to follow the Auction Procedures. A Broker-Dealer Agreement may be terminated by the Auction Agent or a Broker-Dealer on five days' notice to the other party, provided that the Broker-Dealer Agreement with UBS Warburg LLC may not be terminated without the prior written consent of the Fund, which consent may not be unreasonably withheld.

Securities Depository

The Depository Trust Company initially will act as the Securities Depository for the Agent Members with respect to the APS. All of the shares of each series of APS initially will be registered in the name of Cede & Co., as nominee of the Securities Depository. Such shares will be subject to the provisions restricting transfers of the APS contained in the Amended By-Laws. Cede & Co. initially will be the holder of record of all shares of APS, and Beneficial Owners will not be entitled to receive certificates representing their ownership interest in such shares. See Appendix D (Auction Procedures) to the Statement of Additional Information. The Securities Depository will maintain lists of its participants and will maintain the positions (ownership interests) of the APS held by each Agent Member, whether as the Beneficial Owner thereof for its own account or as nominee for the Beneficial Owner thereof. Payments made by the Fund to holders of APS will be duly made by making payments to the nominee of the Securities Depository.

AUCTION PROCEDURES

The following is a brief summary of the procedures to be used in conducting Auctions. This summary is qualified by reference to the Auction Procedures set forth in Appendix D to the Statement of Additional Information. The Settlement Procedures to be used with respect to Auctions are set forth in Appendix C to the Statement of Additional Information.

Auction Date; Advance Notice of Allocation of Taxable Income; Inclusion of Taxable Income in Dividends

An Auction to determine the Applicable Rate for the APS offered hereby for each Dividend Period for such shares (other than the Initial Dividend Period therefor) will be held on the last Business Day preceding the first day of such Dividend Period, which first day is also the Dividend Payment Date for the preceding Dividend Period (the date of each Auction being referred to herein as an "Auction Date"). The initial Auction Date will be August 31, 2001 for Series A APS, September 5, 2001 for Series B APS and September 7, 2001 for Series C APS. Auctions for the APS for Dividend Periods after the Initial Dividend Period normally will be held every Monday after the preceding Dividend Payment Date for Series A APS, every such Wednesday for Series B APS and every such Friday for Series C APS; and each subsequent Dividend Period normally will begin on the following Tuesday for Series A APS, on the following Thursday for Series B APS and on the following Monday for Series C APS (also a Dividend Payment Date). The Auction Date and the first day of the related Dividend Period for a series of APS (both of which must be Business Days) need not be consecutive calendar days. See "--Dividends" for information concerning the circumstances under which a Dividend Payment Date may fall on a date other than the days specified above, which may affect the Auction Date.

Except as noted below and under "Dividends--Gross-up Dividends," whenever the Fund is aware that it will include any net capital gain or other income subject to federal income tax in any dividend on the APS, the Fund will notify the Auction Agent of the amount to be so included at least five Business Days prior to the Auction Date on which the Applicable Rate for such dividend is to be established. Whenever the Auction Agent receives such notice from the Fund, in turn it will notify each Broker-Dealer, who, on or prior to such Auction Date, in accordance with its Broker-Dealer Agreement, will notify its customers who are Beneficial Owners and Potential Beneficial Owners believed to be interested in submitting an Order in the Auction to be held on such Auction Date. The Fund also may

--------------------------------------------------------------

28

<PAGE>

Description of APS

--------------------------------------------------------------

include such income in a dividend on the APS without giving advance notice thereof if it increases the dividend by an additional amount calculated as if such income were a Retroactive Taxable Allocation and the additional amount were a Gross-up Dividend; provided that the Fund will notify the Auction Agent of the additional amounts to be included in such dividend at least five Business Days prior to the applicable Dividend Payment Date. See "--Dividends--Gross-up Dividends."

Orders by Beneficial Owners, Potential Beneficial Owners, Existing Holders and

Potential Holders

On or prior to the Submission Deadline on each Auction Date for a series of APS:

(a) each Beneficial Owner may submit to its Broker-Dealer by telephone a:

(i) "Hold Order"--indicating the number of outstanding APS, if any, such Beneficial Owner desires to continue to hold without regard to Applicable Rate for the next Dividend Period for such shares;

(ii) "Bid"--indicating the number of outstanding APS, if any, that Beneficial Owner desires to continue to hold, provided that the Applicable Rate for the next Dividend Period for such shares is not less than the rate per annum then specified by such Beneficial Owner; and/or

(iii) "Sell Order"--indicating the number of outstanding APS, if any, that such Beneficial Owner offers to sell without regard to the Applicable Rate for the next Dividend Period for such shares; and

(b) Broker-Dealers will contact customers who are Potential Beneficial Owners of APS to determine whether such Potential Beneficial Owners desire to submit bids indicating the number of APS which they offer to purchase provided that the Applicable Rate for the next Dividend Period is not less than the rates per annum specified in such Bids.

The communication by a Beneficial Owner or Potential Beneficial Owner to a Broker-Dealer and the communication by a Broker-Dealer, whether or not acting for its own account, to the Auction Agent of the foregoing information is hereinafter referred to as an "Order" and collectively as "Orders." A Beneficial Owner or a Potential Beneficial Owner placing an Order, including a Broker-Dealer acting in such capacity for its own account, is hereinafter referred to as a "Bidder" and collectively as "Bidders." Any Order submitted by a Beneficial Owner or a Potential Beneficial Owner to its Broker-Dealer, or by a Broker-Dealer to the Auction Agent, prior to the Submission Deadline on any Auction Date shall be irrevocable.

In an Auction, a Beneficial Owner may submit different types of Orders with respect to APS then held by such Beneficial Owner, as well as Bids for additional APS. If, however, a Beneficial Owner offers through its Broker-Dealer to purchase additional APS in such Auction, such Beneficial Owner, for purposes of such offer to purchase additional shares, will be treated as a Potential Beneficial Owner as described below. For information concerning the priority given to different types of Orders placed by Beneficial Owners, see "--Submission of Orders by Broker-Dealers to Auction Agent" below.

The "Maximum Applicable Rate" for a series of APS will be the Applicable Percentage of the Reference Rate. The Auction Agent will round each applicable Maximum Applicable Rate to the nearest one-thousandth (0.001) of one percent per annum, with any such number ending in five ten-thousandths of one percent being rounded upwards to the nearest one-thousandth (0.001) of one percent. The Auction Agent will not round the applicable Reference Rate as part of its calculation of the Maximum Applicable Rate.

------------------------------------------------------------------------

                                                                      29

<PAGE>

Description of APS

------------------------------------------------------------------------

The Maximum Applicable Rate for a series of APS will depend on the credit rating assigned to such series. The "Applicable Percentage" will be determined based on (i) the credit rating assigned on such date to such shares by Moody's (or if Moody's shall not make such rating available, the equivalent of such rating by a Substitute Rating Agency), and (ii) whether the Fund has provided notification to the Auction Agent prior to the Auction establishing the Applicable Rate for any dividend that net capital gains or other taxable income will be included in such dividend on the APS as follows:

<TABLE>
<CAPTION>

| | Applicable Percentage of Reference Rate-- No Notification | Applicable Percentage of Reference Rate-- Notification |
|---|---|---|
| Moody's Credit Ratings on APS | | |
| <S> | <C> | <C> |
| Aa3 or higher.................................. | 110% | 150% |
| A.............................................. | 125 | 160 |
| Baa........................................... | 150 | 250 |
| Below Baa...................................... | 200 | 275 |

</TABLE>

There is no minimum Applicable Rate in respect of any Dividend Period.

The Fund will take all reasonable action necessary to enable Moody's to provide a rating for each series of APS. If Moody's does not make such a rating available, the Underwriters or their affiliates and successors, after consultation with the Fund, will select another Rating Agency to act as a Substitute Rating Agency.

Any Bid by a Beneficial Owner specifying a rate per annum higher than the Maximum Applicable Rate will be treated as a Sell Order, and any Bid by a Potential Beneficial Owner specifying a rate per annum higher than the Maximum Applicable Rate will not be considered. See "--Determination of Sufficient Clearing Bids, Winning Bid Rate and Applicable Rate" and "--Acceptance and Rejection of Submitted Bids and Submitted Sell Orders and Allocation of Shares."

A Broker-Dealer also may hold APS in its own account as a Beneficial Owner. A Broker-Dealer thus may submit Orders to the Auction Agent as a Beneficial Owner or a Potential Beneficial Owner and therefore participate in an Auction as an Existing Holder or Potential Holder on behalf of both itself and its customers. Any Order placed with the Auction Agent by a Broker-Dealer as or on behalf of a Beneficial Owner or a Potential Beneficial Owner will be treated in the same manner as an Order placed with a Broker-Dealer by a Beneficial Owner or a Potential Beneficial Owner. Similarly, any failure by a Broker-Dealer to submit to the Auction Agent an Order in respect of any APS held by it or its customers, who are Beneficial Owners will be treated in the same manner as a Beneficial Owner's failure to submit to its Broker-Dealer an Order in respect of APS held by it, as described in the next paragraph. If a Broker-Dealer participates in an Auction as an Existing Holder or a Potential Beneficial Owner, whether it be its customers or itself, all discussion herein relating to the consequences of an Auction for Existing Holders and Potential Holders also applies to the underlying beneficial ownership interests represented thereby. For information concerning the priority given to different types of Orders placed by Existing Holders, see "--Submission of Orders by Broker-Dealers to Auction Agent." Each purchase or sale in an Auction will be settled on the Business Day next succeeding the Auction Date at a price per share equal to $25,000. See "--Notification of Results; Settlement."

If one or more Orders covering in the aggregate all of the outstanding APS held by a Beneficial Owner are not submitted to the Auction Agent prior to the Submission Deadline, either because a Broker-Dealer failed to contact such Beneficial Owner or otherwise, the Auction Agent will deem a Hold

-----------------------------------------------------------------------

30
<PAGE>

Description of APS

-----------------------------------------------------------------------

Order (in the case of an Auction relating to a Special Dividend Period of 91 days or less) or a Sell Order (in the case of an Auction relating to a Special Dividend Period of longer than 91 days) to have been submitted on behalf of such Beneficial Owner covering the number of outstanding APS held by such Beneficial Owner and not subject to Orders submitted to the Auction Agent.

If all of the outstanding APS are subject to Submitted Hold Orders, the Dividend Period next succeeding the Auction automatically will be the same length as the immediately preceding Dividend Period, and the Applicable Rate for the next Dividend Period for all the APS will be 40% of the Reference Rate on the date of the applicable Auction (or 80% of such rate if the Fund has provided notification to the Auction Agent prior to the Auction establishing the Applicable Rate for any dividend that net capital gains or other taxable income will be included in such dividend on the APS).

For the purposes of an Auction, the APS for which the Fund shall have given notice of redemption and deposited moneys therefor with the Auction Agent in trust or segregated in an account at the Fund's Custodian bank for the benefit of the Auction Agent, as set forth under "--Redemption," will not be considered as outstanding and will not be included in such Auction. The Fund may not submit an Order in any Auction.

Neither the Fund nor the Auction Agent will be responsible for a Broker-Dealer's failure to act in accordance with the instructions of Beneficial Owners or Potential Beneficial Owners or failure to comply with the foregoing.

Submission of Orders by Broker-Dealers to Auction Agent

Prior to 1:00 p.m., New York City time, on each Auction Date, or such other time on the Auction Date as may be specified by the Auction Agent (the "Submission Deadline"), each Broker-Dealer will submit to the Auction Agent in writing or through the Auction Agent's auction processing system all Orders obtained by it for the Auction for a series of APS to be conducted on such Auction Date, designating itself (unless otherwise permitted by the Fund) as the Existing Holder or Potential Holder in respect of the APS subject to such Orders. Any Order submitted by a Beneficial Owner or a Potential Beneficial Owner to its Broker-Dealer, or by a Broker-Dealer to the Auction Agent, prior to the Submission Deadline for any Auction Date, shall be irrevocable.

If the rate per annum specified in any Bid contains more than three figures to the right of the decimal point, the Auction Agent will round such rate per annum up to the next highest one-thousandth (.001) of one percent. If one or more Orders of an Existing Holder are submitted to the Auction Agent and such Orders cover in the aggregate more than the number of outstanding shares of APS held by such Existing Holder, such Orders will be considered valid in the following order of priority:

    (1)  any Hold Order will be considered valid up to and including the number
         of outstanding APS held by such Existing Holder, provided that if more

Exhibit A, Page 77

than one Hold Order is submitted by such Existing Holder and the number of APS subject to such Hold Orders exceeds the number of outstanding APS held by such Existing Holder, the number of APS subject to each of such Hold Orders will be reduced pro rata so that such Hold Orders, in the aggregate, will cover exactly the number of outstanding APS held by such Existing Holder;

(ii)  any Bids will be considered valid, in the ascending order of their respective rates per annum if more than one Bid is submitted by such Existing Holder, up to and including the excess of the number of outstanding APS held by such Existing Holder over the number of outstanding APS subject to any Hold Order referred to in clause (i) above (and if more than one Bid

--------------------------------------------------------------------

                                                                    31

<PAGE>

Description of APS

--------------------------------------------------------------------

submitted by such Existing Holder specifies the same rate per annum and together they cover more than the remaining number of shares that can be the subject of valid Bids after application of clause (i) above and of the foregoing portion of this clause (ii) to any Bid or Bids specifying a lower rate or rates per annum, the number of shares subject to each of such Bids will be reduced pro rata so that such Bids, in the aggregate, cover exactly such remaining number of outstanding shares); and the number of outstanding shares, if any, subject to Bids not valid under this clause (ii) shall be treated as the subject of a Bid by a Potential Holder; and

(iii)  any Sell Order will be considered valid up to and including the excess of the number of outstanding APS held by such Existing Holder over the sum of the number of APS subject to Hold Orders referred to in clause (i) above and the number of APS subject to valid Bids by such Existing Holder referred to in clause (ii) above; provided that, if more than one Sell Order is submitted by any Existing Holder and the number of APS subject to such Sell Orders is greater than such excess, the number of APS subject to each of such Sell Orders will be reduced pro rata so that such Sell Orders, in the aggregate, will cover exactly the number of APS equal to such excess.

If more than one Bid of any Potential Holder is submitted in any Auction, each Bid submitted in such Auction will be considered a separate Bid with the rate per annum and number of APS therein specified.

Determination of Sufficient Clearing Bids, Winning Bid Rate and Applicable Rate

Not earlier than the Submission Deadline for each Auction, the Auction Agent will assemble all Orders submitted or deemed submitted to it by the Broker-Dealers (each such "Hold Order," "Bid" or "Sell Order" as submitted or deemed submitted by a Broker-Dealer hereinafter being referred to as a "Submitted Hold Order," a "Submitted Bid" or a "Submitted Sell Order," as the case may be, or as a "Submitted Order") and will determine the excess of the number of outstanding APS over the number of outstanding APS subject to Submitted Hold Orders (such excess being referred to as the "Available APS") and whether Sufficient Clearing Bids have been made in such Auction. Sufficient Clearing Bids will have been made if the number of outstanding APS that are the subject of Submitted Bids of Potential Holders with rates per annum not higher than the Maximum Applicable Rate equals or exceeds the number of outstanding shares that are the subject of Submitted Sell Orders (including the number of shares subject to Bids of Existing Holders specifying rates per annum higher than the Maximum Applicable Rate). If Sufficient Clearing Bids have been made, the Auction Agent will determine the lowest rate per annum specified in the Submitted Bids (the "Winning Bid Rate") which would result in the number of shares subject to Submitted Bids specifying such rate per annum or a lower rate per annum being at least equal to the Available APS. If Sufficient Clearing Bids have been made, the Winning Bid Rate will be the Applicable Rate for the next Dividend Period for the APS then outstanding. If Sufficient Clearing Bids have not been made (other than because all outstanding APS are the subject of Submitted Hold Orders), the Dividend Period next following the Auction automatically will be a 7-Day Dividend Period, and the Applicable Rate for such Dividend Period will be equal to the Maximum Applicable Rate.

If Sufficient Clearing Bids have not been made, Beneficial Owners that have Submitted Sell Orders will not be able to sell in the Auction all, or may not be able to sell any, of their APS subject to such Submitted Sell Orders. See "--Acceptance and Rejection of Submitted Bids and Submitted Sell Orders and Allocation of Shares." Thus, under some circumstances, Beneficial Owners may not have liquidity of investment.

--------------------------------------------------------------------

32
<PAGE>

Description of APS

--------------------------------------------------------------------

Exhibit A, Page 78

Acceptance and Rejection of Submitted Bids and Submitted Sell Orders and
Allocation of Shares

Based on the determinations described under "--Determination of Sufficient
Clearing Bids, Winning Bid Rate and Applicable Rate" and subject to the
discretion of the Auction Agent to round as described below, Submitted Bids and
Submitted Sell Orders will be accepted or rejected in the order of priority set
forth in the Auction Procedures with the result that Existing Holders and
Potential Holders of a series of APS will sell, continue to hold and/or
purchase APS as set forth below. Existing Holders that submit or are deemed to
have submitted Hold Orders will continue to hold the APS subject to such Hold
Orders.

If Sufficient Clearing Bids have been made:

   (a)   each Existing Holder that placed a Submitted Bid specifying a rate per
         annum higher than the Winning Bid Rate or a Submitted Sell Order will
         sell the outstanding APS subject to such Submitted Bid or Submitted
         Sell Order;

   (b)   each Existing Holder that placed a Submitted Bid specifying a rate per
         annum lower than the Winning Bid Rate will continue to hold the
         outstanding APS subject to such Submitted Bid;

   (c)   each Potential Holder that placed a Submitted Bid specifying a rate
         per annum lower than the Winning Bid Rate will purchase the number of
         APS subject to such Submitted Bid;

   (d)   each Existing Holder that placed a Submitted Bid specifying a rate per
         annum equal to the Winning Bid Rate will continue to hold the
         outstanding shares of APS subject to such Submitted Bids, unless the
         number of outstanding APS subject to all such Submitted Bids of
         Existing Holders is greater than the excess of the Available APS over
         the number of APS accounted for in clauses (b) and (c) above, in which
         event each Existing Holder with such a Submitted Bid will sell a
         number of outstanding APS determined on a pro rata basis based on the
         number of outstanding APS subject to all such Submitted Bids of such
         Existing Holders; and

   (e)   each Potential Holder that placed a Submitted Bid specifying a rate
         per annum equal to the Winning Bid Rate will purchase any Available
         APS not accounted for in clauses (b), (c) or (d) above on a pro rata
         basis based on the APS subject to all such Submitted Bids of Potential
         Holders.

If Sufficient Clearing Bids have not been made (other than because all
outstanding APS are the subject of Submitted Hold Orders):

   (a)   each Existing Holder that placed a Submitted Bid specifying a rate per
         annum equal to or lower than the Maximum Applicable Rate will continue
         to hold the outstanding APS subject to such Submitted Bid;

   (b)   each Potential Holder that placed a Submitted Bid specifying a rate
         per annum equal to or lower than the Maximum Applicable Rate will
         purchase the number of APS subject to such Submitted Bid; and

   (c)   each Existing Holder that placed a Submitted Bid specifying a rate per
         annum higher than the Maximum Applicable Rate or a Submitted Sell
         Order will sell a number of outstanding APS determined on a pro rata
         basis based on the outstanding APS subject to all such Submitted Bids
         and Submitted Sell Orders.

-----------------------------------------------------------------------------
                                                                          33

<PAGE>

Description of APS

-----------------------------------------------------------------------------

If as a result of the Auction Procedures described above any Existing Holder
would be entitled or required to sell, or any Potential Holder would be
entitled or required to purchase, a fraction of APS, the Auction Agent, in such
manner as, in its sole discretion, it shall determine, will round up or down
the number of APS being sold or purchased on such Auction Date so that each
share sold or purchased by each Existing Holder or Potential Holder will be a
whole APS. If any Potential Holder would be entitled or required to purchase
less than a whole APS, the Auction Agent, in such manner as, in its sole
discretion, will determine, will allocate APS for purchase among Potential
Holders so that only whole APS are purchased by any such Potential Holder, even
if such allocation results in one or more of such Potential Holders not
purchasing any APS.

Notification of Results; Settlement

The Auction Agent will advise each Broker-Dealer who submitted a Bid or Sell
Order in an Auction whether such Bid or Sell Order was accepted or rejected in
whole or in part and of the Applicable Rate for the next Dividend Period for
the related APS by telephone or through the Auction Agent's auction processing
system at approximately 3:00 p.m., New York City time, on the Auction Date for
such Auction. Each such Broker-Dealer that submitted an Order for the account
of a customer then will advise such customer whether such Bid or Sell Order was

accepted or rejected, will confirm purchases and sales with each customer purchasing or selling APS as a result of the Auction and will advise each customer purchasing or selling APS to give instructions to its Agent Member of the Securities Depository to pay the purchase price against delivery of such shares or to deliver such shares against payment therefor as appropriate. If a customer selling APS as a result of an Auction fails to instruct its Agent Member to deliver such shares, the Broker-Dealer that submitted such customer's Bid or Sell Order will instruct such Agent Member to deliver such shares against payment therefor. Each Broker-Dealer that submitted a Hold Order in an Auction on behalf of a customer also will advise such customer of the Applicable Rate for the next Dividend Period for the APS. The Auction Agent will record each transfer of APS on the record book of Existing Holders to be maintained by the Auction Agent.

In accordance with the Securities Depository's normal procedures, on the day after each Auction Date, the transactions described above will be executed through the Securities Depository, and the accounts of the respective Agent Members at the Securities Depository will be debited and credited as necessary to effect the purchases and sales of APS as determined in such Auction. Purchasers will make payment through their Agent Members in same-day funds to the Securities Depository against delivery through their Agent Members) the Securities Depository will make payment in accordance with its normal procedures, which now provide for payment in same-day funds. If the procedures of the Securities Depository applicable to APS shall be changed to provide for payment in next-day funds, then purchasers may be required to make payment in next-day funds. If the certificates for the APS are not held by the Securities Depository or its nominee, payment will be made in same-day funds to the Auction Agent against delivery of such certificates.

If any Existing Holder selling APS in an Auction fails to deliver such shares, the Broker-Dealer of any person that was to have purchased APS in such Auction may deliver to such person a number of whole APS that is less than the number of shares that otherwise was to be purchased by such person. In such event, the number of APS to be so delivered will be determined by such Broker-Dealer. Delivery of such lesser number of shares will constitute good delivery. Each Broker-Dealer Agreement also will provide that neither the Fund nor the Auction Agent will have responsibility or liability with respect to the failure of a Potential Beneficial Owner, Potential Beneficial Owner or their respective Agent Members to deliver APS or to pay for APS purchased or sold pursuant to an Auction or otherwise.

------------------------------------------------

34
<PAGE>

Description of APS

------------------------------------------------

BROKER-DEALERS

General

The Auction Agent after each Auction will pay a service charge from funds provided by the Fund to each Broker-Dealer on the basis of the purchase price of APS placed by such Broker-Dealer at such Auction. The service charge (i) for any 7-Day Dividend Period shall be payable at the annual rate of 0.25% in the purchase price of the APS placed by such Broker-Dealer in any such Auction and (ii) for any Special Dividend Period shall be determined by mutual consent of the Fund and any such Broker-Dealer or Broker-Dealers and shall be based upon a selling concession that would be applicable to an underwriting of fixed or variable rate preferred shares with a similar final maturity or variable rate dividend period, respectively, at the commencement of the Dividend Period with respect to such Auction. For the purposes of the preceding sentence, the APS will be placed by a Broker-Dealer if such shares were (i) the subject of Hold Orders deemed to have been made by Beneficial Owners that were acquired by such Beneficial Owners through such Broker-Dealer or (ii) the subject of the following Orders submitted by such Broker-Dealer: (A) a Submitted Bid of a Beneficial Owner that resulted in such Beneficial Owner continuing to hold such shares as a result of the Auction, (B) a Submitted Bid of a Potential Beneficial Owner that resulted in such Potential Beneficial Owner purchasing such shares as a result of the Auction or (C) a Submitted Hold Order.

The Broker-Dealer Agreements provide that a Broker-Dealer may submit Orders in Auctions for its own account, unless the Fund notifies all Broker-Dealers that they no longer may do so; provided that Broker-Dealers may continue to submit Hold Orders and Sell Orders. If a Broker-Dealer submits an Order for its own account in any Auction of APS, it may have knowledge of Orders placed through it in that Auction and therefore have an advantage over other Bidders, but such Broker-Dealer would not have knowledge of Orders submitted by other Broker-Dealers in that Auction.

Secondary Market Trading and Transfer of APS

The Broker-Dealers may maintain a secondary trading market in the APS outside of Auctions; however, they have no obligation to do so, and may discontinue such activity at any time. There can be no assurance that a secondary market for the APS will develop or, if it does develop, that it will provide holders with a liquid trading market (i.e., trading will depend on the presence of willing buyers and sellers and the trading price is subject to variables to be determined at the time of the trade by the Broker-Dealers). The APS will not be registered on any stock exchange or on any automated quotation system. An increase in the level of interest rates, particularly during any Long Term

Dividend Period for a series of APS, likely will have an adverse effect on the
secondary market price of such APS, and a selling shareholder may sell APS
between Auctions at a price per share of less than $25,000.

A Beneficial Owner or an Existing Holder may sell, transfer or otherwise
dispose of APS only in whole shares and only (1) pursuant to a Bid or Sell
Order placed with the Auction Agent in accordance with the Auction Procedures,
(2) to a Broker-Dealer or (3) to such other persons as may be permitted by the
Fund; provided, however, that (a) a sale, transfer or other disposition of
shares of APS from a customer of a Broker-Dealer who is listed on the records
of that Broker-Dealer as the holder of such shares to that Broker-Dealer or
another customer of that Broker-Dealer shall not be deemed to be a sale,
transfer or other disposition for purposes of the foregoing if such Broker-
Dealer remains the Existing Holder of the shares so sold, transferred or
disposed of immediately after such sale, transfer or disposition and (b) in the
case of all transfers other than pursuant to Auctions, such Beneficial Owner or
Existing Holder, its Broker-Dealer, if applicable, or its Agent Member advises
the Auction Agent of such transfer.

-----------------------------------------------------------------------------

                                                                           28

<PAGE>

Description of APS

-----------------------------------------------------------------------------


DIVIDENDS

General

The holders of APS of each series will be entitled to receive, when, as and if
declared by the Board of Trustees, out of funds legally available therefor,
cumulative cash dividends on their shares, at the Applicable Rate determined as
set forth below under "--Determination of Dividend Rate," payable on the dates
set forth below. Dividends on the APS so declared and payable will be paid (i)
in preference to and in priority over any dividends so declared and payable on
the Common Shares, and (ii) to the extent permitted under the Code and to the
extent available, out of net tax-exempt income earned on the Fund's
investments. Dividends on the APS, to the extent that they are derived from
municipal bonds, generally will be exempt from federal income tax, although all
of those dividends will be a tax preference item for corporate taxpayers and a
portion of those dividends may be a tax preference item for purposes of the
federal alternative minimum tax for individuals ("Preference Item"). See
"Taxes."

Dividends on each series of APS will accumulate from the date on which the Fund
originally issues the APS (the "Date of Original Issue") and will be payable on
the APS on the dates described below. Dividends on a series of APS with respect
to the Initial Dividend Period shall be payable on the Initial Dividend Payment
Date for that series. Following the Initial Dividend Payment Date, dividends on
each series of APS will be payable, at the option of the Fund, either (i) with
respect to any 7-Day Dividend Period and any Short Term Dividend Period of 35
or fewer days, on the day next succeeding the last day thereof or (ii) with
respect to any Short Term Dividend Period of more than 35 days and with respect
to any Long Term Dividend Period, monthly on the first Business Day of each
calendar month during such Short Term Dividend Period or Long Term Dividend
Period and on the day next succeeding the last day thereof (each such date
referred to in clause (i) or (ii) being referred to herein as a "Normal
Dividend Payment Date"), except that if such Normal Dividend Payment Date is
not a Business Day, the Dividend Payment Date will be the first Business Day
next succeeding such Normal Dividend Payment Date. Although any particular
Dividend Payment Date may not occur on the originally scheduled date because of
the exceptions discussed above, the next succeeding Dividend Payment Date,
subject to such exceptions, will nonetheless occur on the next following
originally scheduled date. If for any reason a Dividend Period for a series of
APS is scheduled to begin on the same day and end on the same day as a Dividend
Period for another series of APS, then the last day of the Dividend Period for
such other series of APS shall be the second Business Day next succeeding such
scheduled day unless the Fund obtains the opinion of tax counsel referred to
below. Subject to the limitation in the next sentence, if for any reason a
Dividend Payment Date cannot be fixed as described above, then the Board of
Trustees will fix the Dividend Payment Date. However, dividend Periods of any
series of APS shall not be co-extensive with the Dividend Period of any other
series of APS unless the Fund has received an opinion of tax counsel that
having such co-extensive periods will not affect the deductibility, for federal
income tax purposes, of dividends paid on the different series of APS. The
Board of Trustees before authorization of a dividend may change a Dividend
Payment Date if such change does not adversely affect the contract rights of
the holders of APS set forth in the Declaration of Trust or Amended By-Laws.
The Initial Dividend Period, 7-Day Dividend Periods and Special Dividend
Periods are hereinafter sometimes referred to as "Dividend Periods." Each
dividend payment date determined as provided above is hereinafter referred to
as a "Dividend Payment Date."

Prior to each Dividend Payment Date, the Fund is required to deposit with the
Auction Agent sufficient funds for the payment of declared dividends. The Fund
does not intend to establish any reserves for the payment of dividends.

Each dividend will be paid to the record holder of the APS as of 12:00 noon,
New York City time, on the Business Day preceding the Dividend Payment Date,
which holder is expected to be the nominee of

36
<PAGE>

Description of APS

the Securities Depository. See "--The Auction--Securities Depository." The
Securities Depository will credit the accounts of the Agent Members of the
Existing Holders in accordance with the Securities Depository's normal
procedures, which provide for payment in same-day funds. The Agent Member of an
Existing Holder will be responsible for holding or disbursing such payments on
the applicable Dividend Payment Date to such Existing Holder in accordance with
the instructions of such Existing Holder. Dividends in arrears for any past
Dividend Period may be declared and paid at any time, without reference to any
regular Dividend Payment Date, to the nominee of the Securities Depository.

Any dividend payment made on the APS first shall be credited against the
earliest declared but unpaid dividends accumulated with respect to such shares.

Holders of the APS will not be entitled to any dividends, whether payable in
cash, property or stock, in excess of full cumulative dividends except as
described under "--Gross-up Dividends" and "--Non-Payment Period; Late Charge"
below. No interest will be payable in respect of any dividend payment or
payments on the APS which may be in arrears.

The amount of cash dividends per share of APS of each series payable (if
declared) on the Initial Dividend Payment Date, each 7-Day Dividend Period and
each Dividend Payment Date of each Short Term Dividend Period will be computed
by multiplying the Applicable Rate for such Dividend Period by a fraction, the
numerator of which will be the number of days in such Dividend Period or part
thereof that such share was outstanding and for which dividends are payable on
such Dividend Payment Date and the denominator of which will be 365,
multiplying the amount so obtained by $25,000, and rounding the amount so
obtained to the nearest cent. During any Long Term Dividend Period, the amount
of cash dividends per share of APS payable (if declared) on any Dividend
Payment Date will be computed by multiplying the Applicable Rate for such
Dividend Period by a fraction, the numerator of which will be the number of
days in such part of such Dividend Period that such share was outstanding and
for which dividends are payable on such Dividend Payment Date and the
denominator of which will be 360, multiplying the amount so obtained by
$25,000, and rounding the amount so obtained to the nearest cent.

Notification of Dividend Period

The Fund, at its sole option and to the extent permitted by law, by telephonic
and written notice (a "Request for Special Dividend Period") to the Auction
Agent and to each Broker-Dealer, may request that the next succeeding Dividend
Period for a series of APS will be a number of days (other than seven), evenly
divisible by seven, and not fewer than fourteen nor more than 364 in the case
of a Short Term Dividend Period or one whole year or more but not greater than
five years in the case of a Long Term Dividend Period, specified in such
notice, provided that the Fund may not give a Request for Special Dividend
Period for a Dividend Period of greater than 28 days (and any such request will
be null and void) unless, for any Auction occurring after the Initial Auction,
Sufficient Clearing Bids were made in the last occurring Auction and unless
full cumulative dividends, any amounts due with respect to redemptions, and any
Gross-up Dividends payable prior to such date have been paid in full. Such
Request for Special Dividend Period, in the case of a Short Term Dividend
Period, shall be given on or prior to the second Business Day but not more than
seven Business Days prior to an Auction Date for the APS of that series and, in
the case of a Long Term Dividend Period, shall be given on or prior to the
second Business Day but not more than 28 days prior to an Auction Date for the
APS of that series. Upon receiving such Request for Special Dividend Period,
the Broker-Dealers jointly shall determine the Optional Redemption Price of the
APS of that series during such Special Dividend Period and the Specific
Redemption Provisions and shall give the Fund and the Auction Agent written
notice (a "Response") of such determination by no later than the second
Business Day prior to such Auction

37
<PAGE>

Description of APS

Date. In making such determination, the Broker-Dealers will consider (i)
existing short-term and long-term market rates and indices of such short-term
and long-term rates, (ii) existing market supply and demand for short-term and
long-term securities, (iii) existing yield curves for short-term and long-term
securities comparable to the APS, (iv) industry and financial conditions which
may affect the APS of that series, (v) the investment objective of the Fund and
(vi) the Dividend Periods and dividend rates at which current and potential
beneficial holders of the APS would remain or become beneficial holders.

After providing the Request for Special Dividend Period to the Auction Agent
and each Broker-Dealer as set forth above, the Fund, by no later than the
second Business Day prior to such Auction Date, may give a notice (a "Notice of
Special Dividend Period") to the Auction Agent, the Securities Depository and
each Broker-Dealer, which notice will specify (i) the duration of the Special

Dividend Period, (ii) the Optional Redemption Price, if any, as specified in the related Response and (iii) the Specific Redemption Provisions, if any, as specified in the related Response. The Fund has agreed to provide a copy of such Notice of Special Dividend Period to Moody's. The Fund will not give a Notice of Special Dividend Period, and, if such Notice of Special Dividend Period was given already, will give telephonic and written notice of its revocation (a "Notice of Revocation") to the Auction Agent, each Broker-Dealer, and the Securities Depository on or prior to the Business Day prior to the relevant Auction Date if (x) either the 1940 Act APS Asset Coverage is not satisfied or the Fund fails to maintain Moody's Eligible Assets with an aggregate Discounted Value at least equal to the APS Basic Maintenance Amount, on each of the two Valuation Dates immediately preceding the Business Day prior to the relevant Auction Date on an actual basis and on a pro forma basis giving effect to the proposed Special Dividend Period (using as a pro forma dividend rate with respect to such Special Dividend Period the Dividend rate which the Broker-Dealers shall advise the Fund is an approximately equal rate for securities similar to the APS with an equal dividend period) or (y) sufficient funds for the payment of dividends payable on the immediately succeeding Dividend Payment Date have not been irrevocably deposited with the Auction Agent by the close of business on the third Business Day preceding the Auction Date immediately preceding such Dividend Payment Date. The Fund also shall provide a copy of such Notice of Revocation to Moody's. If the Fund is prohibited from giving a Notice of Special Dividend Period as a result of the factors enumerated in clause (x) or (y) above or if the Fund gives a Notice of Revocation with respect to a Notice of Special Dividend Period, the next succeeding Dividend Period for that series will be a 7-Day Dividend Period. In addition, in the event Sufficient Clearing Bids are not made in an Auction, or if an Auction is not held for any reason, the next succeeding Dividend Period will be a 7-Day Dividend Period, and the Fund may not again give a Notice of Special Dividend Period (and any such attempted notice will be null and void) until Sufficient Clearing Bids have been made in an Auction with respect to a 7-Day Dividend Period.

Determination of Dividend Rate

The dividend rate on a series of APS during the period from and including the Date of Original Issue for the APS to but excluding the Initial Dividend Payment Date for that series of APS (the "Initial Dividend Period") will be the rate per annum set forth on the inside cover page hereof. Commencing on the Initial Dividend Payment Date for a series of APS, the Applicable Rate on that series of APS for each Subsequent Dividend Period, which Subsequent Dividend Period shall be a period commencing on and including a Dividend Payment Date and ending on and including the calendar day prior to the next Dividend Payment Date (or last Dividend Payment Date in a Dividend Period if there is more than one Dividend Payment Date), shall be equal to the rate per annum that results from the Auction with respect to such Subsequent Dividend Period. Cash dividends shall be calculated as set forth above under "Dividends--General."

--------------------------------------------------------------------

38
<PAGE>

Description of APS

--------------------------------------------------------------------

Non-Payment Period; Late Charge

A "Non-Payment Period" for a series of APS will commence if the Fund fails to (i) declare, prior to the close of business on the second Business Day preceding any Dividend Payment Date, for payment on or (to the extent permitted as described below) within three Business Days after such Dividend Payment Date to the persons who held such shares as of 12:00 noon, New York City time, on the Business Day preceding such Dividend Payment Date, the full amount of any dividend on the APS payable on such Dividend Payment Date or (ii) deposit, irrevocably in trust, in same-day funds, with the Auction Agent by 12:00 noon, New York City time, (A) on such Dividend Payment Date the full amount of any cash dividend on such shares payable (if declared) on such Dividend Payment Date or (B) on any redemption date for any APS called for redemption, the Mandatory Redemption Price per share of such APS or, in the case of an optional redemption, the Optional Redemption Price per share. Such Non-Payment Period will consist of the period commencing on and including the aforementioned Dividend Payment Date or redemption date, as the case may be, and ending on and including the Business Day on which, by 12:00 noon, New York City time, all unpaid cash dividends and unpaid redemption prices shall have been so deposited or otherwise shall have been made available to the applicable holders in same-day funds; provided that a Non-Payment Period for the APS will not end unless the Fund shall have given at least five days' but no more than 30 days' written notice of such deposit or availability to the Auction Agent, the Securities Depository and all holders of the APS of such series. Notwithstanding the foregoing, the failure by the Fund to deposit funds as provided for by clauses (ii) (A) or (ii) (B) above within three Business Days after any Dividend Payment Date or redemption date, as the case may be, in each case to the extent contemplated below, shall not constitute a "Non-Payment Period." The Applicable Rate for each Dividend Period for the APS of any series, commencing during a Non-Payment Period, will be equal to the Non-Payment Period Rate; and each Dividend Period commencing after the first day of, and during, a Non-Payment Period shall be a 7-Day Dividend Period. Any dividend on the APS due on any Dividend Payment Date for such shares (if, prior to the close of business on the second Business Day preceding such Dividend Payment Date, the Fund has declared such dividend payable on such Dividend Payment Date to the persons who held such shares as of 12:00 noon, New York City time, on the Business Day preceding such Dividend Payment Date) or redemption price with respect to such

Exhibit A, Page 83

shares not paid to such persons when they may be paid to such persons in the
same form of funds by 12:00 noon, New York City time, on any of the first three
Business Days after such Dividend Payment Date or due date, as the case may be,
provided that such amount is accompanied by a late charge calculated for such
period of non-payment at the Non-Payment Period Rate applied to the amount of
such non-payment based on the actual number of days comprising such period
divided by 365, and in such case such period shall not constitute a Non-Payment
Period. In the case of a willful failure of the Fund to pay a dividend or a
Dividend Payment Date or to redeem any APS on the date set for such redemption,
the preceding sentence shall not apply and the Applicable Rate for the Dividend
Period commencing during the Non-Payment Period resulting from such failure
shall be the Non-Payment Period Rate. For the purpose of the foregoing,
payment to a person in same-day funds on any Business Day at any time will be
considered equivalent to payment to that person in New York Clearing House
(next-day) funds at the same time on the preceding Business Day. And any
payment made after 12:00 noon, New York City time, on any Business Day shall be
considered to have been made instead in the same form of funds and to the same
person before 12:00 noon, New York City time, on the next Business Day. The
"Non-Payment Period Rate" initially will be 200% of the applicable Reference
Rate (or 275% of such rate if the Fund has provided notification to the Auction
Agent prior to the Auction establishing the Applicable Rate for any dividend
that net capital gains or other taxable income will be included in such
dividend on the APS), provided that the Board of Trustees of the Fund shall
have the authority to adjust, modify, alter or change from time to time the
initial Non-Payment Period Rate if the Board of Trustees of the Fund determines
and Moody's (or any Substitute Rating Agency in lieu of Moody's in the event
Moody's

-----------------------------------------------------------------------------

<PAGE>                                                                      39

Description of APS

-----------------------------------------------------------------------------

shall not rate the APS) advises the Fund in writing that such adjustment,
modification, alteration or change will not adversely affect its then-current
rating on the APS.

Restrictions on Dividends and Other Payments

Under the 1940 Act, the Fund may not declare dividends or make other
distributions on Common Shares or purchase any such shares if, at the time of
the declaration, distribution or purchase, as applicable (and after giving
effect thereto), asset coverage (as defined in the 1940 Act) with respect to
the outstanding APS would be less than 200% (or such other percentage as in the
future may be required by law). The foregoing limitations on dividends, other
distributions and purchases in certain circumstances may impair the Fund's
ability to maintain its qualification as a regulated investment company under
the Code. See "Taxes." Upon any failure to pay dividends on the APS for two
years or more, the holders of the APS will acquire certain additional voting
rights. See "--Voting Rights" below.

For so long as any APS are outstanding, the Fund will not declare, pay or set
apart for payment any dividend or other distribution (other than a dividend or
distribution paid in shares of, or options, warrants or rights to subscribe for
or purchase, Common Shares or other shares, if any, ranking junior to the APS
as to dividends or upon liquidation) in respect of Common Shares or any other
shares of the Fund ranking junior to or on a parity with the APS as to
dividends or upon liquidation, or call for redemption, redeem, purchase or
otherwise acquire for consideration any Common Shares or any other such junior
shares (except by conversion into or exchange for stock of the Fund ranking
junior to APS as to dividends and upon liquidation) or any such parity stock
(except by conversion into or exchange for stock of the Fund ranking junior to
or on a parity with APS as to dividends and upon liquidation), unless (A)
immediately after such transaction, the Fund would have Moody's Eligible Assets
with an aggregate Discounted Value equal to or greater than the APS Basic
Maintenance Amount, and the 1940 Act APS Asset Coverage (see "--Asset
Maintenance" and "--Redemption" below) would be satisfied, (B) full cumulative
dividends on the APS due on or prior to the date of the transaction have been
declared and paid or shall have been declared and sufficient funds for the
payment thereof deposited with the Auction Agent, (C) any Gross-up Dividend
required to be paid on or before the date of such declaration or payment has
been paid and (D) the Fund has redeemed the full number of APS required to be
redeemed by any provision for mandatory redemption contained in the Amended By-
Laws.

Inclusion of Taxable Income in Dividends

Where the Fund is aware that it will include any net capital gains or other
taxable income in any dividend on APS, the Fund will notify the Auction Agent
of the amount to be so included prior to the Auction Date on which the
Applicable Rate for the dividend is to be established. The Fund may also
include such income in a dividend on shares of APS without giving notice in
advance of the Auction Date if it increases the dividend by an additional
amount calculated as if such income were the subject of a Retroactive Taxable
Allocation and the additional amount were a Gross-up Dividend (as described
immediately below) and notifies the Auction Agent of such inclusion at least
five days prior to the applicable Dividend Payment Date.

Gross-up Dividends

The Fund may retroactively allocate net capital gains or other Taxable Income

to the APS without giving the advance notice to the Auction Agent described above under "--The Auction--Auction Date; Advance Notice of Allocation of Taxable Income; Inclusion of Taxable Income in Dividends." If the Fund does so solely by reason of the fact that such allocation is made as a result of the redemption of all or a portion of the outstanding shares of APS or the liquidation of the Fund (a "Retroactive Taxable

------------------------------------------------------------------------

40
<PAGE>

Description of APS

------------------------------------------------------------------------

Allocation"), the Fund, within 90 days (and generally within 60 days) after the end of the Fund's fiscal year for which a Retroactive Taxable Allocation is made, will provide notice thereof to the Auction Agent and to each holder of APS (initially Cede & Co. as nominee of the Securities Depository) during such fiscal year at such holder's address as the same appears or last appeared on the stock books of the Fund. Within 30 days after such notice is given to the Auction Agent, the Fund will pay to the Auction Agent (who then will distribute to such holders of the APS), out of funds legally available therefor, an amount equal to the aggregate Gross-up Dividend (as defined below) with respect to all Retroactive Taxable Allocations made to such holders during the fiscal year in question. The Fund will not otherwise compensate the holders of the APS for any tax liability caused by the retroactive allocation of net capital gains or other taxable income to the APS. See "Taxes."

A "Gross-up Dividend" means a payment to a present or former holder of the APS of an amount which, when giving effect to the Retroactive Taxable Allocation made to such holder with respect to the fiscal year in question, would cause such holder's after-tax return (taking into account both the Retroactive Taxable Allocation and the Gross-up Dividend) to be equal to the after-tax return the holder would have received if there had been no Retroactive Taxable Allocation. A Gross-up Dividend shall be calculated (i) without consideration being given to the time value of money, (ii) assuming that none of the dividends received from the Fund is a Preference Item, and (iii) assuming that each Retroactive Taxable Allocation would be taxable to each holder of APS at the maximum combined effective marginal federal income and California State tax rate (including any surtax) applicable to the taxable character of the distribution (i.e., ordinary income or net capital gain) in the hands of an individual or a corporation, whichever is greater (disregarding the effect of any local taxes and the phase out of, or provision limiting, personal exemptions, itemized deductions, or the benefit of lower tax brackets). The Fund generally intends to designate any Gross-up Dividend as an "exempt-interest" dividend to the extent permitted by applicable law. However, a portion or all of any Gross-up Dividend will be taxable to the recipient thereof. See "Taxes." The Fund will not pay a further Gross-up Dividend with respect to any taxable portion of a Gross-up Dividend. The Fund shall not be required to pay Gross-up Dividends with respect to any net capital gain or other taxable income determined by the IRS to be allocable in a manner different from that allocated by the Fund.

ASSET MAINTENANCE

The Fund will be required to satisfy two separate asset maintenance requirements under the terms of the Amended By-Laws. These requirements are summarized below.

1940 Act APS Asset Coverage

The Fund will be required under the Amended By-Laws to maintain, with respect to the APS, as of the last Business Day of each month in which any APS are outstanding, asset coverage of at least 200% with respect to senior securities which are shares of beneficial interest in the Fund, including the APS (or such other asset coverage as in the future may be specified in or under the 1940 Act as the minimum asset coverage for senior securities which are shares of beneficial interest of a closed-end investment company as a condition of paying dividends on its common stock) ("1940 Act APS Asset Coverage"). If the Fund fails to maintain 1940 Act APS Asset Coverage and such failure is not cured as of the last Business Day of the following month (the "1940 Act Cure Date"), the Fund will be required under certain circumstances to redeem certain of the APS. See "--Redemption" below.

The 1940 Act APS Asset Coverage immediately following the issuance of APS offered hereby (after giving effect to the deduction of the sales load and offering expenses for the APS), computed using the

------------------------------------------------------------------------

<PAGE>                                                                   41

Description of APS

------------------------------------------------------------------------

Fund's net assets as of August 3, 2001, and assuming the APS had been issued as of such date, will be as follows:

<TABLE>
    <S>                                            <C> <C>          <C> <C>
       Value of Fund assets less liabilities not

Exhibit A, Page 85