Daniel T. Bernhard (CSB# 104229)
FREELAND COOPER & FOREMAN LLP
150 Spear Street, Suite 1800
San Francisco, California 94105
Telephone: (415) 541-0200
Facsimile: (415) 495-4332
Email: bernhard@freelandlaw.com

Attorneys for Plaintiffs
William Bridge, Jr., et al.

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WILLIAM BRIDGE, JR. and MICHELE PROFANT,<br><br>Plaintiffs,<br><br>v.<br><br>E*TRADE SECURITIES LLC,<br><br>Defendant. | CASE NO.: C11-2521 EMC<br><br>**FIRST AMENDED COMPLAINT FOR DAMAGES AND RESCISSION:**<br><br>1. **Negligent Misrepresentation**<br>2. **Fraudulent Misrepresentation**<br>3. **Fraud**<br>4. **Negligent Supervision**<br>5. **Breach of Contract**<br>6. **Rescission -- Civ. Code Sec. 1689**<br><br>**JURY TRIAL DEMANDED** |

For their Complaint herein, Plaintiffs William Bridge, Jr. and Michele Profant ("Plaintiffs"), allege as follows:

### PARTIES

1. Plaintiffs are individuals who have resided at all relevant times in the City of Alameda, County of Alameda, California. They are now and have been at all relevant times the owners, as joint tenants, of an E*Trade brokerage account that was opened on their behalf by an employer, and that brokerage account has been at all times maintained by Plaintiffs at their residence in Alameda County. Plaintiffs are not employed in the financial services industry or related fields, and never have been; they are not sophisticated investors.

2. Defendant E*Trade Securities, LLC ("E*Trade") is a retail securities broker and investment firm, and currently operates as a nationwide online securities retail broker, among other things. It transacts business in California and in Alameda County online through its retail brokerage activities and otherwise. It is and has been at all relevant times a member of FINRA and the NASD; it is governed by their rules, regulations and procedures, as well as by all applicable state and federal laws, and other regulations governing the securities industry.

## JURISDICTION AND VENUE

3. This Court has jurisdiction over these claims and these parties, pursuant to 28 U.S.C §§ 1332 and 1441(b). This action was originally commenced in the Alameda County Superior Court, and was thereafter removed by Defendant E*Trade to the United States District Court for the Northern District of California. The acts and conduct complained of herein, including the solicitation of Plaintiffs' investment and the actual investment itself, all occurred in Alameda County. Defendant E*Trade both actively solicits and transacts business in Alameda County, and throughout the State of California, through use of the U.S. Mail, the internet and telephone, and by other means.

## FACTUAL ALLEGATIONS

4. "Auction Rate Securities" ("ARS") are long term debt or equity instruments that include municipal auction rate bonds and auction rate preferred shares ("ARPS") of closed–end municipal funds. ARS feature a variable interest rate that resets through a periodic bidding process generally known as a "Dutch auction."

5. ARS allowed issuers to obtain long-term financing at lower, short-term rates. The purchasers of ARS were willing to accept the lower rates because the frequent auctions increased the liquidity of the ARS. Financial firms and other issuers of ARS widely marketed ARS to investors as a cash management tool, especially useful to corporate entities. They were widely viewed and treated as equivalent to money market funds but typically offered a higher rate of return with equivalent liquidity. ARS were first introduced to the market in the mid-1980s, and originally they were available only to institutional and corporate investors, usually with a minimum purchase of $250,000 or more.

6. In a typical Dutch auction of ARS a bidder stated the amount of ARS the bidder was willing to purchase, and the minimum interest rate the bidder was willing to accept. All bids were then ranked, and the lowest interest rate required to sell all of a particular ARS product was known as the "clearing rate." Setting a clearing rate accomplished two things: (a) it set the interest rate that was to be paid by the ARS issuer to the new owners until the next auction; and (b) it identified the successful bidders in the auction. Prior to an auction owners of ARS had three choices: they could offer their ARS for sale in the auction; they could choose to hold their existing position in the ARS; or they could decide to "hold at rate", i.e., they kept their ARS if the new clearing rate was at least as high as the prior rate. Any interested buyer or investor, including but not limited to existing ARS owners, could submit bids to purchase. In a successful auction, the winning bidders became the new owners of the ARS sold.

7. When there were insufficient bids to purchase all of the ARS offered for sale at the auction, the auction failed. When an auction failed investors generally had no choice but to hold their illiquid investments until (a) the next successful auction; (b) the issuer redeemed the ARS; or (c) the investor elected to sell its ARS in a secondary market (typically at a much reduced price below par).

8. Issuers of ARS typically retained a financial firm to act as a broker-dealer at the auction for that issuer's ARS, and investors placed bids with that broker-dealer for that issuer's ARS. The auction process for ARS deviated from a traditional Dutch auction to the extent that ARS broker-dealers and even issuers participated actively in the auction process by placing "support" bids during an auction. Intervention and support by broker dealers was essential to maintaining the success, order and coherence of ARS auctions. The support bids guaranteed that a market was maintained for the sale and purchase of ARS. ARS with a low maximum rate were entirely dependent on such support bids to maintain their liquidity. Broker-dealers and issuers had no ongoing obligation, however, to place support bids, or otherwise to intervene in auctions to insure their success.

9. Institutional and corporate investors in the ARS auction process, by virtue of their volume and duration of activity, were commonly aware of the broker-dealer practice of intervening in the auctions through support bids to insure market liquidity. As ARS auctions became better known and more popular, broker-dealers and issuers began to market ARS to individuals. By the early

2000's, the minimum investment required for ARS had dropped to approximately $25,000. Individuals were not typically knowledgeable about the ARS auction process, and were not informed of the practice of intervention and support bids that was standard in the auctions, and that rendered them an artificial market.

10. On May 31, 2006 the Securities and Exchange Commission issued an Order Instituting Administrative and Cease and Desist Proceedings, Making Findings, and Imposing Remedial Sanctions and a Cease and Desist Order Pursuant to Section 8A of the Securities Act of 1933, and Section 15(b) of the Securities Exchange Act of 1934. See, *In the Matter of Bear Stearns, et al.,* Securities Act of 1933 Release no. 8684, Securities Exchange Act of 1934 Release No. 53888, Administrative Proceeding File No. 3-12310 (the "Broker-Dealer Order"). In brief, the SEC found that the failure of broker-dealers and issuers to disclose the details of intervention and support bids in the ARS auctions violated applicable securities laws and regulations, and was unlawful. The SEC also found that this unlawful conduct directly affected the clearing rates of the ARS. In other words, unlawful conduct in the ARS market directly affected the prices bid and paid for ARS. The SEC directed broker-dealers to disclose fully their bidding practices to investors and the market at large to mitigate and ameliorate the manipulative effect of such practices on the market.

11. The SEC's action put on notice the entire ARS industry, composed of investment banks and other broker-dealer and issuers, that the industry's common practice of placing support bids artificially affected the clearing rates, and thus was manipulative and deceptive. Such undisclosed intervention in the ARS auctions masked the real volatility and uncertainty of the ARS market. The failure to disclose the standard practice of support bids deprived investors of essential material information required by them to make informed and objective calculations of risk and other investment decisions.

12. Plaintiff William Bridge, Jr. ("Bridge") has been an employee of Oracle Corporation for most of the past 20 years. In connection with Bridge's Oracle employment, and as part of his compensation, Bridge was awarded Oracle options over the time of his employment. In order to facilitate the handling and exercise of these options, Oracle established a brokerage account for Plaintiffs at E*Trade, account no. 6048-0792. Beginning when the E*Trade account was established,

4

FIRST AMENDED COMPLAINT FOR DAMAGES AND RESCISSION
{00147692-1}

and continuously thereafter at all times relevant hereto, Plaintiffs received monthly account statements addressed to their home address in Alameda, California.

13. Bridge left employment with Oracle Corporation in 2007, and thus had to exercise all of his vested options at that time, which resulted in a potentially significant tax liability to Plaintiffs. In anticipation of paying this tax liability, Plaintiffs wanted and needed to have funds available to them from their E*Trade account.

14. At all times relevant hereto Carl Hartmann was Plaintiffs' E*Trade account representative. Upon information and belief, Hartmann was at all relevant times an employee, agent or representative of E*Trade and was authorized to act as described herein, with E*Trade's knowledge, approval and ratification. Over a period of years Bridge had several discussions with Hartmann about investments including real-time telephone conversations. When Bridge exercised his Oracle options he discussed his prospective tax liability with Hartmann, who arranged a telephone conference with Plaintiffs and another E*Trade employee or agent named, upon information and belief, Robert Trent. In February and March, 2007 Hartmann and Trent conducted a telephone conference call with Plaintiffs who were located at the time in their home in Alameda, California. During the course of this telephone conference call, Trent advised Plaintiffs to invest in ARS, which Plaintiffs had never heard of before. This telephone discussion was followed with additional communications between Plaintiffs and Hartmann, during the course of which Bridge again explained his need to have cash available to pay an anticipated tax obligation.

15. In response to Plaintiffs' stated goals for absolute liquidity, Hartmann also recommended to Plaintiffs that they invest in ARS. He assured Plaintiffs that ARS had the essential qualities that Plaintiffs required and needed in any investment: (1) a higher rate of interest that was tax free in California; (2) safety in that such securities were backed by established and stable companies; and (3) immediate liquidity because ARS auctions occurred every week.

16. Based on the representations made to Plaintiffs by E*Trade, including but not limited to Hartmann, Plaintiffs agreed to purchase ARS. Neither Hartmann nor anyone else at E*Trade ever provided Plaintiffs at any time prior to their investment with a prospectus for any ARS investment; Neither Hartmann nor anyone else at E*Trade ever provided Plaintiffs at any time prior to their

5

investment with any disclosure documents or other written information concerning ARS; Neither Hartmann nor anyone else at E*Trade ever provided Plaintiffs at any time prior to their investment any direction or information about how to inform themselves about ARS and the ARS market. Plaintiffs relied exclusively and fully at all times on the representations and information provided to them by Hartmann and other E*Trade personnel in making their investment in ARS. Plaintiffs were, in fact, unaware of the precise type of ARS investment product that E*Trade was recommending to them until after E*Trade purchased it for Plaintiffs' account.

17. Plaintiffs discovered the actual ARS investment product that E*Trade acquired for them for the first time when they received their regular E*Trade monthly account statement for March, 2007: the PIMCO California Municipal Income Fund Auction Preferred Shares, Series A, bearing CUSIP no. 72200N205.

18. In early 2008 the ARS auctions began to suffer a series of failures. Broker dealers and issuers ceased to participate in and manipulate the auctions by placing strategic support bids, as they had historically done. Consequently, when many ARS auctions failed, the ARS market quickly became "frozen" as the market for ARS disappeared. ARS held by investors, as well as by issuers and others, became completely illiquid as the primary market failed, and any secondary markets vanished. At no time in 2008 did any one at E*Trade communicate any information to Plaintiffs about the problems in the ARS market, the affect or consequences of the market collapse on Plaintiffs' investment, or otherwise alert Plaintiffs or attempt to explain to them the impact on their investment resulting from the collapse of the ARS market.

19. Because Plaintiffs' anticipated tax obligation did not in fact arise in 2008 as Plaintiffs had expected, Plaintiffs had no immediate need for the funds in their E*Trade account. Plaintiffs continued to receive monthly statements for their E*Trade account, and those gave no notice or indication of the collapse of the ARS market. Because no one ever informed Plaintiffs of the market collapse and the ensuing illiquidity of their ARS investment, Plaintiffs were completely unaware that their ARS investment had failed. Plaintiffs discovered that there was a problem with their investment for the first time in July, 2009 when Plaintiffs went online to investigate selling the investment to raise funds for a planned home remodel.

20. When Plantiffs could not make sense of the information on the PIMCO website concerning their investment, they contacted Hartmann at E*Trade in July, 2009. Hartmann then arranged a conference call with Plaintiffs and an E*Trade "expert" on the ARS market. In the conference call the E*Trade expert discussed the ARS market and its collapse. He counseled that Plaintiffs' invested monies might be available in the future, but at that time the funds were "frozen" and completely illiquid.

21. Hartmann and the expert further explained that E*Trade, issuers and others like PIMCO had redeemed the ARS investments of many clients. Together they promised Plaintiffs that their ARS investment could also be redeemed, such that Plaintiffs would receive a return of the full amount of their investment. They explained that the E*Trade ARS investment would simply "disappear" from Plaintiffs' regular E*Trade account statement, and that E*Trade would credit Plaintiffs' full $400,000 investment to Plaintiffs' account, such that Plaintiffs would be "made whole."

22. Plaintiffs agreed to E*Trade's proposal, and relied on Defendant's assurances and representations. Plaintiffs believed that they had reached an agreement with E*Trade and had a resolution for their investment failure with E*Trade. Accordingly, Plaintiffs did nothing more to investigate their losses, the ARS market collapse, or their rights and remedies. In fact, however, E*Trade never performed this redemption and instead E*Trade has refused and failed to honor its promises and assurances to Plaintiffs.

23. Defendant E*Trade is a broker and is required to observe various standards of conduct in its dealings with its customers. These standards are found in the Securities Exchange Act of 1934, and in rules imposed by the Securities and Exchange Commission (the "SEC") itself and through the authority of the SEC as granted to the National Association of Securities Dealers (the "NASD") and its successor organization, the Financial Industry Regulatory Authority ("FINRA").

24. Among other obligations and requirements, E*Trade is required to supervise its agents, investment adviser representatives, and other individuals conducting securities business on its behalf pursuant to FINRA Rule 2010, in addition to 15 USC 78o(b)(4)(E) and NASD Rule 3010.

FIRST AMENDED COMPLAINT FOR DAMAGES AND RESCISSION

{00147692-1}

25. Defendant E*Trade is obligated, under applicable FINRA and NASD rules, including NASD Rule 2310, to "know thy customer" and to determine the suitability of any investment it recommends to customers based on a reasonable inquiry into a potential customers' financial situation and investment objectives, and other relevant information.

26. A basic component in a determination of customer suitability is a brokerage or customer agreement. Upon information and belief, it is E*Trade's standard practice and formal policy to require that a brokerage or customer agreement is entered into with every customer before any trading account is opened. Such a brokerage or customer agreement typically provides critical information about a prospective customer's investing goals, financial status, risk tolerance and other fundamental information essential to understanding the suitability of any investment for an investor. Here, E*Trade never entered into a brokerage or customer agreement with Plaintiffs. E*Trade never asked Plaintiffs to enter into such a brokerage or customer agreement, and never presented any such to Plaintiffs for their review, information or consideration. Consequently E*Trade had no understanding, and could not have any understanding, of Plaintiffs suitability for the ARS investment that E*Trade was recommending.

27. Moreover, in accordance with applicable FINRA Rules 2010 and 2020 and other rules, it is unlawful for a person, in connection with the offer, sale, or purchase of a security, directly or indirectly: (1) to employ a device, scheme, or artifice to defraud; (2) to make an untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (3) to engage in an act, practice, or course of business that operates or would operate as a fraud or deceit upon another person. See also, 15 USC 78o(c)(2)(A) and NASD Rule 2210.

28. Beginning in late 2009 and continuing thereafter, the SEC entered into numerous settlements with many of the ARS issuers or broker-dealer financial institutions that comprised the ARS investment industry. The focus of those settlements was redemption of ARS investments made by individuals and non-institutional investors. Upon information and belief, it was at least in part because of these widespread settlements within the ARS industry that E*Trade promised Plaintiffs in

July, 2009 that their ARS investment would be redeemed by E*Trade crediting Plaintiffs' account, and that Plaintiffs would be "made whole."

29. E*Trade has been and is now, the target of ongoing investigations or legal proceedings involving their marketing and sale of ARS investment products. As recently as August, 2010 the Securities Division of the Office of the Attorney General of the State of South Carolina initiated an action against E*Trade for, *inter alia*, selling ARS investments to unsuitable investors. See, *In the Matter of: E*Trade Securities, LLC, Respondent*, File Nos. 09085, 10009, Administrative Proceeding Before The Securities Commissioner of South Carolina.

## COUNT I
## (NEGLIGENT MISREPRESENTATION)

30. Plaintiffs reallege, as though set forth in full, the allegations contained in paragraphs 1-29 herein.

31. Plaintiffs were not informed by E*Trade in advance about what ARS product E*Trade would purchase for Plaintiffs. Plaintiffs were never provided any information, including any prospectus or other disclosure information about their ARS investment prior to the time that the investment was made. No E*Trade personnel, nor anyone else, ever explained to Plaintiffs that ARS depended for their liquidity on a manipulated and artificial market, and that broker-dealers and other issuers had no obligation to make support bids in any auction, and could cease to do so at any time.

32. Plaintiffs reasonably relied on E*Trade in making their investment, and as Plaintiffs' broker Defendant owed Plaintiffs a duty of care when it acted for Plaintiffs and provided investment advice to them. Defendant knew and expected that Plaintiffs would and did look to them for investment information, advice and guidance. The true nature of the ARS auctions, the vulnerability of such auctions to unforeseen and unpredictable events that would render the ARS illiquid, and the severe consequences of such illiquidity to a small investor, were some of the material risks and information that Plaintiffs never understood, and that E*Trade never explained.

33. Defendant knew or should have known that Plaintiffs reasonably would need and want information about the ARS auctions and investment, and that Plaintiffs were entitled to such information. Nevertheless, Defendant omitted and failed to disclose such essential material

information to Plaintiffs. Instead, Defendant provided Plaintiffs with misleading and inaccurate information about the stability of ARS, which misinformation Defendant knew, or should have known, was false and incorrect.

34. Plaintiffs relied on the misrepresentations and omissions made to them by E*Trade, which knew and intended that Plaintiffs would so rely. Plaintiffs' reliance was reasonable and expected, as Plaintiffs looked to Defendant as their financial advisor and broker, and relied on its experience, knowledge and expertise. Defendant at all times held itself out and offered itself to Plaintiffs as an expert in the financial services and investment areas. As a direct result of Defendant's acts and conduct, Plaintiffs have suffered injury and losses, as described herein.

## COUNT II
## (FRAUDULENT MISREPRESENTATION)

35. Plaintiffs reallege, as though set forth in full, the allegations contained in paragraphs 1-34 herein.

36. The misrepresentations and omissions made by E*Trade were reckless, were made by Defendant knowing them to be untrue at the time when made, or were made with no reasonable basis to believe them to be true at the time they were made. Defendant's misrepresentations and omissions were, moreover, made with Defendant's intent and expectation that Plaintiffs would rely on them, and Plaintiffs did in fact reasonably rely on them.

37. As a direct consequence of relying and acting upon Defendant's misrepresentations and omissions, Plaintiffs suffered the injury and losses alleged herein.

## COUNT III
## (FRAUD)

38. Plaintiffs reallege, as though set forth in full, the allegations contained in paragraphs 1-37 herein.

39. Defendant knew that ARS were not a suitable investment for Plaintiffs based on Plaintiffs' stated goals and purposes. Among other things, Defendant knew that ARS were not a secure investment and risk free; knew that the market liquidity was completely a function of support

bids and other market manipulation; knew that Plaintiffs did not understand or appreciate the market risks associated with the ARS auctions; and knew, or had no reason to believe otherwise, that Plaintiffs were unaware of the manipulation in the ARS market that rendered that investment completely unsuitable for Plaintiffs' financial circumstances and investment goals and stated needs. Defendant failed and omitted to provide to Plaintiffs any disclosure of any sort of materials or other information that could or did apprise Plaintiffs of these and other actual and material risks of investing in ARS.

40. The misrepresentations and omissions by E*Trade were intentional and made for the purpose of inducing Plaintiffs to rely on them, and to invest in ARS. Defendant knew that the representations were false at the time they were made, or that the material omissions rendered the information Plaintiffs had been given false and misleading. Defendant did nothing to correct these misrepresentations and omissions of material fact. Indeed, Defendant intended and sought to have Plaintiffs rely on them so that Plaintiffs would invest in ARS, and so that Defendant could continue to market and sell ARS products and inventory.

41. Plaintiffs did in fact rely on Defendant's misrepresentations and omissions, and invested in the ARS based on such misrepresentations and omissions. Such reliance by Plaintiffs was both reasonable and easily foreseen by Defendant.

42. As a direct consequence of Defendant's intentional misrepresentations and omissions, Plaintiffs invested in the ARS investment, lost the value of that investment, and have suffered damages in the amount of the investment, in addition to other losses Plaintiffs have sustained. In addition, Plaintiffs have been deprived of the use of the funds that they were fraudulently induced to invest. Defendant's acts and conduct were malicious, oppressive and recklessly intended to damage Plaintiffs, and did in fact did damage Plaintiffs. Accordingly, Defendant is liable to Plaintiffs for punitive and exemplary damages, in an amount sufficient to punish and deter Defendant's conduct, as proved at trial

## COUNT IV
## (NEGLIGENT SUPERVISION)

43.     Plaintiffs reallege, as though set forth in full, the allegations contained in paragraphs 1-42 herein.

44.     As a member of the NASD and FINRA, and pursuant to laws, rules and regulations of those regulatory agencies, and other applicable laws and regulations, E*Trade had a duty and obligation to supervise its employees, agents and representatives, including its brokers and account representatives, including Hartmann, and others working with and assisting him.

45.     E*Trade failed to supervise and oversee adequately its brokers and other personnel and employees who worked with Plaintiffs. Specifically, E*Trade failed to ensure that its employees and agents, as well as E*Trade brokers and account representatives including Hartmann, met the obligations and duties owed to Plaintiffs. These include:

(a)     Opening a bona fide E*Trade account for Plaintiffs, and obtaining Plaintiffs' review and execution of an appropriate E*Trade customer agreement establishing Plaintiffs' suitability for various investments;

(b)     Providing Plaintiffs with a prospectus, or any disclosure materials, in advance of E*Trade's purchase of ARSD fro Plaintiffs' account;

(c)     Making full and timely disclosure to Plaintiffs of the risks and other material information concerning the ARS market and industry; and

(d)     Not misleading Plaintiffs concerning rescission of their ARS investment and reimbursement of the full amount invested.

46.     E*Trade's failure to properly and adequately supervise had the direct result of causing Plaintiffs injury ad loss, as alleged herein, and subject to proof at trial.

///

## COUNT V
## (BREACH OF CONTRACT)

47. Plaintiffs reallege, as though set forth in full, the allegations contained in paragraphs 1-29 herein.

48. When Plaintiffs first discovered the failure of their ARS investment, in July, 2009, they contacted Hartmann and had specific discussions about the status of their investment. At that time Hartman and other E*Trade personnel proposed to Plaintiffs and promised them that their investment could and would be redeemed, and that Plaintiffs would receive a full refund and be "made whole." Hartmann and other E*Trade personnel specifically promised that the ARS investment shares would be redeemed in full, that the investment would be deleted from Plaintiffs' account, and that E*Trade would credit Plaintiffs' account for the full $400,000 value of the ARS investment.

49. Plaintiffs accepted Defendant's offer because it was consistent with their overall investment goals and expectations, as well as with their immediate needs. Plaintiffs took no other steps to investigate or recover their losses, based on these promises from E*Trade, nor did Plaintiffs make any further demands on Defendant in consideration for this offer.

50. Despite Plaintiffs' acceptance of E*Trade's offer, and reliance thereon, no redemption or reimbursement for Plaintiffs was ever effected by E*Trade or any other entity. Defendant has consistently refused and rejected Plaintiffs repeated demands that E*Trade honor its agreement with Plaintiffs.

51. Plaintiffs, for their part, have performed all of the acts required by them as part of the consideration for their agreement with E*Trade.

## COUNT VI
## (RESCISSION)

52. Plaintiffs reallege, as though set forth in full, the allegations contained in paragraphs 1-51 herein.

53. The ARS investment was misrepresented and falsified by Defendant to Plaintiffs. In fact, the investment was not suitable for Plaintiffs regardless of what disclosures were made by Defendant, who in fact made no disclosures whatsoever to Plaintiffs about the ARS prior to the actual

investment. Plaintiffs needed a highly liquid and secure investment, which need they described to E*Trade repeatedly. Had Plaintiffs known the true facts about ARS and ARS auctions and investment products, Plaintiffs would never have agreed to allow their funds to be invested.

54. Accordingly, Plaintiffs' ARS investment should be rescinded, in accordance with California Civil Code section 1689 (b) (1) and (2), and other applicable law. Defendant coerced and misled Plaintiffs into the investment through fraud, omission and misrepresentation. Moreover, there was a complete failure of consideration for Plaintiffs' investment because Plaintiffs did not receive the benefits of the investment that they were promised or reasonably expected, contrary to Defendant's representations.

WHEREFORE, Plaintiffs pray for relief from E*Trade as follows:

1. That Plaintiffs recover money damages for the losses suffered as a consequence of Defendant's tortious acts and conduct, according to proof at trial;

2. For damages for Defendant's breach of contract with Plaintiffs, according to proof at trial;

3. For rescission of Plaintiffs' investment contract with Defendant, in the amount of $400,000, plus recovery of costs and fees associated with Plaintiffs' investment, according to proof at trial;

4. For all consequential Plaintiffs have suffered, including but not limited to the costs and fees they incurred and paid incident to their investment activities and their loss of use of the invested monies;

5. For punitive and exemplary damages in an amount according to proof at trial and sufficient to deter Defendant's conduct;

6. For prejudgment and post judgment interest in an amount according to proof at trial;

7. For costs of suit herein; and

///

8.  For such other and additional relief as the Court deems proper.

Dated: August 16, 2011          FREELAND COOPER & FOREMAN LLP


                                By:  /s/
                                    _____
                                    DANIEL T. BERNHARD
                                    Attorneys for Plaintiffs
                                    William Bridge, Jr. and Michele Profant

## JURY TRIAL DEMAND

Plaintiffs hereby demand a trial by jury on all causes of action subject to determination by a jury.

Dated: August 16, 2011          FREELAND COOPER & FOREMAN LLP


                                By:  /s/
                                    _____
                                    DANIEL T. BERNHARD
                                    Attorneys for Plaintiffs
                                    William Bridge, Jr. and Michele Profant